JOHN N. TEDFORD, IV (State Bar No. 205537)
*jtedford@DanningGill.com*
ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
MICHAEL G. D'ALBA (State Bar No. 264403)
*mdalba@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Proposed attorneys for Airport Van Rental, Inc.
and affiliated Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:20-bk-20876-BB |
| AIRPORT VAN RENTAL, INC., et al.,[1] | Chapter 11 |
| Debtors and Debtors in Possession. | **DECLARATION OF YAZDAN IRANI IN SUPPORT OF FIRST DAY MOTIONS** |
| ☒  Affects all Debtors | Date:    [*See notice of hearing*] |
| ☐  Affects the following Debtor(s): | Time:    [*See notice of hearing*] |
| | Place:    [*See notice of hearing*] |

---

[1] Concurrently herewith, Airport Van Rental, Inc., a California corporation ("AVR California"), and four of its affiliates have filed motions for orders directing the joint administration of their chapter 11 cases. In anticipation that the joint administration motion will be granted, the debtors' first day motions and this declaration are being filed only in AVR California's case. The debtors and their tax identification numbers are identified in the *Notice Identifying Jointly Administered Debtors* to be filed with the Court in this case.

1627725.1  26982

1    I, Yazdan Irani, declare and state as follows:

2    1.    I am a founder of, and currently am the Chief Executive Officer of, Airport Van

3    Rental, Inc., a California corporation ("**AVR**" or, if the context requires, "**AVR California**").

4    2.    On December 11, 2020 (the "**Petition Date**"), AVR California and certain of its

5    affiliates (collectively the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of

6    title 11 of the United States Code (the "**Bankruptcy Code**"), thereby commencing chapter 11 cases

7    for the Debtors (collectively the "**Chapter 11 Cases**").  In order to ease their transitions into

8    operations as debtors in possession, the Debtors have filed motions seeking various types of "first-

9    day" relief (the "**First Day Motions**").  This declaration is submitted to (a) offer the Court and

10    parties in interest background on the Debtors and the circumstances leading to the commencement

11    of the Chapter 11 Cases, and (b) provide an evidentiary basis for the relief requested in the First

12    Day Motions.

13    3.    In the First Day Motions, the Debtors are seeking the following types of relief:

14        (a)    joint administration of the Chapter 11 Cases;

15        (b)    an extension of time, to January 8, 2021, for the Debtors to file schedules

16    and statements of financial affairs;

17        (c)    an order limiting the number of parties that must be served with most notices

18    filed and served in the Chapter 11 Cases;

19        (d)    authority to use cash collateral, including to make payments to AVR's

20    Lenders (defined later in this declaration) in accordance with an adequate protection program

21    designed to ensure that the Lenders receive compensation for the postpetition decrease in value of

22    vehicles in which they have an interest;

23        (e)    authority to honor customer deposits;

24        (f)    authority to maintain the Debtors' existing cash management system, in

25    which all revenues and expenses are received into and paid out of AVR California's bank accounts,

26    and to maintain certain prepetition bank accounts that are needed to ensure that there is no

27    disruption in the Debtors' receipt of revenues;

28

1627725.1  26982                                    1

(g)    authority to pay wages, salaries and commissions, and to honor sick, vacation and personal pay benefits that accrued prepetition, up to $13,650 per employee; and

(h)    an order prohibiting utilities from discontinuing services to the Debtors' facilities.

4.    I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.  Unless stated otherwise, all facts in this declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team, my discussions with outside advisers to the Company, my review of documents and information concerning the Debtors' operations, financial affairs, and restructuring efforts, and/or my personal opinion based upon my experience and general knowledge about the Debtors.

5.    I am over the age of 18 and am authorized to submit this declaration on behalf of the Debtors.  If called to testify, I would testify to the matters set forth in this declaration.

## INTRODUCTION

6.    AVR is in the business of renting vehicles, especially large passenger vans, minivans, and SUVs, to individual consumers, corporations, and governmental entities.  It was the first rental company in Los Angeles, San Francisco and other cities in California to specialize in the van rental business.  Over the last thirteen years, AVR has grown into a recognized industry leader in van rentals.

7.    My wife Kimberly ("**Kim**") and I formed AVR California in 2007.  Prior to the COVID-19 pandemic, the corporate office was located at 5235 West 104th Street, Los Angeles, California, near the Los Angeles International Airport.  The premises – a three-acre lot with an indoor parking facility – housed the Company's Los Angeles rental operations and airport parking business.

8.    AVR was formed because we recognized that car rental companies do not adequately serve the needs of customers who need space for five or more passengers.  Many of our "retail" customers are sport groups, churches, and large families.  We pride ourselves in offering quality vans for good prices.

9.      We also provide excellent customer service to help our customers determine exactly what kind of vans they need.  We maintain an online reservation system similar to other car rental companies, at www.airportvanrentals.com.  But we also encourage potential customers to contact us at any time to make sure they get exactly the type of van that they need.

10.     At first, AVR concentrated on growing its business in California.  Our first expansions outside of California were to Las Vegas and Houston.  Over the years we also opened other locations in Colorado, Illinois, Indiana, Iowa, Florida, Georgia, North Carolina, Oregon, Texas and Utah.  Earlier this year, before the pandemic, AVR was operating a fleet of approximately 2,300 vehicles and was operating in 16 cities in 10 states, near major airports.

11.     As discussed further below, of the $39 million of revenue generated by AVR in 2019, approximately 85% was generated from retail customers.  Our retail locations are located near airports, and rely heavily on air travelers who need more than standard passenger vehicles at their destinations.

12.     Although many segments of the economy have been adversely affected by the pandemic, it has had a substantial effect on the travel sector.  According to TSA data, on March 1, 2020, approximately 2.3 million travelers passed through airport security checkpoints.  On March 16, 2020, approximately 1.26 million passengers were screened.  From March 17, 2020, to November 30, 2020, there were only five days (October 18, November 20, November 22, November 25, and November 29) on which the TSA screened over one million passengers.  During the same period last year, the TSA screened less than two million passengers only 23 times, and never fewer than 1.59 million passengers.

///

///

///

///

///

///

///

13.    The following is a chart showing the number of passengers screened from March 31, 2019, through November 30, 2019 (blue) compared to the number of passengers screened during the same time period in 2020 (orange):



14.    The pandemic has also had an adverse effect on the second-highest grossing part of our business:  contracts with private corporations.  Simply, as corporations have cut back on both business and leisurely activities, their demand for rental vans has declined.

15.    A division which has performed relatively well during the pandemic – though not as well as it could in normal circumstances – is our government vanpool business.  Over the last few years, AVR has entered into a number of contracts with governmental entities in Los Angeles, Dallas, and other cities to supply and maintain vans driven by employees as part of government-sponsored "vanpool" programs.  I anticipate that our vanpool programs could continue to grow and become a bigger part of the overall business.

16.    Overall, the pandemic has had a drastic effect on AVR's business.  Whereas we generated $39 million of revenue in 2019, we project that AVR will generate approximately $14 million of revenue this year.  We have reduced the size of our fleet from approximately 2,300 vehicles on January 1, 2020, to approximately 1,100 today.  At the beginning of the year we had 210 employees; today we have approximately 60.  We even reached an agreement with our LAX-

area landlord to terminate the lease.  Many employees are now working from home, and AVR's accounting department has been moved to Salt Lake City (requiring us to restructure the accounting department and bring in new accounting staff).

17.    The Debtors enter these Chapter 11 Cases with approximately $40 million in total financial debt, $27 million of which relates to vehicle financing activities.  This debt burden was sustainable last year, when AVR's revenues were three times as much as this year.  However, under the circumstances, AVR needs to conduct an orderly liquidation of its business or the debt must be restructured if AVR is to continue doing business.

18.    Presently, the Debtors intend to sell certain of its assets, and assign certain of its liabilities, to a new company ("**Newco**") that has been or will be formed by certain of AVR's officers.  The sale will be subject to Bankruptcy Court approval, and I expect it to be subject to overbids.  I anticipate that I will be involved in Newco only if Newco chooses to hire me as a consultant or employee.  I anticipate that all assets not sold to Newco will be assigned to a "liquidating trust" to be liquidated by a trustee and distributed to creditors.

19.    AVR remains open to the possibility of a chapter 11 plan that, among other things, (a) consolidates the Debtors (and possibly some non-Debtors) into one entity, (b) pays the Lenders the full amount of their secured claims during the same period of time those claims would be paid under their existing agreements, and (c) uses future earnings to make distributions to general unsecured creditors over a period of years.  Absent a major source of new funding, I anticipate that such a plan will require the cooperation of substantially all of the Lenders and the consent of unsecured creditors.

20.    To accomplish an orderly liquidation or confirmation of a chapter 11 plan, the Debtors intend to, among other things, (a) make adequate protection payments to compensate the Lenders for the decrease in value of secured creditors' collateral, and (b) continue to sell vehicles and pay the net sales proceeds to the Lenders, during the pendency of this case.

