JOHN N. TEDFORD, IV (State Bar No. 205537)
*jtedford@DanningGill.com*
ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
MICHAEL G. D'ALBA (State Bar No. 264403)
*mdalba@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Airport Van Rental, Inc. and
affiliated Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>AIRPORT VAN RENTAL, INC., et al.,[1]<br><br>       Debtors and Debtors in Possession.<br><br>☐   Affects all Debtors<br><br>☒   Affects the following Debtor(s):<br><br>Airport Van Rental, Inc., a California corporation | Case No. 2:20-bk-20876-BB<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION FOR APPROVAL OF SETTLEMENT, ADEQUATE PROTECTION AND PLAN SUPPORT AGREEMENT WITH NORTH IOWA EQUITY, LLC, RE VEHICLES TO BE ACQUIRED FROM HINCKLEY'S, INC. DBA HINCKLEASE; AND MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATION OF YAZDAN IRANI, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF**<br><br>Date:    June 9, 2021<br>Time:   11:00 a.m.<br>Place:  Courtroom 1539<br>         255 E. Temple St.<br>         Los Angeles, CA 90012 |

---

[1] Pursuant to an order of the Court, this case is being jointly administered with four cases filed by the following affiliated entities: Airport Van Rental, Inc., a Georgia corporation, case no. 2:20-bk-20877-BB; Airport Van Rental, Inc., a Nevada corporation, case no. 2:20-bk-20878-BB; Airport Van Rental, LLP, a Texas limited liability partnership, case no. 2:20-bk-20882-BB; and AVR Vanpool, Inc., a California corporation, case no. 2:20-bk-20883-BB.

1650122.2  26988

**PLEASE TAKE NOTICE** that on June 9, 2021, at 11:00 a.m., in Courtroom 1539 of the United States Bankruptcy Court for the Central District of California, located at 255 East Temple Street, Los Angeles, California,[2] debtor and debtor in possession Airport Van Rental, Inc., a California corporation ("AVR California"), will and does hereby move for an order approving AVR California's proposed *Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement* (the "Agreement") with North Iowa Equity, LLC ("NIE"), and Pritchard Auto Company ("Pritchard"), regarding vehicles to be acquired by Pritchard from Hinckley's, Inc. dba Hincklease ("Hincklease"). In accordance with the Agreement, AVR California is requesting that the Court's order granting this motion include an express finding that the existing lease between Hincklease and AVR California is a "true lease" and not a disguised security agreement.

A copy of the Agreement is attached as Exhibit "1" to the Declaration of Yazdan Irani appended hereto. A copy of the proposed order setting forth the relief requested by this motion is attached hereto as Exhibit "A."

*General grounds for AVR California's request for approval of the Agreement*

In September 2013, AVR California entered into a "Master Lease Agreement" with Hincklease (the "Hincklease Agreement"). AVR California currently is in possession of and is using approximately 150 vehicles pursuant to that agreement.

In contemplation of a potential chapter 11 plan, AVR California is negotiating with Pritchard regarding potential financing to help grow or maintain its fleet of rental vehicles. As part of that potential arrangement, Pritchard has agreed to acquire from Hincklease all of the vehicles that are the subject of the Hincklease Agreement. Pritchard's agreement with Hincklease is not itself subject to approval of the Court. The Agreement between AVR California, Pritchard, and NIE (Pritchard's assignee) is subject to approval of the Court.

---

[2] In-person appearances may not be permitted. Please see the Court's website, www.cacb.uscourts.gov, for Judge Bluebond's procedures for appearing at the hearing.

1    The Agreement serves multiple purposes.  First, it provides for the termination of the

2    Hincklease Agreement and entry into a new agreement regarding the vehicles.  Second, it resolves

3    a variety of issues that have arisen or could arise under the Hincklease Agreement before and after

4    December 11, 2020 (the "Petition Date").  Third, it provides for AVR California's use of the

5    vehicles after approval of the Agreement.  Fourth, it permits AVR California to use cash collateral

6    to the extent of NIE's interest in cash collateral.  Fifth, it sets forth the treatment of NIE under a

7    potential chapter 11 plan (to the extent treatment is required by the Bankruptcy Code) and obtains

8    NIE's support of a plan that provides such treatment.  AVR California believes that the Agreement

9    is in the best interests of the estate and its creditors, and should be approved.

10

11    *General grounds for AVR California's request for an express finding that the Hincklease*

12    *Agreement is a true lease and not a disguised security agreement*

13    The Court recently approved a similar agreement relating to approximately 50 vehicles that

14    Pritchard acquired from another entity referred to as "MiFleet."  Pritchard had acquired the MiFleet

15    vehicles before AVR California sought approval of its agreement with Pritchard, and therefore had

16    stepped into MiFleet's shoes before the motion was filed.  One of AVR California's other lenders,

17    AFC Cal, LLC ("AFC"), opposed the motion on the alleged grounds that it had a security interest

18    in the MiFleet vehicles and that AFC's alleged security interest was superior to whatever right, title

19    and interest Pritchard acquired from MiFleet.  In its opposition, AFC conceded that if the MiFleet

20    agreement was a true lease, MiFleet (and thus Pritchard, as successor) would have an ownership

21    interest in the vehicles to which AFC's alleged security interest would not attach.

22    Pritchard is willing to acquire the Hincklease vehicles, but not if doing so will subject

23    Pritchard's to AFC's meritless contention that it has a security interest in the vehicles Pritchard

24    acquires from Hincklease.  Thus, the Agreement contains the following express condition:

25            (b)    Contents of the Order.  The Order must contain one of
    the following:

26

27                    (i)    A determination that [AFC] has waived (either
    expressly or impliedly) or otherwise released any alleged security
    interest or other right, title and interest that AFC claims to have in the

28    Vehicles and proceeds from sales of the Vehicles; or

1          (ii)    A determination that the Hincklease Agreement
2     is a "true lease" and not a disguised security agreement.

3          Based on a statute that is unique to Utah, and which has not previously been brought to the

4     Court's attention, AVR California has determined that applicable state law favors Hincklease with

5     respect to whether the Hincklease Agreement is a true lease.  Specifically, Utah's Motor Vehicles

6     Code (and not its version of the UCC) contains the following provision:

7          Notwithstanding any other provision of law, a motor vehicle or
          trailer lease agreement that is subject to a terminal rental adjustment
8          clause does not create a sale or security interest.

9     At least on its face, this statute says that notwithstanding the "TRAC-neutral" provisions in Utah's

10    version of the UCC, TRAC leases involving motor vehicles are true leases and not disguised sales

11    or security agreements.

12         AVR California's agreement with Hincklease appears to be the type of agreement that the

13    Utah legislature had in mind when it enacted this Motor Vehicles Code provision.  Indeed, AVR

14    California's agreement with Hincklease expressly states:

15         [AVR California] and [Hincklease] acknowledge that this Agreement
          constitutes a "TRAC (Terminal Rental Adjustment Clause) Lease"
16         with respect to Section 7701(h)(3) of the Internal Revenue Code and
          that [AVR California] has no equity or other ownership rights in the
17         Vehicles or their accessories or replacement parts other than the
          Purchase Option referenced [in] this Agreement.
18

19    The definition of "Terminal Rental Adjustment Clause" in the Utah Motor Vehicles Code is almost

20    exactly the same as the definition of "Terminal Rental Adjustment Clause" in IRC § 7701(h)(3).

21         In light of the applicable legal authorities and the agreement amongst AVR California,

22    Hincklease and Pritchard/NIE that the Hincklease Agreement should be determined to be a true

23    lease, and the Court's order approving the Agreement should include such a finding.[3]

24

25

26

_____

27    [3] To be clear, the finding is limited to the Hincklease agreement, the interpretation of which is
28    governed by Utah law.

*<u>Disclosures Required for Motions for Authority to Obtain Credit or Use Cash Collateral</u>*

In case this motion is deemed to be one seeking authority to obtain credit, AVR California provides the following table summarizing the significant terms of the Agreement:

| Material Term or Type of Provision | Summary of Provision(s) | Location in Loan Agreement and/or Loan Documents | Location in Order |
|---|---|---|---|
| Loan amount | Capitalized cost is appx. $2,869,506. | Vehicle Lease Schedule attached to Agreement | N/A |
| Interest rate | "Monthly Rent Charge" payment equates to 7.5% interest per annum | Vehicle Lease Schedule attached to Agreement | N/A |
| Maturity date | Term for each vehicle is either 12, 18 or 24 months | Vehicle Lease Schedule attached to Agreement | N/A |
| Events of default | Failure to make required payments or perform terms | | N/A |
| Prepayment penalty | Not applicable | | |
| Loan fees | Not applicable | | |
| Grant of lien on property of the estate under § 364(c) or (d) | Lien on proceeds and products of vehicles covered by the Agreement, incl. sublease proceeds | Agreement at ¶ 6 | N/A |
| Provision of adequate protection or priority of a claim that arose prepetition | Payments from AVR California to NIE will constitute adequate protection | Agreement at ¶ 7 | N/A |
| Validity of a claim that arose prepetition | Not applicable | | |
| Waiver or modification of Code provisions or applicable rules relating to the automatic stay | Automatic stay waived as to vehicles covered by the Agreement | Agreement at ¶ 10 | N/A |

1    This motion is based upon this motion, the Memorandum of Points and Authorities, the

2  Declaration of Yazdan Irani, the Request for Judicial Notice, the *Statement Regarding Cash*

3  *Collateral or Debtor in Possession Financing* filed pursuant to Local Bankruptcy Rule 4001-2(a),

4  and such other evidence as may be presented to the Court.

5    **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

6  any opposition or response to the motion must be filed and served at least 14 days before the date

7  of the hearing.  Pursuant to Local Bankruptcy Rule 9013-1(h), the Court may treat failure to timely

8  file documents as consent to the relief requested in the motion.

9

10 DATED:  May 19, 2021                    DANNING, GILL, ISRAEL & KRASNOFF, LLP

11

12                                        By:    _____*/s/ John N. Tedford, IV*_____

13                                               JOHN N. TEDFORD, IV
                                                 Attorneys for Airport Van Rental, Inc. and
14                                               affiliated Debtors and Debtors in Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### BACKGROUND FACTS

**A.    BANKRUPTCY BACKGROUND**

On December 11, 2020 (the "Petition Date"), Airport Van Rental, Inc., a California corporation ("AVR California"), Airport Van Rental, Inc., a Georgia corporation, Airport Van Rental, Inc., a Nevada corporation, Airport Van Rental, LLP, a Texas limited liability partnership, and AVR Vanpool, Inc., a California corporation (collectively the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their properties and continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**B.    VEHICLES LEASED BY AVR CALIFORNIA FROM HINCKLEASE**

The Debtors are in the business of renting vehicles to individual consumers, corporations and governmental entities.  In the ordinary course of business, AVR California acquires or obtains possession of vehicles from sellers through secondary market vehicle auctions or directly from vehicle manufacturers.  AVR California's agreements with financing companies take the form of loan or lease agreements.

On or about September 20, 2013, AVR California and Hinckley's, Inc. dba Hincklease ("Hincklease"), entered into a Master Lease Agreement (the "Hincklease Agreement").  A copy of the Hincklease Agreement is attached as Exhibit "2" to the Request for Judicial Notice.

The Hincklease Agreement provided that Hincklease would lease to AVR California vehicles described in "Schedules" that were prepared each time Hincklease acquired a vehicle to be used by AVR California.  Each Schedule identifies, among other things, the "Termination Date" of the lease of that vehicle, and the amount to be paid by AVR California to Hincklease each month. A copy of one of the Schedules is attached as Exhibit "3" to the Request for Judicial Notice.

1    AVR California currently has approximately 152 vehicles covered by the Hincklease

2    Agreement (the "Vehicles").  The monthly amount that the Hincklease Agreement requires AVR

3    California to pay for the Vehicles is approximately $97,000.

4    The Hincklease Agreement provided that AVR California could be required to provide

5    Hincklease a security deposit to secure AVR California's performance.[4]  AVR California provided

6    Hincklease a security deposit of $164,000.

7    At least generally, the Hincklease Agreement is a "TRAC Lease," which is designed to

8    provide certain benefits, including tax benefits, to parties.  Section 1 of the Hincklease Agreement

9    says the following:

> Lessee and Lessor acknowledge that this Agreement constitutes a
> "TRAC (Terminal Rental Adjustment Clause) Lease" with respect to
> Section 7701(h)(3) of the Internal Revenue Code and that Lessee has
> no equity or other ownership rights in the Vehicles or their accessories
> or replacement parts other than the Purchase Option referenced [in]
> this Agreement.

14    Section 7701(h)(3) of the Internal Revenue Code defines a "terminal rental adjustment clause" as,

15    among other things,

> a provision of an agreement which permits or requires the rental price
> to be adjusted upward or downward by reference to the amount
> realized by the lessor under the agreement upon sale or other
> disposition of such property.

19    26 U.S.C. § 7701(h)(3).

21    **C.    WHETHER THE HINCKLEASE AGREEMENT IS A TRUE LEASE OR A**

22    **DISGUISED SECURITY AGREEMENT**

23    When AVR California filed for bankruptcy, it contended that all of its vehicle leases,

24    including the Hincklease Agreement, are disguised security agreements.  As the Debtors have

25    addressed in prior filings, the economics of the transactions reflect that they are really security

---

[4] In addition, AVR California's obligations under the Hincklease Agreement were guaranteed
by Yazdan and Kimberly Irani.

1   agreements instead of true leases.  This is because, at the end of the day, the Debtors (as "lessee")

2   will end up paying the financing company (as "lessor") the full acquisition price of a vehicle.  Even

3   if the Debtors elect to surrender a vehicle at termination and the vehicle is then sold at auction, the

4   Debtors are required to pay any shortfall between the net sales proceeds and the settlement amount

5   called for under the agreement.  Further, if the net sales proceeds exceed the settlement amount and

6   past due payments, the Debtors get a credit for the excess just as if they owned the vehicle.  Thus,

7   the Debtors are obligated to pay the full value of the vehicle, and are entitled to all of the benefits

8   and burdens of ownership.

9        Recently, in connection with the Debtors' motion for an order extending the time for the

10   Debtors to commence making monthly payments to Hincklease in the full amount called for under

11   the Hincklease Agreement, the Debtors and Hincklease briefed this issue.  However, Hincklease (in

12   its opposition to that motion) and the Debtors (in their reply) focused only on the "TRAC-neutral"

13   provisions in Utah's version of the UCC.[5]  Utah Code § 70A-1a-203 provides that whether a

14   transaction in the form of a lease creates a lease or security interest is determined by the facts of

15   each case.  It also says that a transaction in the form of a lease does not create a security interest

16   "merely because" the transaction has certain attributes.  Thus, attributes that commonly are found

17   in TRAC leases do not *necessarily* make the agreement a security agreement rather than a lease.

18        However, neither party addressed a separate provision of the Utah Motor Vehicles Code,

19   found at Utah Code § 41-1a-609.  That section provides, in relevant part, as follows:

20            (1)    As used in this section, "terminal rental adjustment
         clause" means a provision of an agreement that permits or requires the
21         rental price to be adjusted upward or downward by reference to the
         amount realized by the lessor under the agreement upon sale or other
22         disposition of the property.

23            (2) Notwithstanding any other provision of law, a motor
         vehicle or trailer lease agreement that is subject to a terminal rental
24         adjustment clause does not create a sale or security interest.

25

26

27   _____

   [5] Section 28(f) of the Hincklease Agreement provides that it is governed by the laws of the
28   State of Utah.

1  Thus, in the first subsection, the Utah Legislature defined "terminal rental adjustment clause" to

2  match the definition in the Internal Revenue Code.  In the second, the Legislature dictated that

3  notwithstanding any other provision of law – presumably meaning the TRAC-neutral provision

4  referred to above – a TRAC clause "does not create a sale or security interest."