**AVR CALIFORNIA AND AFFILIATES**

***Debtors***

21.     AVR California is the lead debtor in these Chapter 11 Cases.

22.     Over the years, multiple separate entities – a number of which are also called "Airport Van Rental, Inc." – have been formed in other states in which the Company was conducting business.  Except as to the Texas entity which is a debtor in these Chapter 11 Cases, none of the Debtors have ownership interests in these entities, a list of which is included in Exhibit "1" to the Appendix of Exhibits filed concurrently herewith.

23.     In May 2011, "Airport Van Rental, Inc." was incorporated in Nevada ("**AVR Nevada**").  AVR Nevada is included in these Chapter 11 Cases because, among other things, AVR currently is operating in the state of Nevada, certain of the Company's employees are employees of AVR Nevada, and the Company has substantial debts associated with its Nevada operations.

24.     In January 2015, Airport Van Rental, LLP, was formed in Texas ("**AVR Texas**").  AVR Texas is included in these Chapter 11 Cases because, among other things, AVR currently is operating in the state of Texas and certain of the Company's employees are employees of AVR Texas.

25.     In March 2018, "Airport Van Rental, Inc." was incorporated in Georgia ("**AVR Georgia**").  AVR Georgia is included in these Chapter 11 Cases because, among other things, AVR currently is operating in the state of Georgia and certain of the Company's employees are employees of AVR Georgia.

26.     In June 2019, AVR Vanpool, Inc. ("**AVR Vanpool**"), was incorporated in California.  AVR Vanpool is sometimes referred to as a division or dba of AVR California.  AVR Vanpool is included in these Chapter 11 Cases because, among other things, it is the entity that acquired certain vehicles used by the Company, and it also is the entity that contracted to provide vanpool services to a Dallas-area governmental entity.

27.     The first chapter 11 petition was filed by AVR California.  During the last 180 days, AVR California's principal place of business has been located in the City of Los Angeles, within the Central District of California.  My understanding is that this Court is therefore a proper venue

1  for AVR California's Chapter 11 Case.  It is also my understanding that, by virtue of my ownership

2  interests in the other Debtors, the other Debtors are "affiliates" of AVR California and this Court is

3  a proper venue for their Chapter 11 Cases as well.

4         28.     It is my understanding that, absent "joint administration" of the Chapter 11 Cases,

5  the Debtors sometimes will be required to file substantially the exact same pleading in each of the

6  Chapter 11 Cases when seeking certain forms of relief.  This will require the Debtors to incur

7  substantial and unnecessary legal fees and expenses since papers and pleadings will have to be

8  duplicated and adapted to each Chapter 11 Case, and then filed on the docket for each case.  In

9  order to ease the administrative burden and cost on the Debtors, as well as on the Court, creditors

10  and other parties in interest, the Debtors are requesting that the Chapter 11 Cases be jointly

11  administered and that AVR California's case be designated the "lead" case.  If the Chapter 11

12  Cases are jointly administered, the Debtors propose to file papers using the caption attached as

13  Exhibit "2" to the Appendix of Exhibits.

14

15                     ***Non-Debtors***

16         29.     In June 2014, I incorporated a number of entities in California that have been

17  abandoned and are not doing any business.  These include (a) AVR LAX, Inc., (b) AVR ONT, Inc.,

18  (c) AVR SAN, Inc., (d) AVR SFO, Inc., (e), AVR SJC, Inc., (f) AVR SMF, Inc., and (g) AVR

19  SNA, Inc.

20         30.     In December 2014, "Airport Van Rental, Inc" was incorporated in Oregon ("**AVR**

21  **Oregon**").  To the extent it had independent operations, AVR Oregon's operations have been

22  closed, and AVR Oregon is no longer conducting business.

23         31.     In June 2015, "Airport Van Rental, Inc." was incorporated in Indiana ("**AVR**

24  **Indiana**").  To the extent it had independent operations, AVR Indiana's operations have been

25  closed, and AVR Indiana is no longer conducting business.

26         32.     In March 2016, "Airport Van Rental, Inc." was incorporated in Illinois ("**AVR**

27  **Illinois**").  According to the Illinois Secretary of State's website, the entity was involuntarily

28

1  dissolved on November 10, 2020.  To the extent it had independent operations, AVR Illinois'

2  operations have been closed, and AVR Illinois is no longer conducting business.

3      33.    In June 2016, AVR, Inc. was incorporated in Wyoming ("**AVR Wyoming**").  To the

4  extent it had independent operations, AVR Wyoming's operations have been closed, and AVR

5  Wyoming is no longer conducting business.

6      34.    In October 2016, AVR Dallas Properties, LLC ("**AVR Dallas**"), was formed in

7  Texas.  AVR Dallas was created to hold real property located at 7427-7505 Denton Drive, Dallas,

8  Texas, at which the Company's Dallas operations used to be based.

9      35.    In March 2018, "Airport Van Rental, Inc." was incorporated in North Carolina

10  ("**AVR North Carolina**").  To the extent it had independent operations, AVR North Carolina's

11  operations have been closed, and AVR North Carolina is no longer conducting business.

12      36.    In September 2019, Airport Van Rental – Arizona, Inc., was incorporated in Arizona

13  ("**AVR Arizona**").  To the extent it had independent operations, AVR Arizona's operations have

14  been closed, and AVR Arizona is no longer conducting business.

15      37.    Generally, in this declaration, the Debtors and the Non-Debtors are referred to

16  collectively as the "**Company**."

17

18                  **EMPLOYEES AND PAYROLL**

19      38.    The Company currently has approximately 60 employees across the United States

20  who receive wages and salaries on a bi-weekly basis.

21      39.    The Company's most recent payroll period ended on December 6, 2020, covering

22  the period from November 22, 2020, through December 6, 2020.  Payroll for that period would

23  normally have been distributed by the payroll service to employees on December 11, 2020 (the

24  Petition Date).  However, in an attempt to reduce the adverse effects of the Debtors' bankruptcy

25  filing on the Company's employees, the Debtors arranged for the payroll to be disbursed on

26  December 8, 2020.

27      40.    The Company's next routine payroll period will end on December 20, covering the

28  period from December 7, 2020, through December 20, 2020.  Commissions earned during the

month of November will be paid at that time as well.  Payment for this period will be transferred to the payroll service on December 22, 2020, and distributed by the payroll service to employees on December 24, 2020.  Since the bankruptcy petitions were filed on December 11, 2020, four days' worth of wages and salaries earned during this period were earned prepetition (the "**Prepetition Earnings**").  Estimates of the amounts earned during those four days, and estimated commissions earned during November, are included in a spreadsheet attached as Exhibit "3" to the Appendix of Exhibits.  The Debtors are requesting authority to pay non-insiders' Prepetition Earnings as part of the next routine payroll, and to pay insiders' Prepetition Earnings once the Debtors are authorized to pay insider compensation.

41.    The Debtors' request for authority to pay Prepetition Earnings to employees relates only to employees who are currently employed by the Debtors.  If an employee voluntarily quits or is terminated, the Debtors are not seeking authority to pay such employee.

42.    In addition to regular wages and salaries, the Debtors offer their employees certain benefits.  Benefits offered by the Debtors to all full time employees consist of vacation and sick leave pay, contributions for medical, dental and life insurance benefits, and contributions to an employee 401(k) plan (collectively the "**Employee Benefits**").

43.    All of the Debtors' full-time employees are entitled to accrue vacation and sick leave pay.  Generally, from the time that an employee's entitlement to accrue vacation or sick leave pay vests, the employee earns two weeks of vacation leave pay per year, and forty hours of sick leave pay per year.  Vacation pay is capped at a maximum of 3 weeks, and sick pay is capped at a maximum of 40 hours.

44.    In the ordinary course of business, the Debtors do not allow employees to cash out accrued vacation or sick leave pay, except in the case of an employee's termination.  I believe that, as of today, with one exception, the amount of each employee's accrued vacation, personal and sick leave pay is less than $13,650.  As of November 30, 2020, my accrued vacation and sick leave pay was approximately $16,700.  A schedule of accrued vacation, personal and sick leave pay is included in Exhibit "3" to the Appendix of Exhibits.

45.     The Debtors are requesting authority to honor the Employee Benefits earned prior to the Petition Date.  As to me, because my accrued Employee Benefits exceed $13,650, the Debtors are requesting authority to honor my Employee Benefits only in such amount that my prepetition salary (i.e., salary earned from December 7, 2020 through December 10, 2020) and prepetition Employee Benefits total $13,650.

46.     For certain employees, the Company contributes toward the premiums for basic medical insurance under policies provided and operated by Anthem and Kaiser (the "**Medical Plan**").  The Company contributes toward the premiums for approximately 41 employees.  The amount paid by the Debtors per employee per month ranges from approximately $452 to $2,027.  I believe that, as of today, medical insurance premiums are current.