5       One perhaps could read § 41-1a-609 to mean that a TRAC provision does not *necessarily*

6  create a sale or security interest.  The legislative history is not particularly helpful, because the act

7  that created § 41-1a-609 simply said:

8           This act modifies the Motor Vehicles Code by defining
         terminal rental adjustment clause and providing that a motor vehicle
9        or trailer lease agreement that is subject to a terminal rental adjustment
         clause does not create a sale or security interest.
10

11  2003 Utah Laws Ch. 266 (S.B. 206).  Floor statements by the Senate sponsor (Sen. David Steele)

12  suggest that the bill was not intended to be unique, but was intended to make Utah law consistent

13  with the laws of most other states (which have TRAC-neutral statutes).[6]  However, Sen. Steele

14  clearly intended that TRAC leases be considered regular leases.  For example, in explaining the

15  bill, he said that if a lessee were to file for bankruptcy the property subject to the lease would be

16  considered only as leased property and not saleable property.  Despite having been enacted almost

17  20 years ago, the section does not appear to have ever been cited in any published court decision.

18       In light of the foregoing, the Debtors have concluded that the non-uniform provision in

19  Utah Code § 41-1a-609 likely renders the Hincklease Agreement a "true lease" even though, under

20  the uniform provisions adopted by most states (and which appear in Utah's version of the UCC), it

21  would constitute a disguised security agreement.

22

23  **D.    ADEQUATE PROTECTION PAYMENTS MADE TO HINCKLEASE**

24       On the Petition Date, the Debtors filed a motion for authority to use cash collateral (the

25  "Cash Collateral Motion").  From time to time, the Court has entered orders authorizing AVR

26  California to use cash collateral on an interim basis.  Those orders provide, in part, that "[e]ach

27  _____

28  [6] https://le.utah.gov/av/floorArchive.jsp?markerID=41190.

1650122.2  26988                               9

party claiming an interest in cash collateral shall be and is hereby granted a replacement lien on all of the estate's assets, excluding avoiding power claims and recoveries, to the extent that the Debtors' use of such party's cash collateral results in a decrease in the value of such party's interest in cash collateral."

Prior to the Petition Date, AVR California started making monthly payments to Hincklease and other lenders/lessors pursuant to an "Adequate Protection Program" intended to compensate each of them for any decrease in value of the vehicles in which the lender/lessor has an interest. AVR California also paid each lender/lessor, among other things, proceeds from sales of vehicles in which the lender/lessor had an interest. Pursuant to the Adequate Protection Program, AVR California has paid the following amounts to Hincklease:

| October 2020 | $66,691.10 |
|---|---|
| November 2020 | $266,974.07 |
| December 2020 | $47,471.20 |
| January 2021 | $46,760.45 |
| February 2021 | $42,872.55 |
| March 2021 | $73,173.56 |
| April 2021 | $51,803.57 |

In May 2021, pursuant to a stipulation resolving the Debtors' pending motion for an extension of time to commence making payments to Hincklease in the full amount provided by the Hincklease Agreement, the Debtors will pay Hincklease $82,450.

**E.     HINCKLEASE'S SALE TO PRITCHARD AUTO COMPANY**

Hincklease has agreed to sell all of the Vehicles and all of Hincklease's right, title and interest under the Hincklease Agreement, to Pritchard Auto Company ("PAC"). The agreement between Hincklease and PAC is not subject to Court approval, but PAC's obligation to purchase the Vehicles from Hincklease is expressly conditioned upon entry of an order (1) approving AVR

1  California's Agreement with PAC and NIE, and (2) finding that the Hincklease Agreement is a true

2  lease or finding that AFC has waived or released its alleged security interest in the Vehicles.

3

4  **F.    THE AGREEMENT PROPOSED FOR APPROVAL**

5       After PAC completes its acquisition of the Vehicles and assigns its interests to NIE, AVR

6  California and NIE desire to terminate the Hincklease Agreement and enter into a new agreement

7  that sets forth the terms and conditions of NIE's lease of the Vehicles to AVR California.  AVR

8  California and NIE also desire to resolve any disputes relating to AVR California's use of the

9  Vehicles prior to the date when their agreement takes effect, and the Cash Collateral Motion.

10 Accordingly, subject to Court approval, AVR California, NIE, and PAC have entered into the

11 Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement attached as

12 Exhibit "1" to the Declaration of Yazdan Irani (the "Agreement").

13       Without limitation, the Agreement provides as follows:

14       1.    The order approving the Agreement must contain either (a) a determination that

15            AFC has waived (either expressly or impliedly) or otherwise release any alleged

16            security interest or other right, title and interest that AFC claims to have in the

17            Vehicles and proceeds from sales of the Vehicles, or (b) a determination that the

18            Hincklease Agreement is a true lease.

19       2.    The Agreement will become effective when the Court enters an order approving it.

20       3.    The Hincklease Agreement will be terminated.  New Vehicle Lease Schedules will

21            be incorporated into AVR California's existing agreement with NIE.  Instead of

22            having Pritchard hold the $164,000 deposit in perpetuity, it will be used to reduce

23            the capitalized cost of the Vehicles and, by extension, reduce the amount that AVR

24            California must pay each month.[7]

25

26

27 _____
   [7] The Agreement does expressly address the deposit.  Application of the deposit will just be
28 incorporated into the capitalized costs identified in the VLSes.

4.      AVR California will be permitted to use the Vehicles pursuant to the New Lease Documents.  If AVR California's bankruptcy case is converted to one under chapter 7 of the Bankruptcy Code, NIE may declare the New Loan Documents terminated.

5.      AVR California will grant to NIE a continuing security interest and lien in and to all proceeds and products of the Vehicles, including sublease proceeds.[8]  NIE will be permitted to file initial financing statements and amendments thereto that identify NIE's collateral consistent with the Agreement and the New Lease Documents.

6.      To the extent that NIE has an interest in cash collateral, provided that AVR California is not in default under the Agreement and the New Lease Documents, AVR California is permitted to use NIE's cash collateral through the earlier of (a) the date on which a chapter 11 plan takes effect, and (b) the date on which AVR California's bankruptcy case is converted to one under chapter 7 of the Bankruptcy Code.

7.      If AVR California defaults under the Agreement or the New Lease Documents, AVR California shall account for and deposit into a segregated account all proceeds and products of the Vehicles that are received by AVR from and after the date on which such written demand is made.

8.      NIE will waive any adequate protection liens that arose in favor of Hincklease pursuant to the Court's orders authorizing AVR California's use of cash collateral on an interim or final basis.

9.      After the Agreement becomes effective, the cash payments made by AVR California to NIE in accordance with the New Lease Documents will constitute adequate protection for AVR California's use of the Vehicles and any cash collateral in which NIE has an interest.

---

[8] To address an objection made by AFC to the prior agreement relating to the MiFleet vehicles, the Agreement does *not* say that NIE is granted a "first priority" security interest because it is not the parties intent for this provision to "prime" any existing security interests pursuant to § 365 of the Code.

10.    Any plan of reorganization proposed by AVR California will treat NIE in a manner that is consistent with the Agreement and the New Lease Documents.  NIE will agree to fully support AVR California's proposed plan and will not advance any plan of reorganization or transaction other than as contemplated by the Agreement, or do anything to delay, impede, interfere or oppose, directly or indirectly, or seek any modification of AVR California's plan.

11.    The automatic stay in AVR California's bankruptcy case will be deemed terminated as to the Vehicles and the liquidation proceeds of the Vehicles.  If a default occurs prior to the effective date of a plan, NIE will be permitted to recover the Vehicles without the need for filing any legal action.  However, NIE will file a written notice of default in AVR California's bankruptcy case prior to exercising its remedies as to the Vehicles.[9]  If NIE wishes to enforce its rights as against any other property of AVR or AVR's estate, it may do so only upon entry of a separate order authorizing it to do so.

12.    AVR California and NIE will exchange mutual limited releases.

13.    NIE, as successor in interest to Hincklease, will waive any administrative claim against AVR California's bankruptcy estate for AVR California's post-petition use of any vehicles from the Petition Date through the date when the Agreement becomes effective.  NIE does not waive any administrative claim for any amounts AVR California is required to pay pursuant to the Agreement and the New Lease Documents.

---

[9] To address an objection made by AFC to the prior agreement relating to the MiFleet vehicles, the Agreement limits the scope of relief from stay granted to NIE and requires NIE to file a notice of default in the case prior to exercising its remedies.

## II.

## LEGAL ARGUMENT

### A.    THE PROPOSED USE OF PROPERTY IS APPROPRIATE UNDER SECTION 363

AVR California's use of property of the bankruptcy estate is governed by section 363 of the Bankruptcy Code.[10]

The Agreement has certain features that suggest it is a transaction or use of property of the bankruptcy estate made in the ordinary course of business such that Court approval is not required. In that regard, the Ninth Circuit has held that a debtor in possession's renewal of a lease is within the ordinary course of business.[11]  While the presence of cash collateral in a proposed transaction or use means that Court approval is required, NIE in the Agreement consents to such use.  NIE's consent might qualify the Agreement as being a use of property of the bankruptcy estate that AVR California can enter into without notice or a hearing.[12]

The Agreement differs from the leases in *Dant & Russell*, however, because NIE has replaced Hincklease as the lessor of the Vehicles whereas the parties to the renewed lease in *Dant & Russell* were the same.  In addition, the New Lease Documents are incorporated into the Agreement, which if approved will also deal with a number of disputed and potentially disputed issues.  The lease in *Dant & Russell* was strictly an agreement for the debtor in possession's rental of certain real property owned by Burlington Northern.[13]  Accordingly, the Agreement warrants

---

[10] *See* 11 U.S.C. §§ 363, 1107(a), 1108.

[11] *In re Dant & Russell, Inc.*, 853 F.2d 700, 706 (9th Cir. 1988) ("proper application of persuasive legal authorities requires that the post-petition leases be regarded as within the debtor-in-possession's ordinary course of business").

[12] 11 U.S.C. § 363(c)(2)(A).

[13] The issue under section 363 that was before the court in *Dant & Russell* also differs from the issue at bar.  In *Dant & Russell*, the issue was whether a lease could be avoided as an unauthorized post-petition transfer under section 549.  Whether or not the lease could be avoided would affect the allocation of liability between the bankruptcy estate and the landlord under the lease on environmental claims as to the leased real property.  The landlord argued that the lease was an ordinary course transaction, while the debtor in possession argued that it was not.  The issues at bar do not include whether a particular lease transaction can be avoided under section 549.  Rather,

consideration as a use of property of the bankruptcy estate other than in the ordinary course of business.[14]  Court approval is required for such transactions.

There is ample business justification[15] for the proposed "use" of estate property for at least the following reasons:

- AVR California will be able to continue to possess and use the Vehicles that are the subject of the New Lease Documents.

- The monthly cost to AVR California for the Vehicles will be less than the cost for the Vehicles under the Hincklease Agreement.  The monthly payment that AVR California will make for the Vehicles will decrease from approximately $97,000 to approximately $75,000.

- Under the Agreement, AVR California is not required to cure defaults under the Hincklease Agreement, as set forth by section 365(b)(1) of the Bankruptcy Code as to assumed executory contracts.

- By granting authority to AVR California to use cash collateral and deeming the payments to NIE made under the New Lease Documents to constitute adequate protection, the Agreement eliminates disputes over cash collateral and adequate protection.

- By approving the waiver of a possible administrative claim of NIE as successor to Hincklease for use of vehicles from the Petition Date through the date when the Agreement becomes effective, the Agreement eliminates a potential administrative expense that the bankruptcy estate could otherwise be required to pay.

- The bankruptcy estate is relieved of any adequate protection liens of Hincklease based upon AVR California's use of cash collateral on an interim or final basis.

- The Agreement will result in the support of NIE for a proposed chapter 11 plan of reorganization that is consistent with the Agreement.

Because the Agreement will reduce costs, dispose of certain risks, and enlist support for a proposed chapter 11 plan, AVR California submits that there is a business justification for the Agreement that satisfies AVR California's duty to the estate and creditors.[16]

---

AVR California is proposing to enter into an agreement that will resolve a number of issues, one of which is the ability to maintain its possession of approximately 150 vehicles under a lease.

[14] 11 U.S.C. § 363(b)(1).  *See In re Continental Airlines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986) (debtor in possession's proposal to enter into lease agreements for two aircraft was outside the ordinary course of business).

[15] *Continental Air*, 780 F.2d at 1226 (citations omitted).

[16] *Continental Air*, 780 F.2d at 1226 (citations omitted).

Even if the elements of section 363(b) are met, the Agreement remains subject to the requirements set forth by section 363(d) regarding the automatic stay and section 363(e) regarding adequate protection.[17]   The proposed use of bankruptcy estate property is appropriate under section 363(d) because no relief from the automatic stay has been granted to date as to the Vehicles or proceeds of the Vehicles.  Accordingly, while the Agreement will terminate the automatic stay as to the Vehicles and the liquidation proceeds of the Vehicles, such relief will not conflict with previously granted relief because no such relief has been granted.  The proposed use is appropriate under section 363(e) because NIE agrees that payments made under the New Lease Documents "shall constitute adequate protection for AVR's use of the Vehicles and any cash collateral in which NIE has an interest."

## B.    **THE AGREEMENT IS AN APPROPRIATE CREDIT TRANSACTION**

By the Agreement, AVR California will grant NIE a security interest and lien in the proceeds of the Vehicles, including sublease proceeds.  In that regard, NIE will have authority to file financing statements that identify its collateral.  Accordingly, the Agreement may also be considered as being a financing transaction under section 364 of the Bankruptcy Code.

As a financing transaction, however, what is taking place is that NIE is replacing Hincklease as the lessor of the Vehicles, and terms are being modified in a manner favorable to AVR California's estate and creditors because the transaction will result in AVR California making smaller payments with respect to the same vehicles that had been the subject of the Hincklease Agreement.  Out of an abundance of caution, in the motion AVR California has made the disclosures required by Federal Rule of Bankruptcy Procedure 4001 and is separately filing the statement required by LBR 4001-2.

---

[17] *Continental Air*, 780 F.2d at 1226.

## C.    THE COURT SHOULD APPROVE THE AGREEMENT UNDER FRBP 9019

Federal Rule of Bankruptcy Procedure 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." In *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), the Supreme Court held that a bankruptcy court, in considering whether to approve a compromise, should inform itself regarding

> all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

The Ninth Circuit has clarified the inquiry as follows:

> In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider: "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."[18]

The bankruptcy court has wide latitude and discretion in evaluating a proposed compromise because the judge is "uniquely situated to consider the equities and reasonableness of a particular compromise."[19] "The bankruptcy court need not conduct an exhaustive investigation into the validity of an asserted claim."[20] When the trustee seeks to settle with a creditor, "[i]t is sufficient that, after apprising itself of all facts necessary for an intelligent and objective opinion concerning the claim's validity, the court determines that either (1) the claim has a 'substantial foundation' and is not 'clearly invalid as a matter of law,' or (2) the outcome of the claim's litigation is

---

[18] *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir. 1986) (quoting *In re Flight Transp. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984)).

[19] *United States v. Alaska Nat'l Bank (In re Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982).

[20] *Id.*

'doubtful.'"[21]  The court is not "to decide the numerous questions of law and fact raised by [objectors] but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'"[22]

The Court should approve the proposed Agreement because its terms are fair, reasonable, and in the best interests of the bankruptcy estate.

### 1.    The probability of success in the litigation

The most significant legal issue between AVR California and Hincklease, and thus NIE as its successor, probably is whether the arrangement for the Vehicles is a true lease or a disguised security agreement.  As discussed above, because of a unique provision in Utah's Motor Vehicles Code, it appears that, as a matter of law, the Hincklease Agreement must be treated as a true lease even though, under the UCC's TRAC-neutral provisions, a contrary finding could be warranted. As a result, as to the Hincklease Agreement, the likelihood that AVR California would prevail on the issue of whether the Hincklease Agreement is a true lease appears to be low.

### 2.    The difficulties, if any, to be encountered in the matter of collection

This factor does not apply because AVR is not seeking to collect anything from NIE.

### 3.    The complexity of the litigation involved and expense, inconvenience and delay

Having already conducted legal research regarding the nature of the Hincklease Agreement under Utah law, including research regarding the legislative history of the provision, AVR California does not believe that litigation over the lease/loan issue would be particularly complex or expensive because the Utah Motor Vehicles Code statute appears to resolve the issue.  However, absent the settlement, there are other matters that could arise in AVR California's case which could

---

[21] *Id.*

[22] *In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984) (quoting *In re W. T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

1  require expensive and protracted litigation with Hincklease.  Pritchard and NIE, on the other hand,

2  are more supportive of AVR California and its goals in this case, and are far less likely to contest

3  relief sought by AVR California in the future.  As a result, AVR California expects that approval of

4  the Agreement may significantly reduce administrative expenses in the long run.