47.     For certain employees, the Company contributes toward the premiums for dental insurance under policies provided by United Concordia (the "**Dental Plan**").  The Company contributes toward the premiums for approximately 26 employees.  The amount paid by the Debtors per employee per month ranges from approximately $23.75 to $159.10.  I believe that, as of today, dental insurance premiums are current.

48.     For all full-time employees, the Company provides life insurance under policies provided and operated by Anthem Blue Cross Life.  The Debtors pay $5.75 per employee per month for the employees' life insurance coverage.  The aggregate amount paid by the Debtors for all of their employees per month is approximately $300.  I believe that, as of today, life insurance premiums are current.

49.     I believe that the continued provision of coverage to employees under the Medical Plan and the Dental Plan is a vital component of the Employee Benefits provided to those employees.  I also believe that the continued provision of life insurance coverage to employees is an important component.  As a result, I believe that it is important that the Debtors continue providing such benefits and make any necessary payments with respect to any amounts incurred prior to today, and continue providing coverage under the Medical Plan and the Dental Plan and pay life insurance premiums in the ordinary course of business.

50.    I believe that, except to the extent that employees' vacation and sick leave pay has been earned and not yet been paid to the employees in the ordinary course, the Debtors are current on all of their obligations relating to the Employee Benefits.

51.    I believe that the Debtors' employees' skills, and their knowledge and understanding of the Debtors' operations, are essential to an effective reorganization of the Debtors' business or maintenance of the business pending a sale under section 363 of the Bankruptcy Code.

52.    I also believe that it is important that the Debtors pay employees' outstanding wages and salaries, and honor all of the Employee Benefits, to avoid an interruption in the Debtors' business.  If the Debtors do not do so, there is a risk of unmanageable turnover of the Debtors' work force, and I believe that employees' morale will very likely decline drastically due to, among other things, the economic burdens faced by employees in these tough times.  I believe that many of the Debtors' employees may live paycheck to paycheck, and would suffer harm if they were to not receive payment for the work they performed prior to today.

53.    It is my understanding that the term "insider" is defined in the Bankruptcy Code to mean, with respect to a debtor that is a corporation, (a) a director of the debtor, (b) an officer of the debtor, (c) a person in control of the debtor, (d) a partnership in which the debtor is a general partner, (e) a general partner of the debtor, and (f) a relative of a general partner, director, officer, or person in control of the debtor.  It is also my understanding that the term "insider" is defined to mean, with respect to a debtor that is a partnership, among other things, (a) a general partner in the debtor, (b) a relative of a general partner in the debtor, and (c) a person in control of the debtor.  I believe that the following employees of the Company are insiders:

(a)    Kim and me.  We founded AVR California.  I currently serve as Chief Executive Officer of AVR California.  Kim currently serves as President and Secretary of AVR California.

(b)    Aria Irani ("**Aria**").  Aria, my son, joined AVR in June 2017.  He currently serves as AVR's Chief of Staff.  He founded AVR's vanpool division in or about November 2017, and has been the director of AVR's vanpool operations ever since.

1    (c)    Cesar Leyva ("**Leyva**").  Leyva is the Vice President of Fleet Operations and

2 Vice President of Business Development for AVR.  He has been with the Company since 2009, and

3 is an instrumental part of the Company's operations.  He is one of the co-founders of AVR's

4 vanpool division.

5    54.    My understanding is that the Debtor is required to serve a Notice of

6 Setting/Increasing Insider Compensation, and parties have an opportunity to object to the notice,

7 before compensation is paid to insiders.  The Debtors intend to comply with those requirements

8 with respect to compensation to be paid to the individuals identified above.

9

10    **AVR's Professionals**

11    55.    Since 2011, AVR's general counsel for business and litigation matters has been Joel

12 Glaser APC.  Its principal, Joel Glaser, has significant experience in business litigation,

13 employment practices liability, products liability and personal liability.  Mr. Glaser represents AVR

14 in, or is otherwise familiar with, all of AVR's pending litigation matters.  Subject to Court

15 approval, AVR intends to retain Mr. Glaser's firm to continue to represent it as non-bankruptcy

16 counsel.  Mr. Glaser's current hourly rate is $250 per hour.

17    56.    On or about September 4, 2020, AVR retained Kevin S. Tierney as a consultant to

18 evaluate AVR's financial situation, advise AVR as to the best course of action for a plan of

19 reorganization, and communicate with critical vendors in an effort to establish a consensual out-of-

20 court work-out or chapter 11 plan of reorganization.  Subject to Court approval, AVR intends to

21 retain Mr. Tierney in AVR's bankruptcy case, as an independent contractor, with the title of "Chief

22 Reorganization Officer."  Mr. Tierney's current hourly rate is $200 per hour.

23    57.    On or about September 20, 2020, AVR retained CSA Partners, LLC ("**CSA**"), to

24 provide financial restructuring services.  The principal of CSA is Anthony Scalese, CPA.  Mr.

25 Scalese has provided, and likely will continue to provide, the majority of the services rendered by

26 CSA to AVR.  Subject to Court approval, AVR intends to retain CSA as a financial consultant in

27 AVR's bankruptcy case.  Mr. Scalese's current hourly rate is $200 per hour.

28

1627725.1  26982    12

58.     On or about October 22, 2020, AVR retained Danning, Gill, Israel & Krasnoff, LLP ("**Danning Gill**"), to provide insolvency-related legal advice.  Subject to Court approval, AVR intends to retain Danning Gill to represent it as its insolvency counsel in this bankruptcy case.  The attorneys at Danning Gill principally responsible for representing AVR in this case are John N. Tedford, IV (currently $650 per hour), Zev Shechtman (currently $535 per hour), and Michael G. D'Alba (currently $535 per hour).

59.     For 2018 income tax returns filed by AVR and related entities, AVR's outside tax accountant was El Segundo-based Beach Freeman Lim & Cleland, LLP.  For its 2019 income tax returns, AVR used Pasadena-based HKG LLP ("**HKG**").  AVR has not yet determined whether the use HKG, or another firm, as its tax accountant during this bankruptcy case.

### CONSOLIDATED NATURE OF THE DEBTORS' OPERATIONS

60.     In most respects, the Company operates like a consolidated entity.  The majority of AVR's business is conducted by AVR California.  Revenue generated by the Company is deposited into accounts held in the name of AVR California, and all expenses incurred by the Company are paid by AVR California out of those accounts.  In this way, the Company employs a cash management system in which all income is pooled together to pay the entities' collective expenses. A chart of all bank accounts held in the Debtors' names and comprising the Debtors' consolidated cash management and disbursement system (the "**Cash Management System**") is attached as Exhibit "4" to the Appendix of Exhibits.  Among other things, the schedule identifies the bank at which each account is placed, the type of account, the cash balance as of November 30, 2020, whether customer deposits are held in the account, and whether the Debtors are seeking authority to keep the account open postpetition.

61.     Overall, the Cash Management System is straightforward.

(a)     The Company currently maintains general accounts at Comerica Bank, Bank of the West, 1st Source Bank, and Wells Fargo.

1       (b)    The Company maintains a separate account into which payments from

2  vanpool customers are deposited.  The funds in this account are regularly swept into a general

3  operating account which serves as the Company's main checking account.

4       (c)    The Company maintains a handful of merchant accounts into which

5  customers' debit and credit card payments are deposited.  The funds in those accounts are regularly

6  swept into a general operating account which serves as the Company's main checking account.

7       (d)    The Company maintains an account at Bank of the West which contains

8  funds borrowed under the Small Business Administration's Paycheck Protection Program ("**PPP**").

9  As of November 30, 2020, the balance of the account was approximately $834,000.

10       (e)    The Company also has a payroll account at Bank of the West.

11  Approximately every two weeks, funds are transferred into the payroll account to cover the next

12  payroll.  The Company's payroll service provider, Hospitality Resource Center, LLC ("**HRC**"),

13  draws against the account to pay employees and transmit withholdings to appropriate governmental

14  entities.

15      62.    It is my understanding that the U.S. Trustee generally requires that Chapter 11

16  debtors close existing bank accounts and establish new "debtor-in-possession" accounts at certain

17  approved depositories.  I believe that a disruption in parts of the Cash Management System –

18  especially the flow of monies through the merchant accounts and a Comerica account that must

19  remain open so Company credit cards may continue to be used – could cause delays in the

20  collection and disbursement of funds, impeding the Debtors' ability to carry out normal business

21  operations and resulting in a loss of income.  Accordingly, the Debtors are requesting authority to

22  continue to maintain existing merchant accounts, the Comerica account tied to the Company's

23  credit cards, and a payroll account at Bank of the West (the "**Continuing Prepetition Accounts**").

24  The Debtors also are requesting authority to continue to use the existing Cash Management System

25  to the extent that AVR California collects all of the Debtors' revenues and pays all of the Debtors'

26  ongoing obligations.