5

6          **4.        The paramount interest of creditors**

7          The Agreement results in AVR California paying nearly $22,000 less on a monthly basis in

8  order to use the Vehicles.  It eliminates the need to "cure" defaults in order to assume the lease as

9  part of a plan.  It eliminates any administrative claim that has been incurred under the Hincklease

10 Agreement since the Petition Date.  It obtains the support of NIE for a consistent proposed chapter

11 11 plan.  It resolves cash collateral and adequate protection issues.  For these and other reasons, the

12 Agreement is in the paramount interest of creditors.

13

14 **D.        THE COURT SHOULD FIND THAT THE HINCKLEASE AGREEMENT IS A**

15         **TRUE LEASE**

16         Under the circumstances, it is necessary and appropriate for the order approving the

17 Agreement to contain a finding that the Hincklease Agreement is a true lease.  When the issue was

18 disputed as between AVR California and Hincklease, there was reason for the Court to not make a

19 ruling on that issue in the context of the Debtors' motion for an extension of time to pay Hincklease

20 the full contract amount pursuant to § 365(d)(5) of the Code.  The Court could grant, or deny, that

21 motion without making an express finding.

22         Now, however, because of the previously un-cited Utah Motor Vehicles Code provision and

23 the conditions set forth in the Agreement, it is necessary and appropriate for the Court to find that

24 the Hincklease Agreement is a true lease.  The terms of the Hincklease Agreement are before the

25 Court, and any party still contesting a finding has a full and fair opportunity to try to explain why

26 Utah Code § 41-1a-609 does not resolve the question.

27

28

# III.

## CONCLUSION

For the foregoing reasons, AVR California requests that the Court grant the Motion and approve the proposed Agreement.  AVR California also requests that the order contain one of the following:  (1) a determination that AFC or any successor-in-interest to AFC has waived (either expressly or impliedly) or otherwise released any alleged security interest or other right, title and interest that AFC claims to have in the Vehicles and proceeds from sales of the Vehicles; or (2) a determination that the Hincklease Agreement is a true lease and not a disguised security agreement. AVR California also requests such further relief as the Court deems just and proper.

DATED:  May 19, 2021                          DANNING, GILL, ISRAEL & KRASNOFF, LLP

By:    _____*/s/ John N. Tedford, IV*_____
          JOHN N. TEDFORD, IV
          Attorneys for Airport Van Rental, Inc. and
          affiliated Debtors and Debtors in Possession

1650122.2  26988

## DECLARATION OF YAZDAN IRANI

I, Yazdan Irani, declare as follows:

1.      I am a founder of, and currently am the Chief Executive Officer of, Airport Van Rental, Inc., a California corporation ("AVR California").

2.      On December 11, 2020 (the "Petition Date"), AVR California and certain of its affiliates (collectively the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing chapter 11 cases for the Debtors (collectively the "Chapter 11 Cases").

3.      I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.  Unless stated otherwise, all facts in this declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team, my discussions with the Debtors' outside advisers, my review of documents and information concerning the Debtors' operations, financial affairs, and restructuring efforts, and/or my personal opinion based upon my experience and general knowledge about the Debtors.

4.      I am over the age of 18 and am authorized to submit this declaration on behalf of AVR California.  If called to testify, I would testify to the matters set forth in this declaration.

5.      This declaration is submitted in support of AVR California's Motion for Approval of a settlement agreement with North Iowa Equity, LLC ("NIE"), and Pritchard Auto Company ("Pritchard"), regarding vehicles to be acquired by Pritchard from Hinckley's, Inc. dba Hincklease ("Hincklease").

6.      AVR California is in the business of renting vehicles, especially large passenger vans, minivans, and SUVs, to individual consumers, corporations, and governmental entities.  In the ordinary course of AVR California's business, AVR California acquires vehicles from sellers through secondary market vehicle auctions or directly from vehicle manufacturers.  To finance the purchase of the vehicles, AVR California borrows money from lenders or enters into agreements designated as leases with vehicle financing companies.

7.      Subject to Court approval, AVR California has entered into a Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement (the "Agreement") with NIE and Pritchard.  A true and correct copy of the Agreement is attached as Exhibit "1" hereto.

8.      I believe that the settlement set forth in the Agreement is fair and reasonable and in the best interest of the bankruptcy estate of AVR California for the reasons set forth in the Motion. I also believe that there is a business justification for AVR California's entering into the Agreement, for the reasons set forth in the Motion.

9.      I am informed and believe that the payment required by AVR California's existing agreement with Hincklease currently is approximately $97,000 per month.  Based upon the VLSes attached to the Agreement, the contractual monthly payment for the same Vehicles will be reduced to approximately $75,000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___May 19___, 2021, at ___Denver___, Colorado ___.

_____
Yazdan Irani

1650122.2  26988

22

**REQUEST FOR JUDICIAL NOTICE**

Airport Van Rental, Inc., a California corporation ("AVR California"), requests that the Court take judicial notice of the following:

1.    On December 11, 2020 (the "Petition Date"), Airport Van Rental, Inc., a California corporation ("AVR California"), Airport Van Rental, Inc., a Georgia corporation, Airport Van Rental, Inc., a Nevada corporation, Airport Van Rental, LLP, a Texas limited liability partnership, and AVR Vanpool, Inc., a California corporation (collectively the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.    The Debtors remain in possession of their properties and continue to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    On March 17, 2021, Hinckley's, Inc. dba Hincklease filed a proof of claim in AVR California's case, which was assigned claim number 50 by the Clerk of the Court. Exhibit A to the proof of claim is a Master Lease Agreement effective as of September 20, 2013. A true and correct copy of Exhibit A appended to Hincklease's proof of claim is attached as Exhibit "2" hereto.

4.    Exhibit B to the proof of claim contained multiple documents, each of which is a "Vehicle Lease and Schedule." A true and correct copy of one page of Exhibit B appended to the proof of claim is attached as Exhibit "3" hereto.

DATED: May 19, 2021                    DANNING, GILL, ISRAEL & KRASNOFF, LLP


                                       By:    _/s/ John N. Tedford, IV_
                                              JOHN N. TEDFORD, IV
                                              Attorneys for Airport Van Rental, Inc. and
                                              affiliated Debtors and Debtors in Possession

EXHIBIT A

JOHN N. TEDFORD, IV (State Bar No. 205537)
*jtedford@DanningGill.com*
ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
MICHAEL G. D'ALBA (State Bar No. 264403)
*mdalba@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Airport Van Rental, Inc. and
affiliated Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:20-bk-20876-BB |
| AIRPORT VAN RENTAL, INC., et al.,[1] | Chapter 11 |
| Debtors and Debtors in Possession. | **ORDER GRANTING MOTION FOR APPROVAL OF SETTLEMENT, ADEQUATE PROTECTION AND PLAN SUPPORT AGREEMENT WITH NORTH IOWA EQUITY, LLC, RE VEHICLES TO BE ACQUIRED FROM HINCKLEY'S, INC. DBA HINCKLEASE** |
| ☐  Affects all Debtors | |
| ☒  Affects the following Debtor(s): | |
| Airport Van Rental, Inc., a California corporation | Date:      June 9, 2021<br>Time:      11:00 a.m.<br>Place:     Courtroom 1539<br>           255 E. Temple St.<br>           Los Angeles, CA 90012 |

---

[1] Pursuant to an order of the Court, this case is being jointly administered with four cases filed by the following affiliated entities: Airport Van Rental, Inc., a Georgia corporation, case no. 2:20-bk-20877-BB; Airport Van Rental, Inc., a Nevada corporation, case no. 2:20-bk-20878-BB; Airport Van Rental, LLP, a Texas limited liability partnership, case no. 2:20-bk-20882-BB; and AVR Vanpool, Inc., a California corporation, case no. 2:20-bk-20883-BB.

1650309.1  26988

On June 9, 2021, the Court conducted a hearing on the *Motion for Approval of Settlement, Adequate Protection and Plan Support Agreement with North Iowa Equity, LLC, Re Vehicles to Be Acquired from Hinckley's, Inc. dba Hincklease* (the "Motion") (*docket no. ___*) filed by Airport Van Rental, Inc., a California corporation ("AVR California"), the Honorable Sheri Bluebond, United States Bankruptcy Judge, presiding.  Appearances were as noted on the record at the hearing.

The Court having considered the Motion and the *Statement Regarding Cash Collateral or Debtor in Possession Financing*, and having heard the statements of counsel at the hearing, for good cause appearing, it is

**ORDERED THAT:**

1.    The Motion is **GRANTED**.

2.    The Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement attached as Exhibit "1" to the Declaration of Yazdan Irani appended to the Motion is **APPROVED**.  AVR California is authorized to enter into the Agreement.

3.    The Court hereby **FINDS** that, pursuant to Utah Code § 41-1a-609, the *Master Lease Agreement* between AVR California and Hinckley's, Inc. dba Hincklease is a "true lease" and does not create a sale or security interest.

4.    AVR California is authorized to take such further actions and execute such documents as it believes to be required to memorialize and implement the terms of the Agreement approved hereby.

5.    To the extent set forth in the Agreement, the Court retains jurisdiction to resolve any and all disputes pertaining to the Agreement and this order approving the Agreement, including the enforcement and interpretation of any of the terms of the Agreement.

# # # # #

EXHIBIT 1

# SETTLEMENT AGREEMENT,
## ADEQUATE PROTECTION STIPULATION, AND
## PLAN SUPPORT AGREEMENT

### (*Vehicles Acquired from Hincklease*)

This Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement ("**Agreement**") is entered into as of May 18, 2021, by and between (i) Airport Van Rental, Inc., a California corporation ("**AVR**"), and (ii) North Iowa Equity, LLC, an Iowa limited liability company (collectively "**NIE**"). AVR and NIE are referred to collectively as the "**Parties**" and each, individually, as a "**Party**." Pritchard Auto Company, an Iowa corporation ("**PAC**"), joins in this Agreement to evidence its agreement in the Sale Transaction defined below.

## RECITALS

A.      On or about September 20, 2013, AVR and Hinckley's, Inc. dba Hincklease ("**Hincklease**"), entered into a Master Lease Agreement (the "**Hincklease Agreement**"). In connection with the Hincklease Agreement, AVR and Hincklease executed Vehicle Lease and Schedules ("**Schedules**") for vehicles to be acquired by Hincklease and leased by Hincklease to AVR on the terms set forth in the Hincklease Agreement, the Schedules, and other related documents.

B.      On December 11, 2020 (the "**Petition Date**"), AVR filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Code**"), in the United States Bankruptcy Court for the Central District of California (the "**Court**"). AVR's case number is 2:20-bk-20876-BB (the "**Case**").

C.      On the Petition Date, AVR filed a motion for authority to use cash collateral (the "**Cash Collateral Motion**"). From time to time, the Court has entered orders authorizing AVR to use cash collateral on an interim or final basis. Those orders provided, in part, that "[e]ach party claiming an interest in cash collateral shall be and is hereby granted a replacement lien on all of the estate's assets, excluding avoiding power claims and recoveries, to the extent that the Debtors' use of such party's cash collateral results in a decrease in the value of such party's interest in cash collateral." The Cash Collateral Motion was granted on a final basis through the end of June 2021. AVR anticipates filing a motion for further authority to use cash collateral beyond June 2021.

D.      Prior to the Petition Date, AVR started making monthly payments to Hincklease and other lenders/lessors pursuant to an "**Adequate Protection Program**" intended to compensate each lender/lessor for any decrease in value of the vehicles in which the lender/lessor has an interest. AVR also paid each lender/lessor, among other things, proceeds from any sales of vehicles in which the lender/lessor had an interest. Recently, AVR entered into a stipulation with Hincklease pursuant to which AVR is paying Hincklease adequate protection

payments of $82,450 per month instead of the amount calculated pursuant to the Adequate Protection Program.

 E. As of the date of this Agreement, AVR is in possession of approximately 152 vehicles covered by the Hincklease Agreement (the "**Vehicles**").

 F. By separate agreement, Hincklease has agreed to sell all of the Vehicles, and all of Hincklease's right, title and interest under the Hincklease Agreement, the Schedules, and related agreements, to PAC.  PAC will transfer the Vehicles, and all of Hincklease's right, title and interest under the Hincklease Agreement, the Schedules, and related agreements, to NIE. The transactions between Hincklease, PAC and NIE are referred to herein as the "**Sale Transaction**."

 G. On or about March 24, 2021, AVR, NIE and Pritchard entered into a Master Vehicle Lease Agreement (the "**New Master Agreement**").

 H. Effective as of the Effective Date (defined below), the Parties desire to terminate the Hincklease Agreement and enter into a new agreement that sets forth the terms and conditions of NIE's lease of the Vehicles to AVR.  Copies of the Vehicle Lease Schedules (the "**VLSes**") to be incorporated by reference into the New Master Agreement are attached as Exhibit 1 hereto.  (The New Master Agreement and the VLSes are collectively referred to herein as the "**New Lease Documents**.")  The Parties also desire to resolve any disputes relating to the Cash Collateral Motion.

AGREEMENT

 1. <u>Recitals Acknowledged</u>.  Each of the Parties acknowledges that, to the best of the Party's knowledge, each of the above recitals is true and correct in every material respect.

 2. <u>Conditions</u>.  This Agreement and the Parties' obligations under this Agreement are expressly conditioned upon the following:

  (a) <u>Court Approval Required</u>.  This Agreement is subject to approval of the Court.  The Court's order approving this Agreement is referred to herein as the "**Order**."

  (b) <u>Contents of the Order</u>.  The Order must contain one of the following:

   (i) A determination that AFC, LLC, or any successor-in-interest to AFC, LLC ("**AFC**"), has waived (either expressly or impliedly) or otherwise released any alleged security interest or other right, title and interest that AFC claims to have in the Vehicles and proceeds from sales of the Vehicles; or

   (ii) A determination that the Hincklease Agreement is a "true lease" and not a disguised security agreement.

3.      Effective Date.  The "**Effective Date**" of this Agreement shall be the date on which the Order is entered.

4.      Termination of the Hincklease Agreement and Effective Date of the VLSes.  On the Effective Date, without need for further notice or agreement:

(a)      the Hincklease Agreement shall terminate; and

(b)      the VLSes shall be deemed incorporated by reference into the New Master Agreement and shall become effective.  Notwithstanding anything in Section 9A of the New Master Agreement, AVR's filing of the Case shall not constitute an event of default under the New Lease Documents.

5.      AVR's Authority to Use the Vehicles.

(a)      Provided that AVR is not in default under this Agreement and the New Lease Documents, AVR is authorized to possess and use the Vehicles under the terms and conditions of the New Lease Documents.

(b)      Conversion of the Case to one under chapter 7 of the Code shall constitute a default under this Agreement and the New Lease Documents.  In the event of such a default, NIE may, at its option, and without notice or demand on AVR or any chapter 7 trustee, declare the New Loan Documents terminated in accordance with Section 9A and 9B of the New Master Agreement.

6.      Security Agreement; AVR's Authority to Use of Cash Collateral.

(a)      To secure the performance of all monetary and non-monetary obligations of AVR that come due under the New Lease Documents during the Case, AVR hereby assigns, pledges and grants to NIE a continuing security interest and lien in and to all proceeds and products of the Vehicles, including sublease proceeds.  AVR hereby irrevocably authorizes NIE at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that identify NIE's collateral consistent with this Agreement and the New Lease Documents.

(b)      To the extent that NIE has an interest in cash collateral, as that term is used in section 363(a) of the Code, provided that AVR is not in default under this Agreement and the New Lease Documents, NIE consents to AVR's use of its cash collateral through the earlier of (a) the date on which a chapter 11 plan takes effect, and (b) the date on which the Case is converted to one under chapter 7 of the Code.

(c)      If AVR commits an act that constitutes an event of default under this Agreement or the New Lease Documents, upon receipt of a written notice of default and demand by NIE, AVR shall account for and deposit into a segregated account all proceeds and products of the Vehicles that are received by AVR from and after the date on which such written demand is made.

(d)    NIE waives, releases and discharges any and all adequate protection liens that have arisen in favor of Hincklease pursuant to the Court's orders authorizing AVR's use of cash collateral on an interim or final basis.