27      63.    I do not believe that the Debtors' creditors will be prejudiced by the continuation of

28  the Cash Management System and maintenance of the Continuing Prepetition Accounts.  All of the

Debtors' other bank accounts have been or are in the process of being closed, and new debtor in possession accounts were opened or are being opened at Bank of the West.  Funds received in the merchant accounts will now be swept into the new DIP account.

64.     It is my understanding that section 345 of the Bankruptcy Code contains provisions regarding deposits and investments maintained by a debtor in possession.  Among other things, I understand that, unless the court orders otherwise, except with respect to a deposit or investment that is insured or guaranteed by the United States or an agency thereof, a debtor must require from an entity with which such money is deposited or invested a bond in favor of the United States, secured by the undertaking of certain corporate sureties, subject to certain conditions.  The Debtors are requesting that they be excused from compliance with section 345 because, among other things, the merchant accounts held at Comerica Bank (which I understand is on the U.S. Trustee's list of approved depositories) and 1st Source Bank (which I understand is not on the U.S. Trustee's list) are special use accounts that generally have small balances because the funds are regularly swept into the general account.  Further, since the purpose of maintaining the general account at Comerica is only to ensure continued use of the Company's credit cards, the balance in that account should remain low.

65.     My understanding is that AVR California is the borrower/lessee under all but one of the Company's vehicle loan/lease agreements.  Although our review of the Company's agreements is ongoing, my understanding is that almost all of the contracts with local landlords, vendors and customers are with AVR California.

66.     Because the entities are owned by Kim and/or me individually, and therefore are not connected through stock ownership with a common parent corporation, the Company's entities do not file consolidated tax returns.  Each entity has a separate taxpayer ID number and my understanding is that for tax purposes AVR's accountants allocate the Company's income and expenses to the separate entities to reflect how much taxable income is earned in each state.

67.     Many of the Company's employees are employees of AVR California.  Others are technically employees of the entity formed in the state in which the employee works.  For example, employees who work in our Las Vegas location are employees of the Nevada corporation.

1    Regardless, AVR California is the only entity with a designated payroll account, and payroll is

2    funded by AVR California from revenues largely generated by AVR California or, more recently

3    PPP loan funds.  HRC, the company's payroll service provider, remits funds withheld from

4    employees' paychecks to appropriate governmental agencies.

5

6                            **THE DEBTORS' CREDITORS, GENERALLY**

7            68.    As of the date of the preparation of this declaration, the Debtors are continuing to

8    gather information needed to prepare the Debtors' schedules, statement of financial affairs, and

9    other documents required by the Court and the Office of the United States Trustee (the "**U.S.**

10   **Trustee**").  Accordingly, I am unable to testify as to exactly how many creditors or potential

11   creditors will appear in the Debtors' schedules.  However, including employees, we currently

12   estimate that the master mailing list will include over 300 creditors and potential creditors.

13           69.    As of today, the Debtors currently employ approximately 60 employees.  Prior to

14   the filing of the Chapter 11 Cases, the Debtors paid all employees their estimated wages and

15   salaries through December 6, 2020.  Employees earned wages and salaries from December 7, 2020,

16   through the Petition Date, and those amounts have not yet been paid.  A few employees are owed

17   commissions earned in November 2020.  In addition, employees have, in the ordinary course of

18   their employment, accrued vacation, personal and sick leave pay.  Estimated amounts owed to

19   employees as of the Petition Date are included in Exhibit "3" to the Appendix of Exhibits.  It is my

20   understanding that, at least to a point, claims that may be asserted by the employees are entitled to

21   priority over general unsecured claims.  As a result, I anticipate that employees will need to be

22   identified in the Debtors' schedules and appear on the consolidated master mailing list to be filed in

23   AVR California's case.

24           70.    It is my understanding that, in the absence of the appointment of an Official

25   Committee of Unsecured Creditors, certain pleadings filed with the Court generally must be served

26   in each case on the creditors holding the twenty largest general unsecured claims against the estate.

27   However, because some creditors (particularly employees) hold claims against one Debtor but not

28

1  others, I understand that, in the aggregate, there are more than twenty entities who will appear on

2  the lists of the top twenty general unsecured creditors in the Debtors' cases.

3      71.    As a result, and in conjunction with the Debtors' motion for joint administration, the

4  Debtors are requesting that whenever applicable bankruptcy rules might require service on the top

5  twenty general unsecured creditors in each case, parties instead be required to serve a consolidated

6  list of the top twenty general unsecured creditors of the Debtors' estates.  A schedule of the top

7  twenty general unsecured creditors is attached as Exhibit "5" to the Appendix of Exhibits.

8

9                                **UTILITIES**

10     72.    In the ordinary course of business, the Debtors currently use electric, natural gas,

11  heat, water, sewer, telecommunications, and other services of the same general type or nature

12  originated and provided by approximately 28 utility companies (collectively the "**Utility**

13  **Companies**").  A spreadsheet identifying the Utility Companies and, among other things, the

14  average amounts invoiced by each of the Utility Companies on a monthly basis, is attached as

15  Exhibit "6" to the Appendix of Exhibits.

16     73.    I understand that the Debtors' filing of their chapter 11 petitions occurred during the

17  middle of the billing cycles for many, if not all, of the Utility Companies.  As a result, as of today,

18  there are likely outstanding prepetition amounts owed to the Utility Companies.

19     74.    I believe that if the utility services to the Debtors' current business locations are

20  disrupted, even for a brief period of time, the Debtors will not be able to operate.  I also believe that

21  an interruption in the Debtors' business will have an adverse effect on the Debtors' relationships

22  with customers, employees, vendors and other persons with whom the Debtors conduct business.  I

23  further believe that such a disruption could severely impact the Debtors' cash flow and ability to

24  reorganize or conduct an orderly sale pursuant to section 363 of the Bankruptcy Code.

25     75.    Based upon the Debtors' cash flow projections, including those included in Exhibit

26  "7" to the Appendix of Exhibits, I anticipate that the Debtors will have adequate cash to meet all of

27  its necessary postpetition operating expenses on a current basis, including payments to the Utility

28  Companies.  However, it is my understanding that section 366 of the Code requires debtors to

1   provide "assurance of payment" to the Utility Companies in the form of a deposit or other

2   enumerated form of assurance.  Accordingly, the Debtors are proposing to deliver to each Utility

3   Company a deposit equal to the average monthly invoice amount (i.e., the amount identified in

4   Exhibit "6") within 45 days of the Court's entry of an order granting the Debtors' motion relating

5   to the form, timing and amount of assurance of payment to be provided.

6

7                           **LIFE CYCLE OF VEHICLES ACQUIRED BY AVR**

8           76.     AVR generally acquires its vehicles from sellers through secondary market vehicle

9   auctions, primarily from Manheim and Odessa, or direct from vehicle manufacturers (using funds

10  borrowed from lenders) or through "leases."  My understanding is that the leases may be "disguised

11  sales" rather than "true leases" because, among other things, AVR remains liable to the "lessor" for

12  the full amount owed for a vehicle even after it is sold at the end of the lease term.  Therefore, for

13  purposes of this declaration, each lender/lessor is referred to as a "**Lender**."

14          77.     When a vehicle reaches a particular age – either in terms of months or years, or in

15  terms of odometer mileage – it must be sold.  AVR accomplishes this by delivering the vehicle to a

16  wholesale vehicle auction company.  AVR's vehicles are typically sold by an auction company

17  called "**Manheim**," which I believe is the leading provider of vehicle remarketing services in the

18  United States.  Manheim auctions individual vehicles and the sale proceeds are distributed to the

19  Lender.  If the sale price exceeds the amount that AVR owes for that vehicle, the excess usually is

20  paid to AVR.  However, as noted below, if the sale price is less than the amount that AVR owes for

21  that vehicle, AVR is responsible for paying the shortfall to the Lender directly.

22          78.     An example of how this generally works, contractually, is as follows:

23                  (a)     In or about July 2019, AVR entered into a Commercial Motor Vehicle Lease

24  Agreement (the "**MiFleet Agreement**") with United Rental Group, LLC ("**MiFleet**").  The MiFleet

25  Agreement provided that MiFleet would "lease" AVR vehicles listed and described in Vehicle

26  Lease Order ("**VLOs**") executed in accordance with the MiFleet Agreement.  The term of the

27  "lease" for each vehicle was set forth in the relevant VLO and referred to as the "Vehicle Lease

28  Term."  The duration of the Vehicle Lease Term could not be less than six months.

(b)    In or about September 2019, AVR entered into an VLO for 367 2018 Dodge Grand Caravan SXT minivans.  The VLO included a "Commitment to Purchase" pursuant to which, notwithstanding any provision to the contrary in the MiFleet Agreement, AVR was required to purchase all of the vehicles from MiFleet at the end of the term.

(c)    For each vehicle, the VLO identified the following:

(i)    "Capitalised Cost."  This was the value of the vehicle when it was acquired by AVR.  This is the equivalent of the purchase price.