7.    <u>Adequate Protection Payments</u>.    After the Effective Date, in accordance with sections 361, 362 and 363 of the Code, cash payments made and which are required to be made in a timely manner by AVR to NIE in accordance with the New Lease Documents shall constitute adequate protection for AVR's use of the Vehicles and any cash collateral in which NIE has an interest.

8.    <u>Treatment of the New Lease Documents as a True Lease in the Case</u>.    AVR agrees that, for all purposes in the Case, the New Lease Documents shall be treated as a true lease.

9.    <u>Consent to Treatment under Chapter 11 Plan</u>.

(a)    The Parties acknowledge that this Agreement is entered into in contemplation of the proposal and confirmation of a chapter 11 plan by AVR.

(b)    The treatment of NIE under any plan proposed by AVR shall be consistent with, and AVR shall not in any way seek to alter, modify, or contradict, the terms of this Agreement or the New Lease Documents.  If advisable, AVR shall use its best efforts to obtain confirmation of such a plan.  Provided that AVR's proposed plan is consistent with this Agreement and the New Lease Documents, NIE agrees to fully support AVR's proposed plan and further agrees not to directly or indirectly (i) propose, file, seek, solicit or support any restructuring, refinancing, workout, plan of arrangement, plan of reorganization or other recapitalization transaction for AVR other than as contemplated by this Agreement, or (ii) take any action or commence any proceeding to delay, impede, interfere or oppose, directly or indirectly, or seek any modification of AVR's plan.

(c)    Nothing herein shall be deemed to require confirmation of a plan as a condition to the effectiveness and enforceability of the New Lease Documents.

10.    <u>Relief from Stay</u>.

(a)    As of the Effective Date, the automatic stay arising in the Case under section 362 of the Code shall be deemed terminated as to the Vehicles and the liquidation proceeds of the Vehicles.  If an event of default (as defined in this Agreement or the New Lease Documents) occurs prior to the effective date of a plan, NIE shall be entitled, without further order of the Court, to enforce all of its rights under this Agreement and the New Lease Documents to recover the Vehicles without the need for filing any legal action by NIE against AVR for replevin or return of the Vehicles to NIE.  If NIE wishes to enforce its rights as against any other property of AVR or AVR's estate, NIE may do so only upon entry of a separate order of the Court authorizing NIE to do so.

(b)    If an event of default (as defined in this Agreement or the New Lease Documents) occurs prior to the effective date of a plan, NIE shall file a written notice of the default in the Case prior to exercising its remedies as to the Vehicles.

11.    <u>Mutual Limited Release</u>.

(a)    Effective as of the Effective Date, and except as may be provided in this Agreement and the New Lease Documents, each of the Parties releases, remises, relieves, waives, relinquishes and discharges the other Party and its agents, representatives, attorneys, successors and assigns, of and from any and all rights, claims, defenses, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or causes of action of every nature, character and description, whether known or unknown, suspected or unsuspected, which the Party had, now has, or may hereafter claim under or related to the Hincklease Agreement and AVR's use of the Vehicles prior to the Effective Date.

(b)    Except as may be provided in this Agreement and the New Lease Documents, the Parties waive any and all rights and benefits they may have under section 1542 of the California Civil Code, as well as any and all rights and benefits they may have under any other statute or common law doctrine of similar effect.  Section 1542 of the California Civil Code reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(c)    For purposes of clarification:  The foregoing releases do not apply to any rights, claims, defenses, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or causes of action arising under or related to this Agreement or the New Lease Documents.

12.    <u>Waiver of Administrative Claim</u>.  If and to the extent that NIE, as successor in interest to Hincklease, has a right to assert an administrative claim against AVR's bankruptcy estate for AVR's postpetition use of any vehicles from the Petition Date through the Effective Date, NIE waives its right to such an administrative claim.  NIE does *not* waive any administrative claim for any amounts AVR is required to pay pursuant to this Agreement and the New Lease Documents.

13.    <u>Successors and Assigns</u>.  This Agreement is binding upon and shall inure to the benefit of the Parties hereto, and their respective attorneys, agents, heirs, administrators, predecessors, successors and assigns, and any subsequently appointed trustee under chapter 11 or chapter 7 of the Code.

14.    <u>Severability</u>.  If any portion of this Agreement is found to be void, voidable or unenforceable at law, the remaining terms and conditions of this Agreement may be enforced.

1641882.6  26988                          5

15.    <u>Governing Law and Jurisdiction</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California.  The Court shall retain exclusive jurisdiction to resolve any and all disputes pertaining to this Agreement, including without limitation the enforcement and interpretation of any of its terms, and the Parties agree to submit to the jurisdiction of the Court for the purpose of resolving such disputes.  Notwithstanding the foregoing, the New Lease Documents shall be governed by and construed in accordance with the choice of law provisions contained therein, and jurisdiction over disputes arising under or related to the New Lease Documents and not pertaining particularly to the terms of this Agreement shall be as set forth therein.

16.    <u>Further Assurances</u>.  Each Party shall execute all instruments and documents and take all actions as may be reasonably required to effectuate the purpose of this Agreement, including but not limited to the retitling of all of the Vehicles as directed by PAC and NIE.

17.    <u>Modification</u>.  This Agreement may be modified only by a writing executed by the Party to this Agreement against whom enforcement of such modification is sought.

18.    <u>Attorneys' Fees and Expenses</u>.  Each Party shall bear his, her or its own attorneys' fees, court costs and related expenses incurred by or on behalf of said Party in connection with the preparation of this Agreement and seeking requisite approvals thereof.

19.    <u>Interpretation</u>.  This Agreement has been negotiated at arms' length, and between persons sophisticated and knowledgeable in matters dealt with in this Agreement.  Accordingly, any rule of law, statute, legal decision or common law principle that would require interpretation of any ambiguities in this Agreement against the Party that has drafted it is not applicable, and is waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purpose and intent of this Agreement.

20.    <u>Authority to Sign</u>.  The person signing below on behalf of each Party, and each Party, represents that the signing person has the authority to execute this Agreement on behalf of said Party, and that it is not necessary for any other Party to inquire further into the validity of execution or authority to execute.

[*Continued on Next Page*]

21.   <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, California's Uniform Electronic Transaction Act (Cal. Civ. Code § 1633.1 et seq.) or other applicable law) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

AIRPORT VAN RENTAL, INC., a California corporation

_____

By:     Yazdan Irani
Its:     Chief Executive Officer

NORTH IOWA EQUITY, LLC, an Iowa limited liability company

_____

By:
Its:

PRITCHARD AUTO COMPANY, an Iowa corporation

_____

By:
Its:

# North Iowa Equity, LLC

# VEHICLE LEASE SCHEDULE

The following vehicle is hereby added to the Master Lease Agreement dated **3/24/2021**, between

North Iowa Equity, LLC (Lessor) and Airport Van Rental (Lessee).

Date: **6/11/2021**

**Lessor:**
North Iowa Equity, LLC
1400 S. 24th St., Suite B / P.O. Box 147
Clear Lake, IA 50428

**Lessee:**
Airport Van Rental
12911 Cerise Avenue
Hawthorne, CA 90250

Schedule B

| Unit / VIN | Year | Make | Vehicle Description | In-Service Date | Term | Gross Capitalized Cost | Capitalized Cost Reduction | Net Capitalized Cost | Monthly Payment | Monthly Depreciation | Monthly Rent Charge | Lease End Residual Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5TDDGRFH7HS020723 | 2017 | Toyota | Highlander | 6/11/2021 | 24 | $ 27,076.31 | $ 1,462.01 | $ 25,614.30 | $ 672.38 | $ 512.29 | $ 160.09 | $ 13,319.44 |
| 1GAZGPFG3H1137982 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $ 14,564.31 | $ 780.82 | $ 13,783.49 | $ 361.82 | $ 236.73 | $ 86.15 | $ 8,821.43 |
| 2C4RDGEG7JR140533 | 2018 | DODGE | Gr Caravan GT | 6/11/2021 | 18 | $ 12,503.81 | $ 670.49 | $ 11,833.32 | $ 310.62 | $ 236.67 | $ 73.96 | $ 7,573.32 |
| 2C4RDGEG7JR143304 | 2018 | DODGE | Gr Caravan GT | 6/11/2021 | 24 | $ 12,678.81 | $ 680.08 | $ 11,998.73 | $ 314.97 | $ 239.97 | $ 74.99 | $ 6,239.34 |
| 2C4RDGEG6JR145421 | 2018 | Dodge | Gr Caravan GT | 6/11/2021 | 24 | $ 12,941.31 | $ 694.47 | $ 12,246.84 | $ 321.48 | $ 244.94 | $ 76.54 | $ 6,368.36 |
| JN8AE2KP1H9168530 | 2017 | Nissan | Quest SV | 6/11/2021 | 24 | $ 13,242.31 | $ 713.66 | $ 12,528.65 | $ 328.88 | $ 218.32 | $ 68.22 | $ 6,514.90 |
| JN8AE2KP7H9168578 | 2017 | Nissan | Quest SV | 6/11/2021 | 24 | $ 11,536.06 | $ 620.12 | $ 10,915.94 | $ 286.54 | $ 218.32 | $ 68.22 | $ 5,676.29 |
| 1GAZGPFG0H1169353 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 15,133.06 | $ 812.00 | $ 14,321.06 | $ 375.93 | $ 286.42 | $ 89.51 | $ 7,446.95 |
| 1GAZGPFG4H1194806 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 14,914.31 | $ 800.01 | $ 14,114.30 | $ 370.50 | $ 286.54 | $ 88.21 | $ 7,819.86 |
| 1GAZGPFF0H1194907 | 2017 | Chevrolet | Express Van | 6/11/2021 | 12 | $ 10,867.44 | $ 578.14 | $ 10,289.30 | $ 270.00 | $ 205.79 | $ 64.31 | $ 7,819.86 |
| 2C4RDGEG6JR195350 | 2018 | Dodge | Gr Caravan | 6/11/2021 | 24 | $ 12,637.56 | $ 672.89 | $ 11,964.67 | $ 314.07 | $ 239.29 | $ 74.78 | $ 6,521.63 |
| 2C4RDGEG4JR195621 | 2018 | Dodge | Gr Caravan GT | 6/11/2021 | 24 | $ 11,850.06 | $ 629.71 | $ 11,220.35 | $ 294.53 | $ 224.41 | $ 70.13 | $ 8,527.47 |
| 2C4RDGEG5JR195803 | 2018 | Dodge | Gr Caravan GT | 6/11/2021 | 18 | $ 12,637.56 | $ 672.89 | $ 11,964.67 | $ 314.07 | $ 239.29 | $ 74.78 | $ 6,221.63 |
| 2C4RDGEG6JR195829 | 2018 | Dodge | Gr Caravan GT | 6/11/2021 | 18 | $ 12,200.06 | $ 648.90 | $ 11,551.16 | $ 303.22 | $ 231.02 | $ 72.19 | $ 7,392.74 |
| 2C4RDGEG1JR195947 | 2018 | Dodge | Gr Caravan GT | 6/11/2021 | 24 | $ 12,768.81 | $ 680.08 | $ 12,088.73 | $ 317.33 | $ 241.77 | $ 75.55 | $ 6,286.14 |
| 1GAZGPFG9H1202852 | 2018 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 12 | $ 13,908.06 | $ 744.84 | $ 13,163.22 | $ 345.53 | $ 282.27 | $ 82.27 | $ 10,004.05 |
| 1GAZGPFFXH1214872 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 12 | $ 10,583.06 | $ 562.55 | $ 10,020.51 | $ 263.00 | $ 200.41 | $ 62.63 | $ 7,615.59 |
| 1GAZGPFG6H1256110 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 14,825.06 | $ 792.82 | $ 14,032.24 | $ 368.35 | $ 280.64 | $ 87.70 | $ 7,296.76 |
| 1GA7PFG8H1256206 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $ 14,843.81 | $ 766.43 | $ 13,577.38 | $ 356.41 | $ 271.55 | $ 84.86 | $ 8,689.52 |
| 1GA7PFG6H1256270 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 14,781.31 | $ 790.42 | $ 13,990.89 | $ 367.26 | $ 279.82 | $ 87.44 | $ 7,275.26 |
| 1GA7PFG9H1256599 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 14,606.31 | $ 780.82 | $ 13,825.49 | $ 362.92 | $ 279.57 | $ 86.41 | $ 7,189.25 |
| 1GA7PFG6J1236642 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 13,993.81 | $ 747.24 | $ 13,246.57 | $ 347.72 | $ 264.93 | $ 82.79 | $ 6,888.22 |
| 1GA7PFG8J1237114 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 14,518.81 | $ 776.03 | $ 13,742.78 | $ 360.75 | $ 274.86 | $ 85.89 | $ 7,146.25 |
| 1GA7PFG8J1237229 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 15,131.31 | $ 809.61 | $ 14,321.70 | $ 375.94 | $ 286.43 | $ 89.51 | $ 7,447.28 |
| 1GA7PFG0J1237365 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 12 | $ 14,037.56 | $ 749.64 | $ 13,287.92 | $ 348.81 | $ 265.76 | $ 83.05 | $ 10,098.82 |
| 1GA7PFG5J1237622 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 15,350.06 | $ 821.60 | $ 14,528.46 | $ 381.37 | $ 290.57 | $ 90.80 | $ 7,554.80 |
| 1GA7PFG8J1237680 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 14,518.81 | $ 776.03 | $ 13,742.78 | $ 360.75 | $ 274.86 | $ 85.89 | $ 7,146.25 |
| 2C4RDGEG9JR237953 | 2018 | Dodge | Gr Caravan GT | 6/11/2021 | 24 | $ 12,328.81 | $ 660.89 | $ 11,667.92 | $ 306.28 | $ 233.36 | $ 72.92 | $ 6,067.32 |
| 1GA7PFG8J1237954 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 13,862.56 | $ 740.05 | $ 13,122.51 | $ 344.47 | $ 262.45 | $ 82.02 | $ 9,973.11 |
| 1GA7PFG8J1238041 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 13,883.81 | $ 778.42 | $ 13,784.14 | $ 361.83 | $ 275.68 | $ 86.15 | $ 7,167.75 |
| 1GA7PFG6J1238343 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $ 14,562.56 | $ 821.60 | $ 13,528.46 | $ 381.37 | $ 275.68 | $ 86.15 | $ 7,554.80 |
| 1GA7PFG6J1238932 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 12 | $ 13,993.81 | $ 747.24 | $ 13,246.57 | $ 347.72 | $ 264.93 | $ 82.79 | $ 10,067.39 |