(ii)    "Residual."  This was the anticipated value of the vehicle at the end of the 12-month term.  This is the amount that AVR must pay MiFleet to "purchase" the vehicle at the end of the term.

(iii)    "Monthly Depreciation Charge."  This is the Capitalised Cost minus the Residual, divided by the number of months in the term.

(iv)    "Monthly Rental."  This is the amount that AVR is required to pay MiFleet each month, in addition to the "monthly depreciation charge."  This is the equivalent of interest, calculated against the original purchase price (the "capitalised cost") of the vehicle.  For the above-referenced September 2019 VLO, this equated to interest of 31.8% per annum.

(d)    At the end of the term, AVR is required to "purchase" the vehicles.  The customary way for AVR and similar companies to "purchase" their vehicles is to deliver the vehicles to a wholesale vehicle auction company and have them sold.  If a vehicle sells for less than the Residual, AVR is required to make up the difference regardless of the true market value of the vehicle.

79.    AVR's agreements with other Lenders are similar.  Some Lenders' agreements may also provide that the Lender gets to keep the excess sales proceeds if a vehicle is sold for more than the Residual, although I believe AVR always is required to pay the shortfall if the vehicle is sold for less than the Residual.  This ensures that the Lender receives at least the full price for which the vehicle was acquired by AVR, and ensures that AVR is the party who bears the loss if the market value of a vehicle at the end of the term is less than the Residual.

80.    During "normal" times, these financing arrangements work.  However, the

pandemic has had a severe adverse impact on AVR's revenues, impacting AVR's ability to make

monthly payments.  At the same time, the demand for used passenger vehicles decreased.  As AVR

reduced its fleet size during the pandemic by selling hundreds of vehicles, hundreds sold for less

than the Residual amounts.  AVR was forced to liquidate much of its vehicle fleet prematurely

(much earlier than it would have during its normal operating cycle), which resulted in many

vehicles being upside down when they were sold at auction.  I believe that during "normal" times

AVR may have experienced gains from sales of its vehicles in the ordinary course of business, but

the forced sales required this year resulted in unplanned losses.

### EFFECTS OF THE COVID-19 PANDEMIC

81.    Through its expansion to the midwestern and eastern United States, and its increased

focus on vanpools (discussed later in this declaration), the Company was poised to experience

substantial growth in sales volume and revenue.  From 2011 through 2019, the Company's

revenues increased from approximately $3.8 million to $39 million:



82.    Of the $39 million of revenue in 2019, $33 million (85%) was generated from retail

customers.  Our retail locations are located near airports, and heavily rely on air travelers who

require larger passenger vehicles at their destinations.  Thus, our retail business is highly correlated to the rate of air travel to locations in which we are located.

83.    Not surprisingly, our retail business has suffered significantly as a result of the pandemic, and particularly as a result in the decrease in air travel.  Whereas our retail revenue totaled $33 million in 2019, we project that our retail revenue will total approximately $10 million in 2020.

84.    The other $6.1 million of revenue in 2019 was generated from corporate accounts ($4.4 million) and our burgeoning government vanpool business ($1.6 million).  The pandemic has had a substantial adverse effect on our corporate account revenue.  In contrast, we project that revenues from government vanpools will finish slightly ahead of last year.  Together, we project that our corporate/vanpool revenue will total approximately $4 million in 2020.

85.    In early 2020, we recognized that the pandemic was going to have a major, long-term negative effect on our business, particularly the retail business.  The Company was proactive, and made significant cuts to its fleet by selling off approximately half of its fleet.  Whereas the Company had approximately 2,300 vehicles before the pandemic took hold, it currently has approximately 1,100 vehicles.

86.    Also in response to the pandemic, the Company closed a number of its locations to reduce costs.  Today, the Company is operating in 7 cities in 5 states, with locations near major airports:

| | |
|---|---|
| California | Los Angeles (LAX) and Burlingame (SFO) |
| Colorado | Commerce (DEN) |
| Georgia | Hapeville (ATL) |
| Nevada | Las Vegas (LVS) |
| Texas | Houston (IAH) and Irving (DFW) |

87.    In addition to closing locations and reducing the number of vehicles in the fleet, the Company reduced the number of its employees.  In early 2020, the Company had over 210 employees throughout the United States.  Today, we have approximately 60 employees across the United States.

## ADEQUATE PROTECTION PROGRAM IMPLEMENTED BY AVR

88.     Throughout much of this year, the Company has tried to work with its Lenders to develop a mutually beneficial strategy to deal with the adverse effects of the pandemic.  Over the past few months, the Company has developed and implemented an "**Adequate Protection Program**" which is designed to pay the Lenders the full value of their collateral, plus interest at a rate of 6.0% per annum.  In support of its request for authority to use cash collateral, the Debtors are proposing to continue making payments in accordance with the Adequate Protection Program.

89.     To calculate the monthly payments to be made to each Lender under the Adequate Protection Program, we estimated the decrease in value of the Lender's collateral during the previous 30-day period.  My understanding is that, in a bankruptcy case, this would be referred to as the "diminution" or decrease in value of the Lender's interest in its collateral.

(a)     First, based on current odometer readings, we determined the current value of each of the Company's vehicles using the gold standard pricing tool used by car sellers in the industry – the Manheim Market Report ("**MMR**").  Manheim is a wholesale vehicle auction company which operates vehicle auction sites throughout the country.  Using the data Manheim obtains from hundreds of thousands of vehicles sold, the MMR reliably estimates the price that would be achieved from the auction of any particular vehicle based on its make, model and mileage.  Our vehicles typically sell for 94% to 102% the MMR, so the MMR has proven to be a very reliable indicator of the auction value of our vehicles.

> *For purposes of illustration:  Assume that, on September 15, 2020, a particular 2018 GMC Savana had 40,000 miles, and the then-current MMR for that vehicle was $20,000.*

(b)     Second, for each vehicle, we identified the mileage at which the vehicle will be sold in the ordinary course of the Company's business.  Using the MMR, we then estimated how much each vehicle will be sold for at auction.

> *Continuing the illustration:  Assume that a 2018 GMC Savana is sold at auction once it has 120,000 miles, and that the current MMR for such a vehicle (with 120,000 miles) is $10,000.*

///

///

(c)     Third, based on the information above, we determined the average depreciation cost for each vehicle per mile.

> *Continuing the illustration:  Over the next 80,000 miles, the MMR for the vehicle will decrease from $20,000 to approximately $10,000. Thus, the estimated depreciation cost is 12.5 cents per mile.*

(d)     Fourth, we multiplied the depreciation cost per mile by the number of miles actually consumed during the last 30-day period.  This provides the estimated decrease in the value of the vehicle during the last 30 days.

> *Continuing the illustration:   From September 15, 2020, through October 15, 2020, the vehicle is driven 2,000 miles.   Thus, the estimated decrease in value of the vehicle during the 30-day period was $250.*

90.     After conducting this calculation for each vehicle, we calculated the amounts that needed to be paid to each Lender to compensate it for the decrease in value of its collateral over the previous 30 days.  On November 20, 2020, the Company paid eleven Lenders an aggregate of approximately $200,000 to compensate them for the decrease in value of their collateral from October 15, 2020, to November 15, 2020.

91.     In addition, the Company paid each Lender interest based on the MMR value of its collateral, at a rate of 6.0% per annum.  I believe that 6.0% per annum is a reasonable rate of interest required by lenders in this industry.  On November 20, 2020, the Company paid the eleven Lenders an aggregate of approximately $107,000 of interest, based on the MMR values of their collateral as of October 15, 2020.

92.     Finally, as part of the Adequate Protection Program, the Company also paid each Lender proceeds from auctions of the Lender's collateral (if any).  The Company continues to sell vehicles in the ordinary course of its business.  It also is continuing to downsize its fleet when and where appropriate.  When a vehicle is sold, the Company is required to pay the net sale proceeds to the Lender that has a lien on the vehicle or, in the case of a "lessor," the Lender that is the record owner of the vehicle.

///

///

93.    Altogether, in October and November the Company paid Lenders the following amounts pursuant to the Adequate Protection Program:

| Lender | Mileage Payments | Interest Payments | Defleet Proceeds | Other | Total |
|---|---|---|---|---|---|
| 1st Source | 96,104 | 50,327 | 752,304 | 0 | 898,735 |
| AFC | 94,439 | 45,450 | 209,984 | 0 | 349,873 |
| Hincklease | 52,826 | 34,852 | 151,762 | 94,225 | 333,665 |
| Hitachi | 27,338 | 4,252 | 60,274 | 0 | 91,864 |
| Sumitomo | 6,190 | 2,460 | 0 | 0 | 8,650 |
| Merchants | 9,535 | 1,524 | 0 | 0 | 11,059 |
| United Mile | 26,841 | 9,036 | 68,845 | 0 | 104,722 |
| Selig | 22,512 | 16,674 | 40,787 | 11,200 | 91,173 |
| Sutton | 36,431 | 22,768 | 0 | 0 | 59,199 |
| Union Leasing | 43,997 | 31,497 | 942,710 | 14,000 | 1,032,204 |
| United Leasing | 4,146 | 1,196 | 0 | 0 | 5,342 |
| | 420,359 | 220,036 | 2,226,666 | 119,425 | 2,986,486 |

94.    In connection with its request for authority to use cash collateral, AVR is proposing to make adequate protection payments to Lenders in accordance with the Adequate Protection Program described above.  I believe that doing so will compensate the Lenders for any decrease in value of the vehicles in which they have security interests.