## North Iowa Equity, LLC

## VEHICLE LEASE SCHEDULE

| Continued (VIN) | Year | Make | Model | Date | Term | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1GJZ7PFG5J1239337 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 12 | $13,731.33 | $732.85 | $12,998.46 | $341.21 | $259.97 | $81.24 | $9,878.83 |
| 1GJZ7PFGXJ1239642 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $14,475.06 | $773.63 | $13,701.43 | $359.66 | $274.03 | $85.63 | $8,768.92 |
| 1GJZ7PFG3J1239688 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $14,125.06 | $754.44 | $13,370.62 | $350.98 | $267.41 | $83.57 | $8,557.20 |
| 1GJZ7PFG1J1239806 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $14,693.81 | $785.62 | $13,908.19 | $365.00 | $278.16 | $86.93 | $7,232.26 |
| 1GJZ7PFG3J1239828 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $15,831.31 | $847.98 | $14,983.33 | $393.31 | $299.67 | $93.65 | $7,791.33 |
| 1GJZ7PFG4J1239958 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $13,950.06 | $744.84 | $13,205.22 | $346.64 | $264.10 | $82.53 | $6,866.71 |
| 1GJZ7PFG8J1240062 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $14,518.81 | $776.03 | $13,742.78 | $360.75 | $274.86 | $85.89 | $7,146.25 |
| 1GJZ7PFG9J1240175 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $14,181.31 | $790.42 | $13,990.89 | $367.26 | $279.82 | $87.44 | $7,275.26 |
| 1GJZ7PFG1J1240257 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $14,825.06 | $792.82 | $14,032.24 | $368.35 | $280.64 | $87.70 | $7,296.76 |
| 1GJZ7PFG2J1240347 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $13,993.81 | $747.24 | $13,246.57 | $347.72 | $264.93 | $82.79 | $6,888.22 |
| 1GJZ7PFG1J1240419 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $14,606.31 | $780.82 | $13,825.49 | $362.92 | $276.51 | $86.41 | $7,189.25 |
| 1GJZ7PFG3J1240712 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $14,300.06 | $764.03 | $13,536.03 | $355.32 | $270.72 | $84.60 | $7,038.74 |
| 1GJZ7PFG9J1240751 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $14,868.81 | $795.21 | $14,073.60 | $369.43 | $281.47 | $87.96 | $7,124.74 |
| 1GJZ7PFG2J1241224 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $15,087.56 | $807.21 | $14,280.35 | $374.86 | $285.61 | $89.25 | $7,425.78 |
| 1GJZ7PFG9J1241532 | 2018 | GMC | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $14,450.06 | $773.63 | $13,701.43 | $359.66 | $274.03 | $85.63 | $8,768.92 |
| 1GJZ7PFG5J1250634 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $11,543.81 | $612.92 | $10,930.89 | $286.94 | $218.62 | $68.32 | $6,995.77 |
| 1GAZGPFG4G1263354 | 2016 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $11,762.56 | $624.92 | $11,137.64 | $292.36 | $222.75 | $69.61 | $5,791.57 |
| 1GAZGPFG6H1277875 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $11,973.81 | $641.71 | $11,332.10 | $297.47 | $226.64 | $70.83 | $5,892.69 |
| 3FAGP0PU4HR305971 | 2017 | Ford | Fusion | 6/11/2021 | 18 | $16,268.81 | $871.97 | $15,396.84 | $404.17 | $307.94 | $96.23 | $8,006.36 |
| 1GAZGPFG1J1330013 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $16,793.81 | $900.75 | $15,893.06 | $417.19 | $317.86 | $99.33 | $8,264.39 |
| 1GAZGPFG4J1330390 | 2018 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 15 | $15,700.06 | $840.79 | $14,859.27 | $390.06 | $297.19 | $92.87 | $7,726.82 |
| 1GAZGPFG1J1332383 | 2018 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 18 | $14,650.06 | $783.22 | $13,866.84 | $364.00 | $277.34 | $86.67 | $8,874.78 |
| 1GAZGPFG8H1336428 | 2017 | Chevrolet | G3500 Ext Pass Van LT | 6/11/2021 | 24 | $30,559.81 | $1,658.70 | $28,901.11 | $758.65 | $578.02 | $180.63 | $15,028.58 |
| 3CGTRVPG6HE514027 | 2017 | Ram | Promaster Passenger | 6/11/2021 | 24 | $14,166.31 | $761.63 | $13,404.68 | $351.87 | $268.09 | $83.78 | $6,970.44 |
| 2C4RDGCG3KR543261 | 2019 | DODGE | GR CARAVAN SXT | 6/11/2021 | 24 | $15,653.80 | $843.18 | $14,810.62 | $388.78 | $296.21 | $92.57 | $7,701.52 |
| 2C4RDGCG0KR618795 | 2019 | DODGE | GR CRV | 6/11/2021 | 24 | $11,585.06 | $620.12 | $10,964.94 | $287.83 | $219.30 | $68.53 | $5,701.77 |
| 2C4RDGCG6HR800021 | 2017 | Dodge | Gr Caravan SXT | 6/11/2021 | 18 | $23,137.31 | $1,250.94 | $21,886.37 | $574.52 | $437.73 | $136.79 | $11,380.91 |
| 5B2B6DAA6JN851996 | 2018 | Nissan | NVPSL | 6/11/2021 | 24 | $22,262.31 | $1,202.97 | $21,059.34 | $552.81 | $421.19 | $131.62 | $10,930.86 |
| 5B2B6DAA5JN852024 | 2018 | Nissan | NVPSL | 6/11/2021 | 24 | $21,037.31 | $1,135.81 | $19,901.50 | $522.41 | $398.03 | $124.38 | $10,348.78 |
| 1F8AX9VG4LKA05043 | 2020 | Nissan | Transit AWD | 6/11/2021 | 24 | $39,819.31 | $2,162.39 | $37,656.92 | $988.49 | $753.14 | $235.36 | $19,581.60 |
| 1F8AX9VG5LKA05052 | 2020 | Ford | Transit AWD | 6/11/2021 | 24 | $39,819.31 | $2,162.39 | $37,656.92 | $988.49 | $753.14 | $235.36 | $19,581.60 |
| 1F8EX2ZM8JKA29647 | 2018 | Ford | Transit | 6/11/2021 | 24 | $19,014.06 | $1,023.08 | $17,990.98 | $472.26 | $359.82 | $112.44 | $9,355.31 |
| 1F8EX2YVM8JKA35773 | 2019 | Ford | Transit | 6/11/2021 | 18 | $18,226.56 | $979.90 | $17,246.66 | $452.72 | $344.93 | $107.79 | $8,968.26 |
| 1F8EX2YVM4JKA57916 | 2019 | Ford | Transit | 6/11/2021 | 24 | $18,226.56 | $979.90 | $17,246.66 | $452.72 | $344.93 | $107.79 | $8,968.26 |
| 1FMCU9GDXHUA61421 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $13,374.56 | $720.86 | $12,653.70 | $332.16 | $253.07 | $79.09 | $6,579.92 |
| 1FMZK1CM3JKA68414 | 2019 | Ford | T350 XL | 6/11/2021 | 24 | $20,107.80 | $1,083.04 | $19,024.76 | $499.40 | $380.50 | $118.90 | $9,892.88 |
| 1F8EX2YVM1JKA70011 | 2018 | Ford | Transit XLT T150 | 6/11/2021 | 24 | $19,407.81 | $1,044.66 | $18,363.15 | $482.03 | $367.26 | $114.77 | $9,548.84 |
| 1F8EX2YVGXJKA72818 | 2018 | Ford | Transit | 6/11/2021 | 24 | $20,720.31 | $1,116.62 | $19,603.69 | $514.60 | $392.07 | $122.52 | $10,243.92 |
| 1F8EX2YVM2JKA72852 | 2018 | Ford | Transit | 6/11/2021 | 18 | $16,914.06 | $907.95 | $16,006.11 | $420.16 | $320.12 | $100.04 | $10,243.91 |
| 1F8EX2YVG8JKA73031 | 2018 | Ford | Transit | 6/11/2021 | 24 | $21,857.81 | $1,178.98 | $20,678.83 | $542.82 | $413.58 | $129.24 | $10,752.99 |
| 1F8EX2YVM0JKA73272 | 2018 | Ford | Transit | 6/11/2021 | 24 | $19,057.81 | $1,025.48 | $18,032.33 | $473.35 | $360.65 | $112.70 | $9,376.81 |
| 1F8EX2YVG3JKA73292 | 2018 | Ford | Transit T350 | 6/11/2021 | 24 | $22,732.81 | $1,226.95 | $21,505.86 | $564.53 | $430.12 | $134.41 | $11,183.05 |

# North Iowa Equity, LLC

# VEHICLE LEASE SCHEDULE

Continued

| VIN | Year | Make | Model | Date | Term | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1FBZX2YG7JKA73358 | 2018 | Ford | Transit | 6/11/2021 | 24 | $21,070.31 | $1,135.81 | $19,934.50 | $523.28 | $398.69 | $124.59 | $10,365.94 |
| 1FBZX2YG9JKA73362 | 2018 | Ford | Transit | 6/11/2021 | 24 | $21,857.81 | $1,178.98 | $20,678.83 | $542.82 | $413.58 | $129.24 | $10,752.99 |
| 1FBZX2YG2JKA75275 | 2018 | Ford | Transit | | 24 | $22,032.81 | $1,188.58 | $20,844.23 | $547.16 | $416.88 | $130.28 | $10,839.00 |
| 1FMCU9GD9HUA79280 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | | $713.66 | $12,529.65 | $328.90 | $250.59 | $78.31 | $6,515.42 |
| 1FMCU9GD3HUA81803 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $13,243.31 | $713.66 | $12,529.65 | $328.90 | $250.59 | $78.31 | $6,515.42 |
| 1FBZX2YM5JKA87538 | 2018 | Ford | Transit | 6/11/2021 | 24 | $18,051.56 | $970.31 | $17,081.25 | $448.38 | $341.63 | $106.76 | $8,882.25 |
| 1FBZX2YG3JKA87636 | 2018 | Ford | Transit | 6/11/2021 | 24 | $20,895.31 | $1,126.22 | $19,769.09 | $518.94 | $395.38 | $123.56 | $10,279.93 |
| 1FBZX2YM0JKA87706 | 2018 | Ford | Transit | 6/11/2021 | 24 | $18,882.81 | $1,015.88 | $17,866.93 | $469.01 | $357.34 | $111.67 | $9,290.80 |
| 1FBAX2CM0KKA94550 | 2019 | Ford | Transit | 6/11/2021 | 24 | $25,357.81 | $1,370.87 | $23,986.94 | $629.66 | $479.74 | $149.92 | $12,473.21 |
| 1FBAX2CM3KKA94588 | 2019 | Ford | Transit | 6/11/2021 | 24 | $26,582.81 | $1,438.03 | $25,144.78 | $660.05 | $502.90 | $157.15 | $13,075.29 |
| 1FBAX2CM5KKA94592 | 2019 | Ford | Transit | 6/11/2021 | 24 | $27,020.31 | $1,462.01 | $25,558.30 | $670.91 | $511.17 | $159.74 | $13,290.32 |
| 1FBAX2CM6KKA94598 | 2019 | Ford | Transit | 6/11/2021 | 24 | $25,620.31 | $1,385.26 | $24,235.05 | $636.17 | $484.70 | $151.47 | $12,602.23 |
| 1FBAX2DMXKKA93605 | 2019 | Ford | Transit | 6/11/2021 | 24 | $25,007.81 | $1,351.68 | $23,656.13 | $620.97 | $473.12 | $147.85 | $12,301.19 |
| 1FBZX2ZM4HKB02187 | 2018 | Ford | Transit | 6/11/2021 | 24 | $18,401.56 | $989.50 | $17,412.06 | $457.07 | $348.24 | $108.83 | $9,054.27 |
| 1FBZX2YM0JKB05721 | 2018 | Ford | T350 Low Roof Pass | 6/11/2021 | 24 | $17,657.81 | $948.72 | $16,709.09 | $438.61 | $334.18 | $104.43 | $8,688.73 |
| 1FBZX2ZM2KKB05946 | 2018 | Ford | Transit | 6/11/2021 | 24 | $22,557.81 | $1,217.36 | $21,340.45 | $560.19 | $426.81 | $133.38 | $11,097.03 |
| 1FBZX2YM2JKB06014 | 2018 | Ford | Transit | 6/11/2021 | 24 | $18,051.56 | $970.31 | $17,081.25 | $448.38 | $341.63 | $106.76 | $8,882.25 |
| 1FBZX2YG8JKB06061 | 2018 | Ford | Transit | 6/11/2021 | 24 | $20,282.81 | $1,092.64 | $19,190.17 | $503.74 | $383.80 | $119.94 | $9,978.89 |
| 1FBZX2YM7JKB09376 | 2018 | Ford | Transit XLT | 6/11/2021 | 24 | $18,007.80 | $967.91 | $17,039.89 | $447.30 | $340.80 | $106.50 | $8,860.74 |
| 1FMCU9GD4HUB41393 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $12,718.31 | $684.88 | $12,033.43 | $315.88 | $240.67 | $75.21 | $6,257.38 |
| 1FMCU9GD4HUB87995 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $12,499.56 | $672.89 | $11,826.67 | $310.45 | $236.53 | $73.92 | $6,149.87 |
| 1FMCU9GD3HUB89253 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $12,587.06 | $677.68 | $11,909.38 | $312.62 | $238.19 | $74.43 | $6,192.88 |
| 1FMCU9GD6HUC09886 | 2017 | Ford | Escape | 6/11/2021 | 24 | $13,680.81 | $737.65 | $12,943.16 | $339.76 | $258.86 | $80.89 | $6,730.44 |
| 1FMCU9GD0HUC22973 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $12,149.56 | $653.70 | $11,495.86 | $301.77 | $229.92 | $71.85 | $5,977.85 |
| 1FMCU9GD7HUC23974 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $11,974.56 | $644.10 | $11,330.46 | $297.42 | $226.61 | $70.82 | $5,891.84 |
| 1FMCU9G09HUC33132 | 2017 | Ford | Escape | 6/11/2021 | 24 | $12,587.06 | $677.68 | $11,909.38 | $312.62 | $238.19 | $74.43 | $6,192.88 |
| 1FMCU9G07HUC47630 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $12,499.56 | $672.89 | $11,826.67 | $310.45 | $236.53 | $73.92 | $6,149.87 |
| 1FMCU9GD3HUC77207 | 2017 | Ford | Escape SE | 6/11/2021 | 24 | $12,849.56 | $692.08 | $12,157.48 | $319.13 | $243.15 | $75.98 | $6,321.89 |
| 1FMCU9GD8HUD09519 | 2017 | Ford | Escape | 6/11/2021 | 18 | $11,449.29 | $615.32 | $10,833.97 | $284.39 | $216.68 | $67.71 | $6,933.74 |

Lessor:

Lessee:

# North Iowa Equity, LLC

# VEHICLE LEASE SCHEDULE

The following vehicle is hereby added to the Master Lease Agreement dated    3/24/2021    , between

North Iowa Equity, LLC     (lessor) and     Airport Van Rental     (lessee),

Lessor:
North Iowa Equity, LLC
1400 S. 24th St., Suite B / P.O. Box 147
Clear Lake, IA 50428

Lessee:
Airport Van Rental
12911 Cerise Avenue
Hawthorne, CA 90250

Schedule C

Date:    6/11/2021

| Unit / VIN | Year | Vehicle Description | In-Service Date | Term | Gross Capitalized Cost | Capitalized Cost Reduction | Net Capitalized Cost | Monthly Payment | Monthly Depreciation | Monthly Rent Charge | Lease End Residual Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2C4RC1H70LR109400 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,864.64 | $ 1,574.20 | $ 27,290.44 | $ 716.37 | $ 545.81 | $ 170.57 | $ 14,191.03 |
| 2C4RC1H72LR109401 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,864.64 | $ 1,579.69 | $ 27,384.95 | $ 718.85 | $ 547.70 | $ 171.16 | $ 14,240.17 |
| 2C4RC1H74LR109402 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,864.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H72LR134363 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H74LR134364 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H76LR134365 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H78LR134366 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H7XLR134387 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H79LR134375 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H70LR134376 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H72LR134377 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H74LR134378 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H78LR134131 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,864.64 | $ 1,574.20 | $ 27,290.44 | $ 716.37 | $ 545.81 | $ 170.57 | $ 14,191.03 |
| 2C4RC1H7XLR134132 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H71LR134133 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H73LR134134 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H75LR134135 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H77LR134136 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H79LR134137 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H70LR134138 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,764.64 | $ 1,568.72 | $ 27,195.92 | $ 713.89 | $ 543.92 | $ 169.97 | $ 14,141.88 |
| 2C4RC1H72LR134139 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,764.64 | $ 1,568.72 | $ 27,195.92 | $ 713.89 | $ 543.92 | $ 169.97 | $ 14,141.88 |
| 2C4RC1H79LR134140 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,764.64 | $ 1,568.72 | $ 27,195.92 | $ 713.89 | $ 543.92 | $ 169.97 | $ 14,141.88 |
| 2C4RC1H79LR134141 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H75LR134149 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H70LR134150 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H73LR134151 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H75LR134152 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,164.64 | $ 1,590.65 | $ 27,573.99 | $ 723.82 | $ 551.48 | $ 172.34 | $ 14,338.47 |
| 2C4RC1H77LR134153 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H79LR134154 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H79LR135155 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H70LR135156 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,764.64 | $ 1,623.55 | $ 28,141.09 | $ 728.70 | $ 562.82 | $ 175.88 | $ 14,633.37 |
| 2C4RC1H74LR135157 | 2020 | Chrysler Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,964.64 | $ 1,634.51 | $ 28,330.13 | $ 743.67 | $ 566.60 | $ 177.06 | $ 14,731.67 |