## LONG-TERM CONTRACTS WITH GOVERNMENTAL

## AND NON-GOVERNMENTAL ENTITIES

95.    Not surprisingly, the number of "retail" customers renting vans has declined significantly because of the pandemic.  Fortunately, in 2017, the Company identified the synergies between its core business of renting vehicles to retail customers and the vanpool industry.  Since then, the Company has placed greater emphasis on long-term vanpool contracts with governmental and non-governmental entities, reducing its dependency on retail customers.

96.    The Company has multiple contracts to provide vans to governmental agencies. This has become an important part of its business, as government agencies have implemented or expanded their vanpool programs, and increasingly seek to replace gasoline-power vans with hybrid and electric vans that the Company can supply.  The Company already has been approved for multiple government contracts, and is looking to expand its business with governmental entities.

97.    For example, in or about August 2018, AVR was awarded a "Vanpool Vehicle Supplier Bench Contract" by the Los Angeles County Metropolitan Transportation Authority (the "**MTA**").  The initial term of the contract was two years, with three one-year options.  The MTA exercised the first of the three one-year options this summer.  Over the life of the 5-year contract, the Company may receive revenues of up to $45 million.

98.    In May 2019, AVR was awarded a 3-year contract for vanpool vehicle leasing and services at LAX and the Van Nuys Airport.  The Company's vans are used as part of an Employee Commute Reduction Program, which is part of an employee benefit program provided by Los Angeles World Airports ("**LAWA**").  Under the Company's contract with LAWA, the Company may receive revenues of up to $3.6 million over the 3-year term of the contract.  The Company currently is renting approximately 75 vans to LAWA.

99.    A vanpool contract such as the one with LAWA requires more than just supplying vans.  It is a full turnkey program, with a high expectation of customer service and support.  The Company processes driver applications, preps vanpools, coordinates a delivery schedule, and delivers to each individual vanpool driver his or her assigned vehicle.  With each delivery, the Company reviews safety information and shows specific vehicle features with the driver, explains to the driver how to handle claims, and makes sure the driver knows where the insurance, registration and safety equipment of the vehicle is located.  The Company supplies all maintenance for the vehicles (including preventative maintenance), body work, roadside assistance, and a fully covered insurance program.  When possible, routine maintenance is conducted at the driver's workplace or other convenient location.  The Company's maintenance program for vanpool customers provides a convenient, customer-focused upkeep system.

100.    As part of its contract with LAWA, the Company granted the option of allowing other departments in the City of Los Angeles (the "**City**") and/or other governmental agencies outside of the City to rent vans using the prices, terms and conditions of the LAWA contract.  In August 2019, AVR was awarded a 3-year contract by the Los Angeles Department of Water and Power (the "**DWP**") to rent vans, including a certain type of hybrid van, for the DWP's vanpool program.  Under the contract with the DWP, the Company may receive revenues of up to $4.6

1  million over the 3-year term of the contract.  AVR currently is renting approximately 97 vans to the

2  DWP.

3      101.  In the Los Angeles area, the Company also has contracts to supply vans to, among

4  others, the Los Angeles Harbor Department.  The Company often supplies hundreds of vehicles to

5  U.S. Postal Service locations throughout southern California during the holiday period, when its

6  need for vehicles increases.  During the recent election season, AVR rented approximately 150

7  vans to Los Angeles County for use in the transportation of election-related materials.  AVR is able

8  to satisfy these needs because it already has gone through the process of being an approved supplier

9  of vans for various governmental entities, including the City and the County of Los Angeles.

10      102.  The Company has also grown its vanpool business outside of the Los Angeles area.

11  The Company was approved as a vanpool supplier for, among others, the Victor Valley Transit

12  Authority Vanpool Subsidy program and the San Diego Association of Governments (SANDAG)

13  Vanpool Subsidy Program.  In September 2019, AVR Vanpool was awarded a 5-year contract to

14  provide over 200 vehicles to the Dallas Area Rapid Transit ("**DART**").  Under AVR Vanpool's

15  contract with DART, it may receive revenues of up to approximately $17 million over the 5-year

16  term of the contract.  The company currently is renting approximately 15 vans to DART.

17      103.  We have also entered into contracts to provide vans to private companies, schools

18  and sports teams.  The contracts are typically short term (for example, one to six weeks). but

19  generally have a high continual / recurring renewal rate, which we estimate to be approximately

20  90%,

21      104.  The Company also has been specifically recognized and awarded as a National

22  Recognized Preferred Vendor by Amazon in connection with Amazon's Delivery Service Partner

23  program.  Under that program, delivery persons form small businesses and contract to deliver

24  Amazon packages in Prime-branded blue vans and uniforms.  When Amazon launched the

25  program, it envisioned DSPs with fleets of 20 to 40 vans each.  Using its purchasing power,

26  Amazon negotiated special deals on van leases with companies such as AVR, and requires its DSPs

27  to use preferred vendors.  The Company is currently renting approximately 200 vans to Amazon

28  DSPs.  At this point in the program, Amazon is looking to expand the number of electric vehicles

1  used by its DSPs.  With access to appropriate funding, AVR estimates that it will be able to provide

2  100-200 electric vehicles to DSPs in the coming years.

3

4                          **SOME OTHER FEATURES OF THE COMPANY'S OPERATIONS**

5          105.    The Company has a centralized registration process for its entire fleet, to ensure that

6  registration fees, taxes and tags are completed on time without penalty.  The tags are sent to each

7  office location and installed locally to ensure that each van has the correct plate and paper

8  registration.

9          106.    The Company operates an internal claims department.  This creates consistent

10  documentation and claims handling with regard to vehicle incidents and accidents.  The Company

11  maintains a company-wide fleet insurance policy with National Casualty.  It is not a van/VIN-

12  specific policy.

13          107.    The Company utilizes a fleet management software from Bluebird to track vehicle

14  history, vanpool payments, and vanpool client invoices.  The data maintained by Bluebird includes

15  rental history, maintenance history, monthly mileage, monthly rental rates, registration expiration

16  and details, and driver license and expiration dates.  It also tracks historical mileage (based on the

17  monthly mileage and real mileage of the vanpool) and the upcoming retirement date of a fleet.

18  Using this data, the Company can order new vehicles on a time frame that ensures timely arrival of

19  replacement vehicles that are being retired.

20

21                                      **CUSTOMER DEPOSITS**

22          108.    The Company collects a $200 deposit from retail customers for each rental, and

23  holds the deposit through the entirety of the rental period (an average of three to five days).  The

24  deposit is returned to the customer within three to five days if no damage to the vehicle occurred

25  during the rental period.  If damage did occur, the Company retains the deposit.  Generally, on any

26  given day at this time, the Company holds approximately $40,000 in deposits.

27          109.    My understanding is that customers whose deposits are held on the Petition Date

28  may have unsecured claims against AVR's bankruptcy estate and could be entitled to payment of

1  their claims only through a chapter 11 plan.  I believe that this would be extremely bad for the

2  Company's ability to do business during and after the bankruptcy cases.  Among other things, not

3  returning deposits could lead to negative publicity and the refusal of those customers to rent from

4  the Company in the future.  As a result, the Company is requesting authority to honor its

5  agreements with existing customers by returning their deposits in the ordinary course of the

6  Company's business, regardless of when the deposits were made.

7

8  **SBA LOANS OBTAINED BY AVR AND ITS AFFILIATES**

9      110.    In April 2020, AVR obtained a $500,000 Economic Injury Disaster Loan (the

10  "**EIDL**") from the U.S. Small Business Administration (the "**SBA**").  Under the terms of the loan,

11  payments of $2,437.00 per month are to commence in or about April 2021.  The loan matures in or

12  about April 2050.  A copy of the Loan Authorization and Agreement is included in Exhibit "8" to

13  the Appendix of Exhibits.