## North Iowa Equity, LLC

## VEHICLE LEASE SCHEDULE

Continued

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2C4RC1H78LR139650 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,264.64 | $ 1,596.13 | $ 27,668.51 | $ 726.30 | $ 553.37 | $ 172.93 | $ 14,387.63 |
| 2C4RC1H71LR143538 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H79LR147496 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,764.64 | $ 1,623.55 | $ 28,141.09 | $ 738.70 | $ 562.82 | $ 175.88 | $ 14,633.37 |
| 2C4RC1H70LR147497 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H72LR147498 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 28,764.64 | $ 1,568.72 | $ 27,195.92 | $ 713.89 | $ 543.92 | $ 169.97 | $ 14,141.88 |
| 2C4RC1H74LR147499 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,064.64 | $ 1,585.17 | $ 27,479.47 | $ 721.34 | $ 549.59 | $ 171.75 | $ 14,289.32 |
| 2C4RC1H77LR147500 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,764.64 | $ 1,623.55 | $ 28,141.09 | $ 738.70 | $ 562.82 | $ 175.88 | $ 14,633.37 |
| 2C4RC1H79LR147501 | 2020 | Chrysler | Pacifica Hybrid Trg | 6/11/2021 | 24 | $ 29,764.64 | $ 1,623.55 | $ 28,141.09 | $ 738.70 | $ 562.82 | $ 175.88 | $ 14,633.37 |
| 2C4RC1H73JR164503 | 2018 | Chrysler | Pacifica Hybrid Touring F | 6/11/2021 | 24 | $ 26,764.64 | $ 1,459.07 | $ 25,305.57 | $ 664.27 | $ 506.11 | $ 158.16 | $ 13,158.90 |
| 2C4RC1H75JR164504 | 2018 | Chrysler | Pacifica Hybrid Touring F | 6/11/2021 | 24 | $ 23,764.64 | $ 1,294.60 | $ 22,470.04 | $ 589.84 | $ 449.40 | $ 140.44 | $ 11,684.42 |
| 2C4RC1H7XJR187650 | 2018 | Chrysler | Pacifica Hybrid Touring F | 6/11/2021 | 24 | $ 25,264.64 | $ 1,376.84 | $ 23,887.80 | $ 627.05 | $ 477.76 | $ 149.30 | $ 12,421.66 |
| 2C4RC1H71JR194809 | 2018 | Chrysler | Pacifica Hybrid Touring F | 6/11/2021 | 24 | $ 23,764.48 | $ 1,294.59 | $ 22,469.89 | $ 589.83 | $ 449.40 | $ 140.44 | $ 11,684.34 |

Lessor:

Lessee:

EXHIBIT 2

# HINCKLEY'S, INC.
# MASTER LEASE AGREEMENT

This Master Lease Agreement (this "Agreement") is made at Salt Lake City, Utah, effective the **20th day of September, 2013** (the "Effective Date") by and between **HINCKLEY'S, INC.,** a Utah corporation (doing business as HINCKLEASE), with its principal offices located at 2305 S President's Dr, Suite F, Salt Lake City, UT 84120 ("Lessor") and **AIRPORT VAN RENTAL, INC.,** a California Corporation, with its principal offices located at 5250 West Century Boulevard Suite # 106, Los Angeles, California  90045 ("Lessee"). (Lessor and Lessee are referenced herein individually as a "Party" and collectively as the "Parties").

1. VEHICLES LEASED. Lessor leases to Lessee, and Lessee leases from Lessor, all vehicles (including all replacements and substitutions thereto from time to time) (individually a "Vehicle" and collectively, the "Vehicles") described in each and every Vehicle Lease Schedule executed and delivered pursuant to this Agreement (singly, a "Schedule" and collectively, "Schedules"). Each Schedule incorporates this Agreement. Lessee and Lessor acknowledge that this Agreement constitutes a "TRAC (Terminal Rental Adjustment Clause) Lease" with respect to Section 7701(h)(3) of the Internal Revenue Code and that Lessee has no equity or other ownership rights in the Vehicles or their accessories or replacement parts other than the Purchase Option referenced this Agreement.

2. TERM.

a) Schedules. The term of each Schedule (a "Schedule Term") shall commence upon the delivery (the "Delivery Date") to Lessee of the Vehicle subject to each Schedule and shall continue until the Termination Date (the "Termination Date") specified in each Schedule, unless terminated earlier as permitted by this Agreement. The termination of a Schedule Term, without more, shall not affect the rights of the Parties with respect to any obligation due but not performed prior to such termination including any obligation by Lessee to Lessor to pay Rent. The execution of the Schedule by Lessee shall constitute a certificate of acceptance of the Vehicle by Lessee.

b) This Agreement. The term of this Agreement shall commence on the Effective Date and shall continue in effect thereafter so long as any Schedule Term remains in effect. The expiration or termination of this Agreement, without more, shall not affect the rights of the Parties with respect to any obligation due but not performed prior to such termination.

3. RENT. Lessee shall pay rent ("Rent") monthly to Lessor in the amounts and by the dates as set forth in each Schedule. Unless otherwise explicitly provided in a Schedule, each monthly installment of Rent payable under each Schedule shall be paid in advance on the first business day of the month in which said payment is to be made, regardless of whether Lessor has rendered a monthly statement. If the Delivery Date is other than the first day of the month, the monthly rental shall be pro-rated for that month. Lessee shall pay all Rent as due when due without demand, invoice or notice. If any payment due under a Schedule (including, but not limited to, Rent) is not paid within fifteen (15) days after the due date thereof, Lessee shall pay to Lessor a late charge on such overdue payment at a rate equal to the greater of 1.5% of the outstanding amount due or $40.00 per Vehicle.  All Rent and other payments due and payable under each Schedule shall be made to Lessor at its address shown above, or at such other address as Lessor may designate from time to time. In the event of an Early Termination which occurs on other than the last day of a lease month, Rent shall be prorated for such partial period.

4. NET LEASE. EACH SCHEDULE SHALL BE A TRIPLE NET LEASE WHEREBY LESSEE SHALL PAY ALL TAXES, MAINTENANCE, INSURANCE AND OTHER COSTS AND EXPENSES AS MORE FULLY SET FORTH IN THIS AGREEMENT. LESSEE'S OBLIGATIONS TO PAY ALL RENT AND OTHER SUMS WHEN DUE AND TO OTHERWISE PERFORM AS REQUIRED UNDER EACH SCHEDULE SHALL BE ABSOLUTE AND UNCONDITIONAL, AND SHALL NOT BE SUBJECT TO ANY ABATEMENT, REDUCTION, SET-OFF, DEFENSE, COUNTERCLAIM, INTERRUPTION, DEFERMENT OR

RECOUPMENT, FOR ANY REASON WHATSOEVER. IN THE EVENT THAT THE LESSEE SHALL DESIRE TO RETAIN ANY VEHICLE LISTED ON ANY SCHEDULE BEYOND THE SCHEDULED TERMINATION DATE, LESSEE SHALL NOTIFY LESSOR OF SUCH INTENT IN WRITING NOT LATER THAN THIRTY (30) DAYS PRIOR TO TERMINATION DATE, AND SUCH EXTENSION SHALL BE AT THE DISCRETION OF LESSOR PURSUANT TO THE PROVISIONS OF SECTION 12 BELOW. If any of the Vehicles are unsatisfactory for any reason, Lessee shall make any claim solely against the manufacturer of the Vehicle and shall, nevertheless, pay Lessor or its successors or Assignees (as defined in Section 18) all amounts due and payable under the Schedule for such Vehicles.

5. TAXES. Lessee shall promptly report, file, pay and indemnify and hold Lessor harmless with respect to any and all Taxes, as hereinafter defined. The term "Taxes" as used herein shall mean all taxes, fees and assessments due, assessed or levied by any foreign, federal, state or local government or taxing authority, and any penalties, fines or interest thereon, which are imposed against or upon any of the Vehicles, their use or operation, or the rentals or receipts due under this Agreement, but shall not include any taxes based upon or measured by the income of Lessor. The foregoing notwithstanding, Lessor shall file such tax returns relating to sales and property taxes as may be required of Lessor pursuant to applicable law, and remit the amount thereof, and Lessee shall reimburse Lessor promptly upon demand for the amount of such taxes. Lessor will, upon request by Lessee, submit to Lessee written evidence of Lessor's payment of all Taxes due hereunder.

6. INSURANCE. Until the Vehicles have been received by Lessor pursuant to Sections 10, 12 or 21 of this Agreement, Lessee shall at all times carry and maintain insurance on (or self insure, if approved in advance in writing by Lessor for items 6a. and 6b. herein) the Vehicles, at the sole and exclusive expense of Lessee, which has the following minimum coverages; a) Comprehensive, including fire and theft for the actual value, b) Collision for actual value with a maximum deductible of $2,500, c) Public Liability for $2,000,000 and d) Property Damage for $100,000 with insurance companies satisfactory to Lessor. Such policies shall (y) name Lessor (and, if Lessor requests at any time, any successor of Lessor or Assignee (as defined in Section 18 of this Agreement)) as loss payee and as additional insured for liability insurance, and (z) provide that Lessor (and any successor of Lessor or Assignee) shall receive notice at least 30 days before coverage lapses or is canceled or materially changed. Lessee shall promptly provide to Lessor evidence of insurance coverage prior to the receipt of the Vehicles by Lessee and every six (6) months thereafter, or as may otherwise be reasonably requested by Lessor. Lessee shall direct its insurance company to issue all checks to Lessor for loss or damage to a Vehicle unless such check is made payable to a repair facility for repair work done on such Vehicle.

7. MAINTENANCE & REPAIRS: Lessee shall keep and maintain the Vehicles in good operating condition and working order, using as a guide the maintenance program prescribed in the Operator's Manual provided with the Vehicles, and shall perform all maintenance services required or recommended for such Vehicles at the intervals specified in the Operator's Manual provided with such Vehicles.

Lessee shall be responsible for the cost of all gasoline, oil, lubrication, replacement parts, and all washing, polishing, towing, and storage, to the extent necessary to maintain the Vehicles in good operating and marketable condition. Lessee shall maintain the proper oil, battery and coolant levels and protection against freezing of all Vehicle radiators and engines. Lessee will not alter or adjust the Odometer, Emission Control Equipment or, any items that may nullify the manufacturer's warranty on the Vehicles.

Lessee shall pay for all repairs and maintenance items not covered by the manufacturer's warranty.

8. USE, LOCATION AND CONTROL. The Vehicles shall be used and operated by Lessee only in the ordinary conduct of the regular business of Lessee and in accordance with all applicable operating instructions, and applicable governmental laws, rules and regulations. Lessee shall cause the Vehicles to be possessed and operated only in the United States of America, except that, with respect to a lease of Vehicles in Alaska or Hawaii pursuant to this Agreement, the Vehicles may be transported through Canada and/or over the waters between the Continental United States and Alaska or Hawaii by qualified carriers: (a) for purposes of delivering the Vehicles to Lessee, and (b) to place the Vehicles for sale at an approved auction in the United States. In order to confirm Lessee's compliance with its obligations under this

Agreement, Lessee shall allow Lessor and its Assigns to physically inspect any Vehicle under lease anywhere it may be located from time to time, during reasonable hours without notice. Lessee shall not use the Vehicles, or permit any other person or entity to use the Vehicles, or any part of the Vehicles, for any purpose or in any manner other than that for which the Vehicles were designed. Lessee shall indemnify, defend, and hold Lessor harmless for any injuries and or damages that shall occur as a result of any illegal or non-recommended usage (in Lessor's reasonable opinion). If, as a result of such illegal or non-recommended usage, a Vehicle shall become damaged beyond reasonable repair (in Lessor's reasonable opinion), Lessee shall promptly pay Lessor in full the Settlement Amount.

9. PURCHASE OPTION. At any time after the Minimum Term specified on the applicable Schedule, if Lessee is not in default, it shall have a purchase option (the "Purchase Option"), whether at the end of the Lease Term or in the event of an Early Termination (as defined in Section 10), which may be exercised by Lessee giving Lessor written notice of such exercise and by Lessee paying Lessor the following settlement amount ("Settlement Amount") within seven (7) days of such notice:

(i) The Residual Value or Depreciated Value as specified on the Schedule; **plus**
(ii) Any past due monthly installments of Rent; **plus**
(iii) Any interest, late charges or other amounts due under this Agreement; **plus**
(iv) Any fees and taxes imposed in connection with the purchase; **plus**
(v) The Premature Termination Factor specified on the Schedule times the number of remaining monthly installments of Rent.

10. EARLY TERMINATION. At any time after the Minimum Term and before the end of the Lease Term specified in a particular Schedule, Lessee may terminate the lease of any Vehicle leased under such Schedule provided Lessee is not in default (an "Early Termination"). In the event of an Early Termination, Lessee shall do one of the following: (i) purchase the Vehicle, (ii) acting as agent for Lessor, cause the Vehicle to be sold at auction or to a wholesaler, (iii) surrender the Vehicle to Lessor, or (iv) surrender the Vehicle to the manufacturer or its agent as part of a manufacturer repurchase or guaranteed depreciation program as follows:

(i) Early Termination/Purchase of Vehicle. If Lessee elects to purchase a Vehicle with respect to an Early Termination, it shall pay Lessor the Settlement Amount as defined in Section 9 above.

(ii) Early Termination/Sale of Vehicle by Lessee. If Lessee elects to act as Lessor's agent to cause a Vehicle to be sold at auction or to a wholesaler in an Early Termination, Lessee shall pay to Lessor an amount equal to the Settlement Amount in full not later than seven (7) days subsequent to such sale. In the event the sale generates a surplus over the amount of the Settlement Amount, Lessee shall receive such surplus. All Vehicles released to an Auction, wholesaler or selling agent by Lessee shall be reported in writing or by email to Lessor not later than 72 hours thereafter. Lessee shall ensure that the proceeds from the auction or wholesaler are paid directly to Lessor. In the event any auction or wholesaler shall pay Lessee and or Lessee's agent(s) in error for a Vehicle, Lessee shall immediately endorse such payment to Lessor and forward same to Lessor at Lessor's place of business. Rent will continue to accrue for such Vehicle(s) until payment is received in full.

(iii) Early Termination/Surrender of Vehicle. If Lessee elects to surrender a Vehicle to Lessor prior to the end of the Lease Term, Lessee shall be responsible to pay Lessor any shortfall between the Settlement Amount and the net proceeds received by Lessor from the sale of such Vehicle, together with any disposition fee as indicated on the Schedule, not later than seven (7) days subsequent to such sale. In the event the net sales price received by Lessor from the auction is greater than the Settlement Amount, Lessee shall be entitled to receive an account credit in the amount of the net surplus as determined by Lessor after proceeds have been received in full and all sale and other expenses related to the Vehicle are established and satisfied.

(iv) Early Termination/Manufacturer Programs. If Lessee elects to surrender a Vehicle to a manufacturer in connection with an applicable Manufacturer Program, as defined in Section 11

below, the terms and provisions of Section 11 shall apply. Lessee shall ensure that the proceeds from the Manufacturer Program are paid directly to Lessor.

11. MANUFACTURER REPURCHASE/GUARANTEED DEPRECIATION PROGRAMS. In the event any Vehicle leased under this Agreement shall be qualified to participate in any manufacturer repurchase or guaranteed depreciation program ("Manufacturer Program(s)"), Lessee may participate in such programs, provided, however, that such participation shall not alter or diminish Lessee's duties and obligations toward Lessor under this Agreement. At the end of the Lease Term or in the case of an Early Termination, Lessee may turn in to the manufacturer or sell at auction Vehicles under a Manufacturer Program, provided, however, that Lessee shall remain responsible to see that Lessor is paid the Settlement Amount within ten (10) days of surrendering the Vehicle to the manufacturer or of the sale at auction. Lessee shall ensure that the proceeds from the Manufacturer Program are paid directly to Lessor. Lessee shall also be responsible to pay or reimburse Lessor for any additional charges incurred as a result of participation in the Manufacturer Programs. Permission by Lessor to allow Vehicles to be resold through any Manufacturer Program will in no way waive any right of Lessor to collect any and all amounts due under this and any other written agreements between Lessor and Lessee. Lessee shall indemnify, defend and hold Lessor harmless from any liabilities, damages, costs or charges incurred with respect to any Manufacturer Program regarding any Vehicle, including but not limited to vehicle damage, excess mileage, auction sale fees, and transportation fees. In the event any Vehicle covered by any Manufacturer Program shall be rejected for any reason by the manufacturer and/or its auction or remarketing representatives, Lessee unconditionally agrees to pay Lessor the full Settlement Amount with respect to such Vehicle within ten (10) days of receiving notice of rejection. Lessor assumes no liability for any disputed claim by any manufacturer in regard to any Vehicle involved with any Manufacturer Program.