14      111.    In connection with the EIDL, AVR granted the SBA a security interest in

15  equipment, fixtures, accounts and non-automotive inventory located at AVR's former address,

16  5235 West 104th Street, Los Angeles, California.  The Company vacated that location in August

17  2020.  On April 6, 2020, the SBA filed a UCC-1 Financing Statement with the California Secretary

18  of State.  A true and correct copy of the financing statement is included in Exhibit "8" to the

19  Appendix of Exhibits.

20      112.    In mid-April 2020, to help pay payroll, rent, utilities and other expenses when the

21  pandemic took hold, the Debtors and one non-Debtor obtained PPP loans from 1st Source Bank

22  ("**1st Source**").  To the extent not forgiven, payments were to commence in or about mid-

23  November 2020.

24      113.    The following entities obtained PPP loans in the following amounts:

25          AVR California..............................................$1,315,000.00
        AVR Arizona ........................................................4,600.00
26          AVR Georgia ......................................................45,600.00
        AVR Nevada.....................................................157,800.00
27          AVR Texas ........................................................80,100.00

28

1    114.    My understanding is that approximately 50% to 60% of the amounts borrowed are

2  eligible for forgiveness.  We are in the process of submitting loan forgiveness applications for all of

3  these loans.

4

5                    **CREDITORS WHO PROVIDED ACQUISITION LOANS**

6                        **OR "LEASED" VEHICLES TO AVR**

7    115.    The Company has identified eleven Lenders that financed the Company's

8  acquisition of vehicles currently being used by the Company.  As discussed earlier in this

9  declaration, the Company started making adequate protection payments to the Lenders in October,

10  and intends to continue making payments pursuant to the Adequate Protection Program.  The

11  Company has also endeavored to review the Lenders' documentation and, where documents could

12  not be located, requested copies of documents from the Lenders.  This effort is ongoing.  A

13  summary chart identifying the amounts owed to each Lender, and the value of each Lender's

14  collateral, as of November 15, 2020, is attached as Exhibit "9" to the Appendix of Exhibits.

15    116.    ***1st Source Bank*** ("**1st Source**").  AVR purchased some of its vehicles using loans

16  made by 1st Source.  Copies of select documents relating to 1st Source's loans are attached as

17  Exhibit "10" to the Appendix of Exhibits.  As of November 15, 2020, 1st Source was owed

18  approximately $5.9 million.  Based on the MMR for each vehicle, the aggregate value of the

19  vehicles acquired with money borrowed from 1st Source is approximately $4.3 million.

20    117.    ***AFC Cal, LLC*** ("**AFC**").  AVR purchased some of its vehicles using loans made by

21  AFC.  Copies of select documents relating to AFC's loans are attached as Exhibit "11" to the

22  Appendix of Exhibits.  As of November 15, 2020, AFC was owed approximately $4.7 million.

23  Based on the MMR for each vehicle, the aggregate value of the vehicles acquired with money

24  borrowed from AFC is approximately $4.1 million.

25    118.    ***Hinckley's, Inc. dba Hincklease*** ("**Hincklease**").  AVR acquired some of its

26  vehicles pursuant to a "lease" or "leases" with Hincklease.  Copies of select documents relating to

27  Hincklease are attached as Exhibit "12" to the Appendix of Exhibits.  My understanding is that

28  Hincklease did not file any UCC-1 financing statement with the California Secretary of State.  As

1  of November 15, 2020, the full face amount owed to Hincklease was approximately $4.0 million.

2  Based on the MMR for each vehicle, the aggregate value of the vehicles currently "leased" from

3  Hincklease is approximately $3.20 million.

4      119.    ***Hitachi Capital America Corp.*** ("__Hitachi__").  AVR purchased some of its vehicles

5  using loans made by Hitachi.  Copies of select documents relating to Hitachi's loans are attached as

6  Exhibit "13" to the Appendix of Exhibits.  My understanding is that Hitachi did not file any UCC-1

7  financing statement with the California Secretary of State.  As of November 15, 2020, Hitachi was

8  owed approximately $456,000.  Based on the MMR for each vehicle, the aggregate value of the

9  vehicles acquired with money borrowed from Hitachi is approximately $289,000.

10      120.    ***Merchants Fleet Management*** ("__Merchants__").  AVR acquired some of its vehicles

11  pursuant to a "lease" or "leases" with Merchants.  Copies of select documents relating to Merchants

12  are attached as Exhibit "14" to the Appendix of Exhibits.  My understanding is that Merchants did

13  not file any UCC-1 financing statement with the California Secretary of State.  As of November 15,

14  2020, the full face amount owed to Merchants was approximately $169,000.  Based on the MMR

15  for each vehicle, the aggregate value of the vehicles currently "leased" from Merchants is

16  approximately $153,000.

17      121.    ***Selig Leasing Co., Inc.*** ("__Selig__").  AVR acquired some of its vehicles pursuant to a

18  "lease" or "leases" with Selig.  Copies of select documents relating to Selig are attached as Exhibit

19  "15" to the Appendix of Exhibits.  My understanding is that Selig did not file any UCC-1 financing

20  statement with the California Secretary of State.  As of November 15, 2020, the full face amount

21  owed to Selig was approximately $1.8 million.  Based on the MMR for each vehicle, the aggregate

22  value of the vehicles currently "leased" from Selig is approximately $1.6 million.

23      122.    ***Sumitomo Mitsui Finance and Leasing Co., Ltd.*** ("__Sumitomo__"), as assignee of

24  Jules & Associates, Inc. ("__J&A__").  AVR purchased some of its vehicles using loans made by J&A.

25  Copies of select documents relating to these loans are attached as Exhibit "16" to the Appendix of

26  Exhibits.  As of November 15, 2020, Sumitomo was owed approximately $385,000.  Based on the

27  MMR for each vehicle, the aggregate value of the vehicles acquired with money borrowed from

28  J&A is approximately $249,500.

123.    ***Sutton Leasing, Inc.*** ("**Sutton**").  AVR acquired some of its vehicles pursuant to a "lease" or "leases" with Sutton.  Copies of select documents relating to Sutton are attached as Exhibit "17" to the Appendix of Exhibits.  My understanding is that Sutton did not file any UCC-1 financing statement with the California Secretary of State.  As of November 15, 2020, the full face amount owed to Sutton was approximately $3.1 million.  Based on the MMR for each vehicle, the aggregate value of the vehicles currently "leased" from Selig is approximately $2.2 million.

124.    ***Union Leasing Trust*** ("**Union**").  AVR acquired some of its vehicles pursuant to a "lease" or "leases" with Union.  Copies of select documents relating to Union are attached as Exhibit "18" to the Appendix of Exhibits.  My understanding is that Union did not file any UCC-1 financing statement with the California Secretary of State.  As of November 15, 2020, the full face amount owed to Union was $3.5 million.  Based on the MMR for each vehicle, the aggregate value of the vehicles currently "leased" from Union is approximately $2.4 million.

125.    ***United Leasing, Inc.*** ("**United**").  Copies of select documents relating to United's loans are attached as Exhibit "19" to the Appendix of Exhibits.  AVR purchased some of its vehicles using loans made by United.  As of November 15, 2020, United was owed approximately $104,000.  Based on the MMR for each vehicle, the aggregate value of the vehicles acquired with money borrowed from United is approximately $108,000.

126.    ***United Mile Fleet, LLC aka United Rental Group, LLC aka MiFleet*** ("**MiFleet**").  AVR acquired some of its vehicles pursuant to a "lease" or "leases" with MiFleet.  Copies of select documents relating to MiFleet are attached as Exhibit "20" to the Appendix of Exhibits.  My understanding is that MiFleet did not file any UCC-1 financing statement with the California Secretary of State.  As of November 15, 2020, the full face amount owed to MiFleet was approximately $1.2 million.  Based on the MMR for each vehicle, the aggregate value of the vehicles currently "leased" from MiFleet is approximately $838,000.  In September 2020, MiFleet filed a complaint against AVR in the Los Angeles Superior Court, case no. 20TRCV00650.  In October 2020, AVR filed an answer.  A case management conference is currently scheduled for mid-January 2021.

## <u>R</u>EQUEST FOR <u>A</u>UTHORITY TO <u>U</u>SE <u>C</u>ASH <u>C</u>OLLATERAL

127.    It is my understanding that, now that the Chapter 11 Cases have been filed, there are provisions of the Bankruptcy Code that must be fulfilled by the Debtors prior to using the proceeds, products, offspring, rents, or profits of property subject to security interests.  Particularly, it is my understanding that the Debtors generally must obtain the consent of secured creditors holding liens against the Debtors' property, or obtain Bankruptcy Court approval of the use of cash collateral. As noted above, a few months ago we starting paying Lenders in accordance with the Adequate Protection Program.  Although the Lenders all accepted the payments, we have had insufficient time or opportunity to obtain their formal consent to the use of cash collateral after the Petition Date.

128.    Exhibit "7" to the Appendix of Exhibits contains operating projections for the first thirteen weeks after the Chapter 11 Cases are filed, through the week of March 8, 2021.  These projections of cash receipts and disbursements were prepared by and based on a review by Anthony Scalese of CSA (our financial restructuring consultant), Kody Burgess (our Controller), and other accounting department employees at the Company.  To the best of my knowledge and belief, all of the information contained in the exhibit is true and accurate.