12. SCHEDULED TERMINATION AND LESSEE'S RESPONSIBILITY. At the end of the Lease Term Lessee shall do one of the following: (i) purchase the Vehicle, (ii) acting as agent for Lessor, cause the Vehicle to be sold at auction or to a wholesaler, (iii) surrender the Vehicle to Lessor, or (iv) surrender the Vehicle to the manufacturer or its agent as part of a Manufacturer Program.

(i) Purchase of Vehicle. If Lessee elects to purchase a Vehicle, it shall pay Lessor the Settlement Amount as defined in Section 9 above.

(ii) Sale of Vehicle by Lessee. If Lessee elects to act as Lessor's agent to cause a Vehicle to be sold at auction or to a wholesaler, Lessee shall pay to Lessor an amount equal to the Settlement Amount in full not later than seven (7) days subsequent to such sale. In the event the sale generates a surplus over the amount of the Settlement Amount, Lessee shall retain such surplus. All Vehicles released to any Auction, wholesaler or selling agent by Lessee shall be reported in writing to Lessor not later than 72 hours thereafter. Lessee shall ensure that the proceeds from the auction or wholesaler are paid directly to Lessor.

(iii) Surrender of Vehicle. If Lessee elects to surrender a Vehicle to Lessor, Lessee shall be responsible to pay Lessor any shortfall between the Settlement Amount and the net proceeds received by Lessor from the sale of such Vehicle, together with any disposition fee as indicated on the Schedule, not later than seven (7) days after notification of such deficiency. In the event the net sales price received by Lessor from the auction is greater than the Settlement Amount, Lessee shall be entitled to receive an account credit in the amount of the net surplus as determined by Lessor after proceeds have been received in full and all sale and other expenses related to the Vehicle are established and satisfied.

(iv) Manufacturer Programs. If Lessee elects to surrender a Vehicle to a manufacturer in connection with an applicable Manufacturer Program, as defined in Section 11 above, the terms and provisions of Section 11 shall apply. Lessee shall ensure that the proceeds from the Manufacturer Program are paid directly to Lessor.

In the event any Vehicle is held by Lessee beyond the scheduled Termination Date, Lessee shall continue to pay Rent monthly as specified on the applicable Schedule. In the event Lessee retains any Vehicle for more

than ninety (90) days beyond the Termination Date, a fee of $25.00 per month shall be added to the Rent of such Vehicle, regardless of whether Lessor has notified Lessee of the lease termination. Lessor is not obligated to permit Lessee to retain any Vehicle listed on any Schedule beyond its specified Termination Date. Lessor may also elect to designate that certain Vehicles covered in this Agreement shall be returned to Lessor exclusively at Lessor's option. Lessee shall be ultimately responsible to pay Lessor the Settlement Amount regardless of how the Vehicle is disposed at lease termination.

13. OWNERSHIP, LIENS, LICENSING, TITLING. The Vehicles are and shall at all times be the property of Lessor. Lessee shall have no right, title or interest in any of the Vehicles except as a lessee and as set forth in this Agreement and the Schedule. No provision of this Agreement or of any Schedule shall be construed as conveying to Lessee any interest in the Vehicles other than as a lessee. Lessee shall keep the Vehicles, all Schedules and this Agreement free and clear of all liens, charges, claims and other encumbrances other than as specifically approved by Lessor in writing. In the event Lessor shall release Vehicle title, Manufacturer's Certificates of Origin, and/or licensing documents to Lessee, Lessee's agents, auctions and/or State titling authorities for purposes other than a sale event after which Lessor is paid in full, Lessee shall be responsible to handle such documents in a manner to protect the interest of Lessor as owner and its secured creditors. If transfer of title or licensing is not completed to the satisfaction of Lessor for any reason within forty-five (45) days of release of title or ownership document, Lessor may require Lessee to pay Lessor the full value of the Vehicle in funds as directed by Lessor. In the event Lessee shall fail to record Lessor Ownership interest, shall fail to record lien information on state applications as directed by Lessor, or if Lessee fails to properly license and title a Vehicle in the opinion of Lessor, Lessee shall immediately upon notice received, facilitate proper corrections to all records through appropriate state agencies, at the Lessee's expense. Lessee expressly agrees to expeditiously process all license & titling transactions pertaining to Vehicles leased under this Agreement and the Schedules hereto to protect the interests of ownership parties. In the event that any Vehicle shall be sold by Lessee or Lessee's representative, Lessee hereby guarantees payment in full of all amounts owing under this Agreement within (7) seven days of sale event occurring. In the event Lessor shall deem a Vehicle to be improperly licensed and/or titled, Lessor may cause a correction to be affected, in which case Lessee shall be responsible for all reasonable costs related thereto, together with a $50 handling fee per correction.

14. NO LESSOR WARRANTIES. LESSOR LEASES THE VEHICLES **"AS IS"** AND, LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE VEHICLES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE. LESSEE WAIVES ANY CLAIM (INCLUDING ANY CLAIM BASED ON STRICT OR ABSOLUTE LIABILITY IN TORT) LESSEE MIGHT HAVE, NOW OR IN THE FUTURE, AGAINST LESSOR FOR ANY LOSS, DAMAGE (INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES) OR EXPENSE WITH RESPECT TO OR ARISING OUT OF THE USE OF THE VEHICLES. LESSEE ACKNOWLEDGES THAT LESSOR DID NOT SELECT, OR MANUFACTURE THE VEHICLES AND THAT LESSEE SELECTED THE VEHICLES BASED UPON ITS OWN JUDGMENT AND LESSEE EXPRESSLY DISCLAIMS ANY RELIANCE ON ANY STATEMENT MADE BY LESSOR OR ITS AGENTS REGARDING THE VEHICLES. Lessor assigns to Lessee, and Lessee shall have the benefit of, any and all manufacturer's warranties, with respect to the Vehicles; provided, however, that the sole remedy of Lessee for the breach of any such warranty, indemnification or service agreement shall be against the manufacturer of such Vehicles and not against Lessor, nor shall any such breach have any effect whatsoever on the rights and obligations of Lessor or Lessee under this Agreement or any Schedule.

15. RISK OF LOSS/CASUALTY VALUE. Upon the delivery of the Vehicles to Lessee, Lessee shall bear the entire risk of any and all damage, destruction and or loss to any and all the Vehicles. As provided above in Section 4 of this Agreement, no such damage, destruction or loss shall excuse or relieve Lessee of the duty to pay Rent or to perform any other obligation under this Agreement or any Schedule. In the event any Vehicle leased under this Agreement shall become stolen, impounded, levied upon in any manner, or damaged beyond reasonable repair (in Lessor's sole judgment), such Vehicle shall be purchased by Lessee not later than 30 days subsequent to such occurrence pursuant to the terms of Section 9 above. Any Vehicles which fall into this category must be reported to Lessor in writing within 72 hours of Lessee becoming aware of such circumstance.

16. GENERAL INDEMNIFICATION. Lessee shall defend, indemnify and hold harmless Lessor, its successors and assigns, and the officers and employees of Lessor, from and against any damage, loss, theft, or destruction of any Vehicle, and against all losses, liabilities, damages, injuries, claims, demands, costs and expenses of every kind and nature, whether or not covered by insurance, including legal fees, and disbursements arising out of and in connection with the use, condition or operation of Vehicles pursuant to this Agreement. Without limiting the generality of the foregoing, Lessee shall promptly pay and resolve all parking citations, fines, assessments, impoundments, impound fees, traffic citations, arrests, seizures, towing charges, storage charges, and all other fees and costs, including, without limitation, late charges, fines, interest and attorneys fees related to the use and operation of the Vehicles. In the event Lessee fails to timely pay or resolve any such items, Lessor may assess Lessee a late charge of Fifty Dollars ($50.00) for each such occurrence. Lessee shall give Lessor, its successors or assigns prompt notice of any occurrence, event or condition in connection with which Lessor, its successors or assigns may be entitled to indemnification pursuant to the provisions of this Section 16. The provisions of this Section 16 shall survive the termination of this Agreement and of any Schedule.

17. NO SUBLEASE OR ASSIGNMENT; MERGER.

a) IF LESSEE IS IN THE BUSINESS OF RENTING VEHICLES TO RETAIL CUSTOMERS, LESSEE MAY LEASE VEHICLES IN THE ORDINARY COURSE OF ITS VEHICLE RENTAL BUSINESS TO INDIVIDUAL CUSTOMERS. LESSEE SHALL NOT OTHERWISE SUBLEASE, ASSIGN OR IN ANY WAY DISPOSE OR RELINQUISH CONTROL OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT OR ANY SCHEDULE WITHOUT THE EXPRESS WRITTEN CONSENT OF LESSOR, WHICH MAY BE WITHHELD IN LESSOR'S SOLE DISCRETION.

b) Except upon the express written consent of Lessor, Lessee shall not: (i) enter into any transaction of merger or consolidation or any commitment with respect thereto; (ii) permit any substantial change in the ownership or control of the capital stock of Lessee; or (iii) change the form or organization of the business of Lessee.

18. LESSOR ASSIGNMENT. Lessor may, to any person or entity (each such person or entity an "Assignee") without notice to Lessee, assign or sell its interest in, grant a security interest in, or otherwise transfer, in whole or in part to any person or entity (each such person or entity an "Assignee"), this Agreement, one or more Schedules, any or all of the Vehicles or any of its rights, interests or obligations with respect thereto, including, without limitation, all Rent and other sums due or to become due under any Schedule to one or more persons or entities. Upon notice thereof from Lessor (as provided in Section 28(e) below), Lessee shall pay Rent to an Assignee. Lessee acknowledges that any such assignment or transfer by Lessor will not materially impair Lessee's prospect of obtaining return performance by Lessor, materially change Lessee's duties or obligations under this Agreement or any affected Schedule, nor materially increase the burdens or risks imposed on Lessee, and Lessee further agrees that any such assignment or transfer shall be permitted even if the same could be deemed to materially affect the interests of Lessee. LESSEE SHALL NOT ASSERT AGAINST ANY ASSIGNEE ANY CLAIM, DEFENSE, COUNTERCLAIM OR SET-OFF THAT LESSEE MAY AT ANY TIME HAVE AGAINST LESSOR.

19. PROVISIONAL SECURITY AGREEMENT. This Agreement and all the Schedules are intended by the Parties to be a "lease" as that word is used and defined in Utah Code Ann. Section 70A-2a-103(1)(j) and as that term is used and defined in the Utah Uniform Commercial Code, Utah Code Ann., Title70A, Chapters 1 through 11 as amended. Further, this Agreement and all the Schedules are intended by the Parties to be a "true lease" and not a disguised sale. In the event that it is determined at any time in any legal proceeding that any of the Vehicles is not subject to a true lease and or that the ownership, or title to any, of the Vehicles is not held by and or in Lessor, then Lessee herewith grants to Lessor a security interest in all the Vehicles subject to this Agreement and every Schedule (any and all amendments thereto) and all proceeds thereof to secure the performance of all obligations of whatever kind or nature due by Lessee to Lessor under this Agreement and every Schedule. Lessee also agrees to execute any and all documents including but not limited to all security agreements and financing statements, and to take whatever other actions are requested and or required by Lessor to perfect and to continue Lessor's security interest in and to the Vehicles.

20. EVENTS OF DEFAULT. Each of the following shall constitute an "Event of Default."

a) Lessee fails to make any payment of Rent or of any other amount payable by Lessee when due plus any applicable grace period pursuant to this Agreement or any Schedule, regardless of whether or not Lessor provides notice of such default;

b) Lessee fails to perform or observe any other term, covenant or condition of this Agreement or of any Schedule or any other agreement with Lessor and such failure shall continue for a period of five (5) calendar days;

c) Any representation or warranty made by Lessee to Lessor in this Agreement, or in any Schedule or in any other writing or material provided by Lessee shall be false or misleading at any time in any material respect;

d) Lessee ceases doing business as a going concern or transfers all or a substantial part of its assets; or Lessee becomes or is adjudicated insolvent or bankrupt, admits in writing its inability to pay its debts as they become due, or makes an assignment for the benefit of creditors; or Lessee applies for, or consents to, the appointment of any receiver, trustee or similar officer for it or for all or any substantial part of its property; or such receiver, trustee or similar officer is appointed without the consent of Lessee; or Lessee institutes any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction, or any such proceeding is instituted against Lessee and is not dismissed within thirty (30) days; or any judgment, writ, warrant or attachment or execution of similar process is issued or levied against a substantial part of Lessee's property and remains unsatisfied for thirty (30) days; or Lessee has its articles of incorporation, charter or right to do business in any state revoked, suspended, terminated or otherwise changed; or

e) Lessor reasonably deems itself to be insecure.

Lessee shall promptly notify Lessor of the occurrence of any Event of Default.

21. REMEDIES. Upon the occurrence of any Event of Default, Lessor may, without notice to Lessee, exercise any one or more of the following remedies, as Lessor in its sole discretion may elect:

a) Upon the demand of Lessor, Lessee shall promptly, and, at the sole cost and expense of Lessee, return the Vehicles to such location or locations as Lessor shall designate;

b) Upon the demand of Lessor, Lessee shall immediately pay to Lessor an amount equal to the total of all Rents and other amounts due and to become due under this Agreement and all applicable Schedules;

c) Repossess any Vehicle under this Agreement according to applicable law, including by going onto Lessee's property to peacefully repossess such Vehicle, with or without the aid of a sheriff or constable, provided that any such repossession shall not release Lessee from its obligations under this Agreement;

d) Upon notice to Lessee, Lessor may collect directly from Assignee's renters all payments owed to Assignee with respect to Vehicles leased hereunder, and Lessee shall cooperate with such collection, including, without limitation, immediately giving Lessor access to all client Vehicle rental documents;

e) Upon notice to Lessee, Lessor may terminate this Agreement and any or all Schedules, sue to enforce Lessee's performance thereof, and or exercise any other right or remedy then available to Lessor at law or in equity;

f) Lessor may hold all funds from the disposition of Vehicles as security for performance of all of Lessee's obligations under this Agreement until six months after the last Vehicle leased by Lessee is sold, and such funds shall be applied by Lessor in due course to satisfy such obligations; and

g) Lessor may exercise all rights and remedies of a lessor under Article 2A of the Uniform Commercial Code as adopted in the State of Utah, as Lessor may from time to time elect.

The exercise of any of the foregoing remedies by Lessor shall not constitute a termination of this Agreement or any Schedules unless Lessor expressly so notifies Lessee in writing. No failure or delay on the part of Lessor to exercise any right or remedy of Lessor under this Agreement shall operate as a waiver. No express or implied waiver by Lessor of any one Event of Default shall constitute a waiver of any other Event of Default by Lessee or a waiver of any right of Lessor. No remedy referred to in this Section 21 is intended to be exclusive, but each shall be cumulative and concurrent, and shall be in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity. In addition to the above, and in any event, Lessee shall be liable for all costs, damages and expenses incurred by Lessor by reason of the occurrence of any Event of Default or the exercise of any remedy by Lessor, including, but not limited to, all attorneys' fees and costs, including on appeal, whether or not court proceedings are brought, costs related to the repossession, storage, repair and disposition of the Vehicles, and all incidental and consequential damages.

22. LESSOR'S RIGHTS ON LESSEE'S FAILURE TO PAY. In the event that Lessee fails to pay or otherwise perform any obligation due by Lessee under this Agreement or any Schedule, Lessor may, but shall not be obligated to, pay such amounts or perform such obligations for the account of Lessee without thereby waiving Lessor's right to declare an Event of Default. In any such event, Lessee shall immediately upon demand reimburse Lessor for any such costs and expenses incurred by Lessor.

23. QUIET ENJOYMENT. Lessor covenants that Lessee shall quietly possess the Vehicles if, and so long as, Lessee performs all obligations due by Lessee under this Agreement and all Schedules.