129.    The Debtors contend that the use of cash collateral to pay for the ordinary costs and expenses of preserving, maintaining and operating assets subject to the Lenders' security interests, in and of itself, constitutes adequate protection of the Lenders' interests in their collateral. Notwithstanding, to provide "adequate protection" to the Lenders with respect to any postpetition decrease in value of their collateral, the Debtors are proposing to make payments to the Lenders in accordance with the Adequate Protection Program.

130.    I believe that the estimated current values of the Debtors' vehicles as set forth in Exhibit "21" to the Appendix of Exhibits, based on the MMR value for each vehicle, are reasonable and reflect the fair value of such vehicles in the current market.

///

///

///

## REAL PROPERTY LEASES THAT MAY BE ASSUMED

131.    AVR is a party to a number of real property leases that the Debtors may seek to assume, either under a chapter 11 plan or in connection with a sale of certain of the Debtors' assets. It is my understanding that the Bankruptcy Code requires chapter 11 debtors to timely perform substantially all of their postpetition obligations under any unexpired lease of nonresidential real property until such lease is assumed or rejected.

132.    The Debtors have identified seven leases of nonresidential properties (including two oral leases of properties owned by related entities) that it wishes to retain during these Chapter 11 Cases and may seek to assume, or assume and assign, under a chapter 11 plan or sale under section 363 of the Bankruptcy Code.  As reflected in the Cash Collateral Budget, the Debtors intend to comply with all of their postpetition obligations under these leases.

### *Los Angeles Sheraton*
### *Los Angeles, California*

133.    As of August 2, 2020, AVR's lease of its former headquarters near the LAX airport was terminated.  On July 24, 2020, AVR entered into a 3-year lease with New Wynn Li LP ("**New Wynn Li**"), to lease office space and a limited number of parking spaces at the Four Points by Sheraton Los Angeles International Airport (the "**LAX Property**").  New Wynn Li is holding a security deposit of $20,000.

134.    The monthly rent currently is $17,500 per month.  To the best of my knowledge, AVR is current on its obligations under the lease.

### *820 Malcolm*
### *Burlingame, California*

135.    In July 2015, AVR entered into 5-year lease with Monfredini Properties ("**Monfredini**") to lease space at 820 Malcolm, Burlingame, California (the "**SFO Property**"). Monfredini is holding a security deposit of $17,000.

136.    The original contract rate of rent currently is $16,883 per month and will increase to $17,389 per month starting on January 1, 2021.  However, effective August 1, 2020, due to the impact of the pandemic on both of our businesses, Monfredini and AVR agreed to modify the lease to provide for payments of $8,400 per month, which the Company has been paying, in exchange for the Company continuing to lease the premises.  To the best of my knowledge, AVR is current on its obligations under the lease as modified.

### 3312 Valley View Lane
### Irving, Texas

137.    In September 2017, AVR California purchased real property located at 3312 Valley View Lane, Irving, Texas (the "**DFW Property**"), for approximately $700,000.  The seller was Clyde Wayne Kirk.  In connection with the purchase, AVR California executed a promissory note in favor of Mr. Kirk in the amount of $665,000, secured by a deed of trust against the DFW Property.  In February 2020, AVR California executed a deed in lieu of foreclosure, transferring title to the DFW Property back to Mr. Kirk.  At the same time, AVR California entered into a 3-year lease with Mr. Kirk.  Mr. Kirk is holding a security deposit of $5,612.

138.    The base rent currently is $4,500 per month, but will increase to $5,000 per month in January 2021 and $5,500 in March 2021.  To the best of my knowledge, AVR is current on its obligations under the lease.

### 5650 Greens Road
### Houston, Texas

139.    In or about March 2019, AVR California entered into a 5-year lease with Betty W. Baker to lease space at 5650 Greens Road, Houston, Texas (the "**IAH Property**").  I believe that Ms. Baker is holding a security deposit of $2,200.

140.    The rent currently is $1,600 per month.  To the best of my knowledge, AVR is current on its obligations under the lease.

1

***3120 Sylvan Road***
***Hapeville, Georgia***

2

3      141.    In February 2018, AVR California entered into a 5-year lease with Berhe Asfaha

4  and Judy Berhe to lease space at 3120 Sylvan Road, Hapeville, Georgia (the "**ATL Property**").

5  The lease term expires on March 31, 2023.  The landlords are holding a security deposit of $5,000.

6      142.    The rent currently is about $2,625 per month.  To the best of my knowledge, AVR is

7  current on its obligations under the lease.

8

9

***17901 E. 81st Avenue***
***Commerce City, Colorado***

10

11      143.    In October 2016, AVR Denver, LLC ("**AVR Denver**"), was formed in Colorado.

12  AVR Denver was created to hold real property used by AVR California to operate its business in

13  Colorado, located at 17901 81st Avenue, Commerce City, Colorado (the "**DEN Property**").  AVR

14  California acquired title to the DEN Property in July 2016 and quitclaimed it to AVR Denver in

15  October 2016.  AVR Denver then constructed a brand new retail/automotive garage building and

16  parking lot on the property.  As rent, AVR California has been paying the mortgage and other

17  expenses associated with the DEN Property.  The mortgage component of the rent currently is

18  about $10,041 per month.

19

20

***7040 Gilespie Street***
***Las Vegas, Nevada***

21

22      144.    My understanding is that PJ D&D Holdings, LLC ("**PJ**"), a Nevada limited liability

23  company, acquired real property located at 7040 Gilespie Street, Las Vegas, Nevada (the "**LAS**

24  **Property**") in or about 2008.  The LAS Property is situated across the street from the McCarran

25  Rental Car Center.  Around 2012, I approached the owner to see if he was willing to sell me the

26  LAS Property.  Instead of selling the LAS Property, the owner of PJ wanted to sell his ownership

27  interest in PJ.  AVR does not have an ownership interest in PJ.  In effect, the Company has an oral

28  lease pursuant to which it uses the LAS Property in exchange for paying the mortgage and all costs

1    associated with the LAS Property.  The mortgage component of the rent currently is about $3,440

2    per month.

3

4                        **REAL PROPERTY LEASES TO BE REJECTED**

5            145.    As noted above, the Company has closed a number of its locations this year in

6    response to the COVID-19 pandemic.  Some of the landlords have worked with the Company and

7    agreed to terminate their leases.  However, even though we have vacated those premises some of

8    the leases have not yet expired or been terminated.

9            146.    Because we have vacated those premises, these leases are of no value and benefit to

10   the estate.  Further, if the Debtors are required to timely perform their postpetition obligations

11   under these leases, they are burdensome to the Debtors' bankruptcy estate.  Therefore, the Debtors

12   are or will be requesting authority to reject the leases identified in Exhibit "22" to the Appendix of

13   Exhibits, effective as of the Petition Date.

14           147.    Exhibit "22" also identifies leases that, according to the Debtor's records, already

15   have expired.  Out of an abundance of caution, the Debtors are or will be requesting authority to

16   reject those leases, effective as of the Petition Date, if they are unexpired.

17

18                              **DEBTOR'S SCHEDULES**

19           148.    It is my understanding that the Court's local rules provide that, within fifteen days

20   after a debtor files a petition, the debtor must file a variety of schedules, a statement of financial

21   affairs, and various other documents (collectively the "**Schedules**") with the Court.  The Debtors'

22   management team and outside advisors tried to gather much of the information needed to prepare

23   the Schedules prior to the Petition Date, but for a number of reasons the Debtors were unable to

24   prepare the Schedules for filing at the same time as their voluntary petitions for relief.

25           149.    Among other things, the Debtors have continued operating in the ordinary course of

26   business.  Further, with the assistance of outside advisors retained to assist in developing a plan of

27   reorganization, the Debtors have been heavily focused on preparing financial statements and

28   projections, exploring potential reorganization options, and negotiating with existing Lenders and a

1  potential future lender. The Debtors also have been working with bankruptcy counsel to gather

2  information needed for the Debtors' first-day motions. There are a number of documents that we

3  are attempting to locate, and doing so has been made more difficult by stay-at-home orders and the

4  relocation of our headquarters.

5       150.   It is my understanding that the U.S. Trustee requires that chapter 11 debtors submit

6  numerous reports and information to the U.S. Trustee within seven days after filing for bankruptcy.

7  The Debtors' management has been diligently working to prepare those reports and gather the

8  documents that need to be submitted.

9       151.   In light of the foregoing, the need for the Debtors to focus on its business as well as

10  other matters that will arise in the Chapter 11 Cases during the first few weeks, the upcoming

11  holidays, and the difficulties that arise as result of pandemic-related restrictions, I do not believe

12  that the Debtors will be able to complete and file their Schedules by December 23, 2020. The

13  Debtors are requesting until January 8, 2021, to do so.

14

15       I declare under penalty of perjury under the laws of the United States of America that the

16  foregoing is true and correct.

17       Executed on December _10_ 2020, at Las Vegas, Nevada.

18

19                       _____

20                       Yazdan Iram

21

22

23

24

25

26

27

28