24. LESSEE REPRESENTATIONS. Lessee represents and warrants to Lessor that (a) Lessee is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation; (b) Lessee will authorize the signing, delivery and performance of each Schedule before signing it; (c) when fully executed and delivered, this Agreement and each Schedule will be a legal, valid and binding agreement of Lessee, enforceable against Lessee in accordance with its terms subject to applicable bankruptcy and other laws, and will not violate or create a default under any law, rule, regulation, judgment, order, instrument, agreement or charter document binding on Lessee or its property; (d) no consent or approval of, notice to, or filing with any governmental authority is required for Lessee to sign, deliver or perform this Agreement and each Schedule other than may be required to file financing statements; (e) there are no pending or threatened actions or proceedings before any court or administrative agency that could have a material adverse effect on Lessee, nor is Lessee in default under any material loan, lease or purchase obligation; and (f) all information furnished and to be furnished by Lessee to Lessor is and will be true and correct and complete; and (g) all financial statements regarding Lessee furnished and to be furnished by Lessee to Lessor have been and will be prepared according to generally accepted accounting principles.

25. FINANCIAL AND OTHER INFORMATION. Lessee shall furnish to Lessor, at the sole cost and expense of Lessee: (a) upon request, but at least quarterly, a copy of the financial statements of Lessee (which shall include an aged accounts receivable report, profit & loss, and balance sheet) certified by signature of the principal financial officer of Lessee and in form reasonably acceptable to Lessor within twenty (20) days after the last day of the applicable month; (b) a monthly updated fleet list containing Vehicle identification number, year, make, model, and last known odometer reading by the 20th day of each month; (c) annual audited or reviewed financial statements within ninety (90) days after the end of Lessee's fiscal year; (d) copies of Lessee's state and federal tax returns within thirty (30) days of filing with the appropriate tax authority; and (e); such additional information concerning Lessee's business operations as Lessor may reasonably request from time to time including, without limitation, documents normally reviewed as part of an audit and client and fleet rental documents. Lessee shall notify Lessor within ten (10) days after any material adverse change in Lessee's financial condition. Lessor shall have the right, at Lessor's sole expense, to hire auditors to audit, inspect, and copy the books and records of Lessee with respect to Lessee's business activities with or without advance written notice by Lessor to Lessee. Lessee shall

cooperate with Lessor in providing Lessor's auditor's reasonable access to all of its books and records during normal business hours for this purpose.

26. SECURITY DEPOSIT. Lessee may be required to provide Lessor with a security deposit (the "Security Deposit") for the faithful performance by Lessee of all of the terms, covenants and conditions required to be performed by Lessee hereunder. If a Security Deposit is required, Lessor and Lessee shall execute and deliver an addendum to this Agreement which shall set forth the terms and conditions of the Security Deposit and shall be a part of this Agreement. Lessor and Lessee may modify or amend the terms and conditions of the Security Deposit by executing additional addenda to this Agreement which shall likewise become a part of this Agreement.

27. FURTHER ASSURANCES. Upon the request of Lessor, Lessee shall promptly deliver to Lessor all such documents and instruments as Lessor deems reasonably necessary or advisable to protect all of the rights, title and interests of Lessor in any of the Vehicles, the Schedules and or this Agreement including, but not limited to, fully executed certificates of Vehicles acceptance, financing statements, certified resolutions of shareholders and or directors, incumbency certificates, opinion of counsel for Lessee, estoppel certificates, fixture filings and certificates evidencing the insurance required in Section 6 of this Agreement.

28. MISCELLANEOUS.

a) Entire Agreement. The Parties acknowledge that there are no agreements or understandings, written or oral, between the Parties with respect to any of the Vehicles, other than as set forth herein and in each Schedule and that this Agreement and each Schedule contains the entire agreement between the Parties with respect thereto.

b) Signature for Lessee. Lessor may sign all financing statements for Lessee as Lessor may deem appropriate for filing at any time and in any place to protect the rights and interests of Lessor in any of the Vehicles and in any of the Schedules and in this Agreement.

c) No Waiver. To the full extent permitted by applicable law, Lessee hereby waives all rights of Lessee under any provision of law now or hereafter in effect which might limit or modify or otherwise render unenforceable in any respect, any remedy or other provision of this Agreement or any Schedule. No delay by Lessor in exercising any right, power or remedy under this Agreement or any Schedule shall constitute a waiver, and any waiver by Lessor on any one occasion or for any one purpose shall not be construed as a waiver on any future occasion or for any other purpose and specifically, by way of example only, acceptance by Lessor or any Assignee of any payment of Rent after the date any such payment is due shall not constitute a waiver or remedy any Event of Default arising out of the failure of payment except as may be expressly waived in writing by Lessor.

d) Binding Nature. This Agreement and every Schedule shall be binding upon, and shall inure to the benefit of Lessor, Lessee and their respective successors, legal representatives, and assigns.

e) Notices. Any notice, request, or other communication to either of the Parties shall be in writing and shall be deemed received no later than the day that is (i) three (3) business days after deposit in the United States mail by registered or certified mail, return receipt requested, postage prepaid, (ii) the day after notice is deposited with Federal Express or other nationally recognized overnight courier service, or (iii) the same day notice is delivered by hand delivery to an officer or manager of such Party. Each Party may change its address by like notice stating its new address to the other.

f) Applicable Law. This Agreement and all Schedules shall be considered executed, and delivered in the State of Utah and shall be governed and construed for all purposes under and in accordance with the laws of the State of Utah.

g) Resolution of Disputes. Any controversy or dispute between the Parties with respect to this Agreement or any Schedule or any of the Vehicles shall be resolved, in the discretion of Lessor, in a court of

competent jurisdiction sitting in Salt Lake County, Utah, in Lessee's state of incorporation or domicile, or in any state where a Vehicle is located (the "Designated Forum"), and Lessee herewith consents to and submits itself to the jurisdiction of such courts in the Designated Forum. In addition, and separately, any such controversy or dispute may be referred to mediation at the sole direction and election of Lessor at such place and under such procedures as Lessor may determine at the sole discretion and election of Lessor.

h) Severability. In the event any one or more of the provisions of this Agreement or any Schedule shall for any reason shall be held invalid, illegal, or unenforceable, the remaining provisions of this Agreement or any Schedule shall be unimpaired, and the invalid, illegal, or unenforceable provision shall be replaced by a mutually acceptable, valid, legal, and enforceable provision which comes closest to the intention of the Parties underlying the invalid, illegal, or unenforceable provision.

i) Claims. Any claim by Lessee against Lessor for any breach by Lessor of any obligation of Lessor under this Agreement or any Schedule shall be commenced in a court of competent jurisdiction located in Salt Lake County, State of Utah within one (1) year after such claim accrues.

j) Additional Matters. Section headings are for convenience only and are not substantive terms or conditions of this Agreement.

29. CERTIFICATION. Lessee hereby certifies, under penalty of perjury as follows:

a) Lessee intends that more than fifty percent (50%) of the use of the Vehicles subject to this Agreement will be in the Lessee's trade or business;

b) Lessee has been advised that Lessee will not be treated as the owner of the Vehicles subject to this Agreement for Federal income tax purposes; and

c) No term or provision of this Agreement or any Schedule shall be amended, altered, waived, discharged or terminated except in writing signed by the Parties in compliance with Section 2A-208(2) of the Uniform Commercial Code requiring a separate signature of such provision.

Lessee separately certifies to the matters set forth in this Section 29 by signing in the space immediately provided below.

**AIRPORT VAN RENTAL, INC**

Lessee's Signature:_____
                Yazdan Irani
                It's _____(title)

[Signatures on following page]

IN WITNESS THEREOF, Lessor and Lessee have set their respective hands below as of the Effective Date.

LESSOR:

HINCKLEY'S, INC., a Utah Corporation

(D/B/A HINCKLEASE)

By: _____

Brian T. Baker
Executive V.P. Fleet Services

Subscribed and sworn before me this
___ day of _____, 2013

_____
NOTARY PUBLIC

SEAL

Notary Public
CHANTELL GAITAN
Commission #660557
My Commission Expires
October 31, 2016
State of Utah

LESSEE:

AIRPORT VAN RENTAL, INC.
a California corporation

By: _____

Yazdan Irani
It's _____(title)

Subscribed and sworn before me this
8th day of October, 2013

_____
NOTARY PUBLIC

SEAL



CASEY DEANN HUBBARD
Commission # 2040700
Notary Public - California
Los Angeles County
My Comm. Expires Sep 8, 2017

SLC_528953.9                    11

EXHIBIT 3

## VEHICLE LEASE AND SCHEDULE
between
### HINCKLEY'S, INC., a Utah Corporation dba HINCKLEASE ("Lessor")
2305 South President's Dr., Suite F
Salt Lake City, UT 84120
and
### Airport Van Rental Inc
5235 W 104 St
Los Angeles, CA 90045

**HINCKLEASE**

(Covid-19 re-write)

Lease Type:  Trac Lease

Lessor hereby leases to the Lessee named above, and the Lessee hereby leases from the Lessor, the vehicles described below upon the terms and conditions set forth herein and in the Master Lease Agreement dated: See Schedule between Lessor and Lessee. The Lessee and Lessor affirm and incorporate by reference the Master Lease Agreement which applies to this Vehicle Lease and Schedule as if included herein.

*** This schedule provides for lower payments initially, and higher payments for the remaining term ***

1. FIRST FULL MONTHLY PAYMENT DUE:  ___8/1/2020___   Master Lease Agreement Date: 9/20/2013

2. DESCRIPTION OF LEASED VEHICLES: Lessor hereby continues leases to Lessee and Lessee hereby hires from Lessor, on terms and conditions herein provided and provided in the Master Lease Agreement aforementioned, these certain motor vehicles described as follows and hereinafter referred to as "Vehicles"

| | Year | Make | Model | Vehicle ID# | Interest Only Rent Start | Full Month Rent Start | Termination Date | Odometer | Cost | Residual Value |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | 2019 | Ford | Transit | 1FBAX2CM3KKA94588 | 5/1/2020 | 8/1/2020 | 5/28/2023 | 12408 | $36,689.20 | $12,644.25 |
| (2) | | | | | | | | | | |
| (3) | | | | | | | | | | |
| (4) | | | | | | | | | | |
| (5) | | | | | | | | | | |
| (6) | | | | | | | | | | |
| (7) | | | | | | | | | | |
| (8) | | | | | | | | | | |
| (9) | | | | | | | | | | |
| (10) | | | | | | | | | | |
| (11) | | | | | | | | | | |
| (12) | | | | | | | | | | |
| (13) | | | | | | | | | | |
| (14) | | | | | | | | | | |
| (15) | | | | | | | | | | |
| (16) | | | | | | | | | | |
| (17) | | | | | | | | | | |
| (18) | | | | | | | | | | |
| (19) | | | | | | | | | | |
| (20) | | | | | | | | | | |

3.TOTAL LEASE TERM:  ___37.43___  Months Total

4. LEASE PAYMENT AND TERM: Lessee agrees to accept/pay the vehicles at the total monthly amounts hereinafter specified. Lessee agrees to pay such payment in advance without deduction, setoff or counterclaim on or before the 15th day of each month along with all fees specified herein and in the "Master Lease Agreement" aforementioned. Any payments not received as hereby specified will be subject to $40.00 minimum late charge per vehicle billed upon the first day of each month. Acceptance of late payments and/or imposition of late charges shall not constitute a change of terms of vehicles leased hereunder or a waiver of the Lessor's rights.

Lessee agrees to pay Lessor daily/monthly charges for each day held and until Lessor, or it's specified agent, officially accepts return of vehicle as follows:

Total Monthly Term:  ___37.43___

Excess mile charge:  ___N/A___ per mile
Monthly Mileage Allowance:  ___Unlimited___

Interest Only Billing Rate:  ___$139.82___ For the Months of: May, June, July 2020
Regular Monthly Billing Rate:  ___$981.30___ August 01, 2020 thru remaining term
Daily Rate Each:  ___$29.38___
Origination Fee:  ___$15.00___ Each Vehicle
Premature Termination Factor:  ___$854.86___
Minimum term Lessee will retain vehicles:  ___30___ days

Lessee under penalty of perjury, by signing this schedule hereby affirms that: Lessee unconditionally agrees to guarantee the "Value" of the vehicles as specified in the Master Lease Agreement. Lessee affirms each vehicle listed is IN POSSESSION (NOT sold, stolen, impounded, or converted), & IN RENTABLE CONDITION and agrees to pay off ANY vehicle in EXCESS of 100,000 miles.

5. LICENSE AND REGISTRATION:  Lessee agrees to pay Lessor a license charge of:  ___$0.00___ per each vehicle.   State of Licensing:  ___UTAH___

4/9/2020

VP Fleet Operations

X _____     ___8/1/2018___     TITLE: _____
Lessee                                        Date                          Owner, Officer
Airport Van Rental Inc.

X _____     ___8/1/2018___     Executive VP
Hinckley's, Inc. dba Hincklease, Inc ("Lessor")   Date

Date: ___5/1/2020___

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1901 Avenue of the Stars, Suite 450, Los Angeles, CA 90067-6006.

A true and correct copy of the foregoing document entitled (*specify*):  Notice of Motion and Motion for Approval of Settlement, Adequate Protection and Plan Support Agreement With North Iowa Equity, LLC, Re Vehicles to Be Acquired From Hinckley's, Inc. DBA Hincklease; and Memorandum of Points and Authorities, Declaration of Yazdan Irani, and Request for Judicial Notice in Support Thereof  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 19, 2021  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. <u>SERVED BY UNITED STATES MAIL</u>:**
On (*date*) May 19, 2021 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Sheri Bluebond
U.S. Bankruptcy Court
Roybal Federal Building
255 E. Temple Street, Suite 1534
Los Angeles, CA 90012

☐ Service information continued on attached page.

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u> (state method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 19, 2021 | Gloria Ramos | */s/ Gloria Ramos* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

ADDITIONAL SERVICE INFORMATION (if needed):

1. **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- **Eric S Bershatski**    info@BLGLA.com
- **Shraddha Bharatia**    notices@becket-lee.com
- **Jess R Bressi**    jess.bressi@dentons.com, kimberly.sigismondo@dentons.com
- **Donald H Cram**    dhc@severson.com, cas@severson.com
- **Michael G D'Alba**    mdalba@DanningGill.com,
  DanningGill@gmail.com;mdalba@ecf.inforuptcy.com
- **John P Dillman**    houston_bankruptcy@publicans.com
- **Eryk R Escobar**    eryk.r.escobar@usdoj.gov
- **M Douglas Flahaut**    flahaut.douglas@arentfox.com
- **Kim P. Gage**    kgage@cookseylaw.com
- **Duane M Geck**    dmg@severson.com, pag@severson.com
- **Evelina Gentry**    evelina.gentry@akerman.com, rob.diwa@akerman.com
- **Lydia A Hewett**    lydia.hewett@cpa.state.tx.us
- **Alan Craig Hochheiser**    ahochheiser@mauricewutscher.com,
  arodriguez@mauricewutscher.com
- **Courtney J Hull**    bk-chull@oag.texas.gov, sherri.simpson@oag.texas.gov
- **Jonathan J Kim**    jkim@pszjlaw.com, jkim@pszjlaw.com
- **Matthew F Kye**    mkye@kyelaw.com
- **Elan S Levey**    elan.levey@usdoj.gov, tiffany.davenport@usdoj.gov
- **Garry A Masterson**    BnkEcf-CA@weltman.com
- **Kevin H Morse**    kmorse@clarkhill.com, blambert@clarkhill.com
- **Haleh C Naimi**    hnaimi@advocatesolutionsinc.com
- **Tom Roddy Normandin**    tnormandin@pnbd.com,
  srichards@pnbd.com;cathyjones@pnbd.com;msmigura@pnbd.com
- **R Gibson Pagter**    gibson@ppilawyers.com,
  ecf@ppilawyers.com;pagterrr51779@notify.bestcase.com
- **Jeremy V Richards**    jrichards@pszjlaw.com, bdassa@pszjlaw.com;imorris@pszjlaw.com
- **Zev Shechtman**    zshechtman@DanningGill.com,
  danninggill@gmail.com;zshechtman@ecf.inforuptcy.com
- **Richard A Solomon**    richard@sgswlaw.com
- **John N Tedford**    jtedford@DanningGill.com,
  danninggill@gmail.com;jtedford@ecf.inforuptcy.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov
- **Glenn S Walter**    gwalter@honigman.com
- **Larry D Webb**    Webblaw@gmail.com, larry@webblaw.onmicrosoft.com
- **Elizabeth Weller**    dallas.bankruptcy@publicans.com
- **Roye Zur**    rzur@elkinskalt.com, aaburto@elkinskalt.com;myuen@elkinskalt.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**