JOHN N. TEDFORD, IV (State Bar No. 205537)
*jtedford@DanningGill.com*
ZEV SHECHTMAN (State Bar No. 266280)
*zs@DanningGill.com*
DANIELLE R. GABAI (State Bar No. 339242)
*dgabai@DanningGill.com*
DANNING, GILL, ISRAEL & KRASNOFF, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067-6006
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Airport Van Rental, Inc., a California
corporation, and AVR Vanpool, Inc.

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Case No. 2:20-bk-20876-BB [main case]<br>Case No. 2:20-bk-20883-BB |
| AIRPORT VAN RENTAL, INC., a California corporation; and AVR VANPOOL, INC., a California corporation, | Chapter 11 |
| Debtors and Debtors in Possession | **FIRST MODIFIED FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED MAY 24, 2022** |
| | *Confirmation hearing*:<br>Date: September 15, 2022<br>Time: 10:00 a.m.<br>Place: Courtroom 1539<br>255 East Temple Street<br>Los Angeles, California |

1689360.4  26988

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................... 1

II.   DEFINITIONS; RULES OF INTERPRETATION; AND COMPUTATION OF TIME...................... 3

      A.    Defined Terms ....................................................................................... 3

      B.    Rules of Interpretation............................................................................ 26

      C.    Computation of Time ............................................................................. 27

      D.    Governing Law ..................................................................................... 27

      E.    Reference to Monetary Figures .............................................................. 28

      F.    Reference to the Debtors or the Reorganized Debtors ................................ 28

      G.    Controlling Document ........................................................................... 28

III.  EFFECTIVE DATE CONDITIONS ............................................................................ 28

      A.    Conditions to the Effectiveness of the Plan............................................. 28

      B.    Effect of Entry of Order Denying Confirmation of the Plan........................ 29

      C.    Effect of Failure of Conditions to the Effectiveness of the Plan .................. 29

IV.   CLASSIFICATION OF CLAIMS AND INTERESTS ..................................................... 30

      A.    General Overview ................................................................................. 30

      B.    Unclassified Claims .............................................................................. 30

      C.    Classified Claims and Interests............................................................... 30

V.    ALLOWANCE AND TREATMENT OF UNCLASSIFIED CLAIMS ................................. 32

      A.    Administrative Expense Claims.............................................................. 32

            1.    Administrative Expense Claims Arising in the Ordinary Course of
                  the Debtors' Business .................................................................. 32

            2.    U.S. Trustee fees ....................................................................... 32

            3.    Professional Fee Claims .............................................................. 33

            4.    Section 503(b)(9) Claims ............................................................ 35

            5.    Other Administrative Expense Claims ........................................... 35

            6.    Post-Effective Date Fees and Expenses ......................................... 37

      B.    Unsecured Priority Tax Claims (Not Including the CDTFA Disputed Priority
            Tax Claim).......................................................................................... 37

      C.    Allowance and Treatment of the CDTFA Disputed Priority Tax Claim................. 38

**TABLE OF CONTENTS**
**(Continued)**

**Page**

| | | |
|---|---|---|
| VI. | CLASSIFICATION, ALLOWANCE AND TREATMENT OF CLASSIFIED CLAIMS | 39 |
| | A. | Class 1 – 1st Source | 39 |
| | B. | Class 2 – 1st Source (from AFC) | 41 |
| | C. | Class 3 – Sumitomo | 42 |
| | D. | Class 4 – Hitachi | 43 |
| | E. | Class 5 – United Leasing | 44 |
| | F. | Class 6 – SBA | 46 |
| | G. | Class 7 – LCA Bank Corporation | 48 |
| | H. | Class 8 – San Diego County Regional Airport Authority | 48 |
| | I. | Class 9 – Colorado Department of Revenue | 49 |
| | J. | Class 10 – City of Commerce City, Colorado | 51 |
| | K. | Class 11 – Texas Comptroller of Public Accounts (Motor Vehicle Rental Taxes) | 53 |
| | L. | Class 12 – Texas Comptroller of Public Accounts (Franchise Taxes) | 55 |
| | M. | Class 13 – Priority Wage Claims | 58 |
| | N. | Class 14 – Convenience Class Claims | 59 |
| | O. | Class 15 – General Unsecured Claims | 59 |
| | P. | Class 16 – Interests in AVR California | 60 |
| | Q. | Class 17 – Interests in AVR Vanpool | 60 |
| VII. | CONFIRMABILITY OF THE PLAN AND CRAMDOWN | 61 |
| VIII. | CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS; SETOFF AND RECOUPMENT | 61 |
| | A. | Allowance of Claims | 61 |
| | B. | Disallowance of Claims | 61 |
| | C. | Objections to Claims | 62 |
| | D. | Disputed Claims and Estimations | 62 |
| | | 1. | No Distributions with Respect to Disputed Claims | 62 |
| | | 2. | Distributions on Account of Disputed Claims Once They Are Allowed | 62 |

## TABLE OF CONTENTS
### (Continued)

**Page**

|   |   |   |   |
|---|---|---|---|
| | 3. | Allowance of Claims Subject to § 502(d) of the Bankruptcy Code | 63 |
| E. | | Extension of the Claims Objection Deadline | 63 |
| F. | | Authority to Compromise Disputed Claims | 63 |
| G. | | Setoff and Recoupment | 63 |
| IX. | | MEANS FOR IMPLEMENTATION | 64 |
| A. | | Overview of Plan Implementation | 64 |
| B. | | Deposit of $850,000 in the Segregated Account | 64 |
| C. | | From the Confirmation Date to the Effective Date | 64 |
| D. | | Management of the Reorganized Debtors | 64 |
| | 1. | AVR California | 64 |
| | 2. | AVR Vanpool | 65 |
| E. | | Dissolution of AVR Vanpool | 65 |
| F. | | Reorganized Debtor's Business Operations | 65 |
| G. | | The Plan Compromise Agreement | 65 |
| H. | | The Irani Contribution Agreement | 66 |
| I. | | New Leases for the Premises Used by AVR California for Its Denver and Las Vegas Operations, and for Its Office in Hawthorne | 66 |
| J. | | Disbursing Agent | 67 |
| K. | | Delivery of Distributions on Account of Allowed General Unsecured Claims | 68 |
| L. | | Undeliverable or Non-Negotiated Distributions | 68 |
| M. | | Allocations | 68 |
| N. | | No Postpetition or Default Interest on Claims | 69 |
| O. | | Preservation of Causes of Action | 69 |
| P. | | Amendments to the Debtors' Articles of Incorporation and/or Bylaws | 69 |
| X. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 70 |
| A. | | Assumption of Executory Contracts and Unexpired Leases | 70 |
| B. | | [Intentionally Omitted] | 71 |

**TABLE OF CONTENTS**
(Continued)

**Page**

| | | | |
|---|---|---|---|
| | C. | Rejection of Specific Executory Contracts | 71 |
| | D. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 72 |
| | E. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 72 |
| | F. | Assumption Dispute Resolution | 73 |
| | G. | Contracts and Leases Entered Into After the Petition Date | 74 |
| XI. | | SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS | 74 |
| | A. | Compromise and Settlement of Claims, Interests, and Controversies | 74 |
| | B. | Discharge of Claims | 75 |
| | C. | Releases by the Debtors | 75 |
| | D. | Exculpation | 76 |
| | E. | Injunction | 77 |
| | F. | Temporary Enforcement Injunction Re Claims Against Responsible Persons | 78 |
| XII. | | EFFECTS OF CONFIRMATION | 78 |
| | A. | Binding Effect of the Plan | 78 |
| | B. | Vesting of Assets | 79 |
| | C. | Dissolution of the Committee | 79 |
| | D. | No Liability for Solicitation or Participation | 79 |
| XIII. | | RETENTION OF JURISDICTION | 80 |
| XIV. | | MISCELLANEOUS PROVISIONS | 82 |
| | A. | Elimination of Vacant Classes | 82 |
| | B. | Voting Classes; Presumed Acceptance by Non-Voting Classes | 82 |
| | C. | Controversy Concerning Impairment | 82 |
| | D. | Additional Documents | 82 |
| | E. | Exemption from Transfer Taxes | 82 |
| | F. | Expedited Tax Determination | 83 |
| | G. | Payment of Statutory Fees | 83 |
| | H. | Amendment, Modification or Withdrawal of the Plan | 83 |

## TABLE OF CONTENTS
### (Continued)

**Page**

I.      Withholding and Reporting Requirements............................................................ 83

J.     Waiver of FRBP 7062........................................................................................... 84

K.    Exhibits and Schedules...................................................................................... 84

L.     Successors and Assigns ..................................................................................... 84

M.   Saturday, Sunday or Legal Holiday ................................................................... 84

N.    Post-Effective Date Effect of Evidences of Claims or Interests ........................... 84

O.    Non-severability of Plan Provisions ................................................................... 85

P.     Balloting ............................................................................................................ 85

Q.    No Admissions or Waiver of Objections .............................................................. 85

R.     Survival of Settlements ...................................................................................... 85

S.     Effect of Post-Confirmation Conversion to Chapter 7 ......................................... 86

T.     Final Decree ...................................................................................................... 86

# I.
# INTRODUCTION

On December 11, 2020 (the "**Petition Date**"), Airport Van Rental, Inc., a California corporation (federal tax ID no. 38-3772483) ("**AVR California**"), and AVR Vanpool, Inc., a California corporation (federal tax ID no. 84-2205959) ("**AVR Vanpool**"), each filed a voluntary Chapter 11 petition for relief under the Bankruptcy Code.

This First Modified First Amended Chapter 11 Plan of Reorganization Dated May 24, 2022 (the "**Plan**"), is the Chapter 11 Plan proposed by AVR California and AVR Vanpool.  The two plan proponents, whose bankruptcy cases are being jointly administered, are collectively referred to herein as the "**Debtors**."

The Plan is a plan of reorganization.  The terms of the Plan have been agreed upon by, among others, the Official Committee of Unsecured Creditors appointed in the Debtors' Cases (the "**Committee**").  The terms of the Debtors' proposed compromise with the Committee are set forth in a term sheet appended as Exhibit 5 hereto (the "**Plan Compromise Agreement**"), and the operative terms of the Plan Compromise Agreement have been incorporated into the Plan. The Committee supports confirmation of the Plan on the terms set forth herein.

Generally, the Plan proposes to restructure debts owed to 12 Classes of Creditors who hold Secured Claims against AVR California's Estate.  With one exception, Secured and Unsecured Priority Tax Claims will be paid in full, with interest, in accordance with § 1129(a)(9) of the Bankruptcy Code.  The California Department of Tax and Fee Administration ("**CDTFA**") asserts a Priority Tax Claim against AVR California's Estate in the amount of approximately $5.28 million. CDTFA has agreed to a settlement pursuant to which the full amount of its Claim will be an Allowed Unsecured Priority Tax Claim but a portion of its Claim will receive treatment as though it were a General Unsecured Claim.  Based on the Debtors' projections, CDTFA will receive approximately $3.86 million, and possibly more, in full and complete satisfaction of its Claim.

Under the Plan, the Reorganized Debtor will pay the following into a "**Settlement Fund**" to be administered by a "**Plan Disbursing Agent**" mutually agreed upon by the parties to the Plan Compromise Agreement:[1]

- The Debtors will pay $850,000 on or before the Effective Date of the Plan.

- The Reorganized Debtor will pay $500,000 on or before February 1, 2023.

- The Reorganized Debtor will pay certain percentages of revenue received by the Reorganized Debtor during a 5-year period commencing on the Effective Date of the Plan (the "**Revenue-Sharing Payments**").  If less than $1.8 million of Revenue-Sharing Payments are paid into the Settlement Fund for revenues received during

---

[1] This general summary is provided for convenience only, and is not intended to modify or limit the terms and details of the Plan Compromise Agreement in any way.

the 5-year period, the Reorganized Debtor will continue paying 1.65% of revenues into the Settlement Fund until the aggregate amount of Revenue-Sharing Payments paid into the Settlement Fund is equal to $1.8 million.

- If the Reorganized Debtor is sold (or substantially all of the Reorganized Debtor's assets are sold) within 8 years after the Effective Date, the Settlement Fund will receive the greater of (1) $700,000 and (2) 6.5% of the net sales proceeds.  If the Reorganized Debtor is not sold (or substantially all of the Reorganized Debtor's assets are not sold) within 8 years after the Effective Date, the Reorganized Debtor will pay $700,000 into the Settlement Fund.

The Plan Disbursing Agent will be responsible for making distributions from the Settlement Fund to Holders of Allowed Unsecured Priority Tax Claims and Allowed General Unsecured Claims in accordance with the Plan.

The Debtors project that the payments made to the Settlement Fund for the benefit of Holders of Allowed General Unsecured Claims will total at least $1.41 million.[2]  Holders of such Claims are projected to receive at least 38.8% of such Claims.  The Plan will be funded by, among other things, Cash on hand on the Effective Date, future operations, and $850,000 from the Debtors' owner, Yazdan Irani.

The Debtors believe that the most likely alternative to confirmation of the Plan is conversion of the Debtors' cases to Chapter 7 and liquidation of the Debtors' assets by a Chapter 7 trustee.  The Debtors estimate that, if their Cases are converted to Chapter 7, General Unsecured Creditors will receive substantially less on account of their Claims than they will under the Plan.

Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan (as proposed prior to modifications made pursuant to the Plan Compromise Agreement).  The Debtors are the proponents of the Plan within the meaning of § 1129 of the Bankruptcy Code.

*All Holders of Claims and Interests entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan*.  If confirmed, the Plan will bind all persons it provides for, whether or not they accept the Plan, object to confirmation, file a Proof of Claim or Interest, or have their Claims or Interests allowed.

*Your rights may be affected.  Read these papers carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.*

---

[2] This does not include at least $1.85 million that will be paid to CDTFA on account of the portion of its Claim that will receive treatment as though it were a General Unsecured Claim.

**II.**
**DEFINITIONS; RULES OF INTERPRETATION; AND COMPUTATION OF TIME**

**A.     Defined Terms**

In this document, capitalized terms have the meanings set forth below.

| | |
|---|---|
| *1st Source* | means 1st Source Bank. |
| *1st Source 1-A Claim* | has the same meaning as "1st Source 1-A Claim" as that term is defined and used in the 1st Source Settlement Agreement. |
| *1st Source 1-B Claim* | has the same meaning as "1st Source 1-B Claim" as that term is defined and used in the 1st Source Settlement Agreement. |
| *1st Source 2-A Claim* | has the same meaning as "1st Source 2-A Claim" as that term is defined and used in the 1st Source Settlement Agreement. |
| *1st Source 2-B Claim* | has the same meaning as "1st Source 2-B Claim" as that term is defined and used in the 1st Source Settlement Agreement. |
| *1st Source DIP Loan* | means the loan of up to $5.4 million of debtor-in-possession financing on the terms set forth in the 1st Source Settlement Agreement. |
| *1st Source Loan Documents* | means the Loan and Security Agreement dated May 12, 2008, between 1st Source and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| *1st Source Settlement Agreement* | means the 1st Amended DIP Financing Agreement, Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement approved by the Court by Order entered on June 17, 2021 (docket no. 491), as amended by Amendment No. 1 to 1st Amended DIP Financing Agreement, Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement approved by the Court by Order entered on April 1, 2022 (docket no. 857). |
| *Adequate Protection Program* | means the program instituted by the Debtors in October 2020, pursuant to which the Debtors starting making monthly "adequate protection" payments to its vehicle lenders and lessors. |

1689360.4  26988                                3

| | |
|---|---|
| ***Administrative Expense Claim*** | means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to §§ 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (1) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtors, including wages, salaries or commissions for services rendered after the Petition Date, (2) Professional Fee Claims, (3) Substantial Contribution Claims, and (4) fees and charges payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930. |
| ***Administrative Expense Claim Bar Date*** | means the first Business Day that is 30 days after the Effective Date. |
| ***Administrative Expense Claim Objection Deadline*** | means the first Business Day that is 180 days after the Effective Date; *provided, however*, that such date may be extended by the Court at the Reorganized Debtors' request. |
| ***AFC*** | means AFC Cal, LLC. |
| ***AFC Loan Documents*** | means (1) the Demand Promissory Note and Security Agreement dated September 24, 2007, between AFC and AAA Van Rental, LLC dba Universal Van Rental, (2) the Demand Promissory Note and Security Agreement dated June 4, 2009, between AFC and the Debtor, (3) the Demand Promissory Note and Security Agreement dated July 11, 2014, between (a) AFC and (b) the Debtor and Ace Medical Transportation, LLC, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Affiliate*** | has the meaning set forth in § 101(2) of the Bankruptcy Code. |
| ***Allowed*** | means, with respect to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) that is not Disallowed and (1) with respect to which no objection to the allowance thereof or request for estimation has been filed, (2) that has been expressly Allowed under the Plan, any stipulation approved by the Court, or a Final Order of the Court, (3) is both not Disputed and either (a) evidenced by a Proof of Claim timely filed in accordance with the Bar Date Notice (unless a Proof of Claim is |

| | |
|---|---|
| ***Allowed*** <br> ***(continued)*** | not or shall not be required to be filed in accordance with the Plan, the Bankruptcy Code, or a Final Order of the Court) or (b) listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed, (4) is allowed by a Final Order, or (5) is compromised, settled, or otherwise resolved to by (a) the Debtors and (b) the Holder of such Claim or Interest; *provided that*, except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including §§ 502(b), 503(b) and 506 of the Bankruptcy Code. |
| | Except as otherwise expressly specified in the Plan or any Final Order, and except to the extent such interest is Allowed pursuant to § 506(b) of the Bankruptcy Code, the amount of an Allowed Claim shall not include interest or any premium on such Claim from and after the Petition Date. |
| | For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. |
| | Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  For the avoidance of doubt, a Claim identified in a Proof of Claim filed after the Claims Bar Date shall not be Allowed for any purpose whatsoever absent entry of a Final Order allowing such late-filed Claim. |
| | Notwithstanding anything to the contrary herein, no Claim of any Entity subject to § 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. |
| | "Allow," "Allowance," and "Allowing" shall have correlative meanings. |
| ***Armanino*** | means Armanino LLP, the Debtors' business valuation expert. |
| ***Assumption Dispute*** | has the meaning set forth in Section X.F of the Plan. |

| | |
|---|---|
| ***Atlanta Premises*** | means AVR California's location servicing the Hartsfield Jackson Atlanta International Airport, located at 3120 Sylvan Road, Hapeville, Georgia. |
| ***Avoidance Actions*** | means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors and any recovery, subordination, or other remedies that may be brought by or on behalf of the Debtors and the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including under §§ 502, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, chapter 5 of the Bankruptcy Code, or applicable non-bankruptcy law. |
| ***AVR California*** | means Airport Van Rental, Inc., a California corporation. |
| ***AVR Denver*** | means AVR Denver, LLC, a Colorado limited liability company. |
| ***AVR Georgia*** | means Tropria Nav Georgia, Inc., a Georgia corporation, fka Airport Van Rental, Inc., a Georgia corporation. |
| ***AVR Nevada*** | means Tropria Nav Nevada, Inc., a Nevada corporation, fka Airport Van Rental, Inc., a Nevada corporation. |
| ***AVR Texas*** | means Tropria Nav Texas, LLP, a Texas limited liability partnership, fka Airport Van Rental, LLP, a Texas limited liability partnership. |
| ***AVR Vanpool*** | means AVR Vanpool, Inc., a California corporation. |
| ***B. Riley*** | means B. Riley Advisory Services, a dba of GlassRatner Advisory & Capital Group, LLC. |
| ***Ballot*** | means the voting form distributed to each Holder of a Claim entitled to vote on the Plan, on which the Holder is to indicate acceptance or rejection of the Plan and make any other elections or representations required pursuant to the Plan and which must be actually received on or before the Voting Deadline. |
| ***Bankruptcy Code*** | means title 11 of the United States Code (11 U.S.C. §§ 101-1532), as now in effect or as may be amended hereafter and applicable to the Cases. |
| ***Bar Date Notice*** | means the Notice of Bar Date for Filing Proofs of Claim filed in AVR California's Case on January 29, 2021 (docket no. 148). |
| ***Barnes & Thornburg*** | means Barnes & Thornburg, LLP. |

1689360.4  26988

6

| | |
|---|---|
| ***Beneficiaries*** | means, collectively, (1) Holders of Allowed Unsecured Priority Tax Claims and (2) Holders of Allowed Class 15 Claims who do not elect to receive lump sums of $300 on the Effective Date in lieu of the distributions such Holders will otherwise receive on account of such Claims under the Plan. |
| ***Business Day*** | means a day that is not a Saturday, Sunday, a day designated as a legal holiday in FRBP 9006(a)(6), or any other day on which banking institutions in Los Angeles, California, are required or authorized to close by law or executive order. |
| ***CarRentals.com*** | means CarRentals.com, Inc. |
| ***CarRentals.com Agreement*** | means the CarRentals.Com, Inc. Vehicle Rental Supply Agreement dated December 15, 2015, between CarRentals.com and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Case*** | means, as the context requires, AVR California's Chapter 11 case, case number 2:20-bk-20876-BB, or AVR Vanpool's Chapter 11 case, case number 2:20-bk-20883-BB, pending in the Court. |
| ***Cases*** | means, collectively, AVR California's Case and AVR Vanpool's Case. |
| ***Cash*** | means the legal tender of the United States of America or equivalents thereof. |
| ***Cash Collateral*** | has the meaning set forth in § 363(a) of the Bankruptcy Code. |
| ***Cash Management Motion*** | means the Notice of Motion and Motion for Entry of Order Authorizing Debtors to Maintain Cash Management System and Certain Prepetition Bank Accounts, Granting Related Relief, and Waiving 14-Day Stay, filed in AVR California's Case on December 11, 2020 (docket no. 9). |
| ***Cause of Action*** | means any action, claim, proceeding, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guarantee, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known, unknown, contingent or non- |

| | |
|---|---|
| *Cause of Action (continued)* | contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes (1) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (2) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, (3) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests, (4) any claim arising under § 362 of the Bankruptcy Code, (5) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in § 558 of the Bankruptcy Code, and (6) any Avoidance Actions. |
| *CDTFA* | means the California Department of Tax and Fee Administration. |
| *CDTFA Appeal* | means the appeal initiated by CDTFA of the *Order Granting Motion for Order Determining that Sales Taxes Owed to the State of California for 2011-2017 Are Not Entitled to Priority* entered by the Court on February 14, 2022 (docket no. 783). |
| *CDTFA Claim* | means the Claim asserted by CDTFA against AVR California for sales and use taxes incurred during the 2011 through 2020 tax years, for environmental fees incurred during the 2017 and 2020 tax years, and interest on such taxes and fees, all as evidenced by POC 76 filed in AVR California's Case. |
| *CDTFA Disputed Priority Tax Claim* | means the CDTFA Claim to the extent it is for sales taxes owed to CDTFA for the 2011 through 2017 tax years, and interest thereon. |
| *CDTFA Undisputed Priority Tax Claim* | means the CDTFA Claim to the extent it is for sales taxes owed to CDTFA for the 2018 through 2020 tax years, for environmental fees incurred during the 2017 and 2020 tax years, and interest on such taxes and fees. |
| *Chapter 7* | means chapter 7 of the Bankruptcy Code. |
| *Chapter 11* | means chapter 11 of the Bankruptcy Code. |
| *Commerce City* | means City of Commerce City, Colorado. |

1689360.4  26988

8

| | |
|---|---|
| *Claim* | has the meaning set forth in § 101(5) of the Bankruptcy Code. |
| *Claims Bar Date* | means the last date for filing Proofs of Claims arising prior to the Petition Date, and such other deadline(s) for filing Proofs of Claims against the Estates as may be set forth in the Bankruptcy Code or an Order or Orders of the Court.  The general Claims Bar Date was March 19, 2021.  The Claims Bar Date for Governmental Units was June 9, 2021. |
| *Claims Objection Deadline* | means the deadline for objecting to a Claim, which shall be 120 days after the Effective Date, subject to extensions and/or exceptions as may be ordered by the Court. |
| *Claims Register* | means the official register of Claims maintained by the Clerk in the Case. |
| *Class* | means a category of Holders of Claims or Interests designated in the Plan pursuant to § 1122(a) of the Bankruptcy Code. |
| *Class ** Claim* | means a Claim in the particularly identified Class. |
| *Class ** Interest* | means an Interest in the particularly identified Class. |
| *Clerk* | means the Clerk of the Court. |
| *Colorado DOR* | means the Colorado Department of Revenue. |
| *Committee* | means the statutory committee of unsecured creditors, appointed by the U.S. Trustee in AVR California's Case pursuant to § 1102 of the Bankruptcy Code. |
| *Company* | means, collectively, the Debtors and any related entities through or in coordination with which the Debtors conducted their business. |
| *Confirmation Date* | means the date on which the Court enters the Confirmation Order. |
| *Confirmation Hearing* | means the hearing held by the Court to consider confirmation of the Plan, as such hearing may be, or may have been, continued from time to time. |
| *Confirmation Order* | means the Order of the Court confirming the Plan pursuant to § 1129 of the Bankruptcy Code. |

1689360.4  26988

9

| | |
|---|---|
| ***Convenience Class Claim*** | means (1) a General Unsecured Claim in an amount equal to or less than $300, or (2) a General Unsecured Claim in an amount greater than $300 but with respect to which the Holder of the Claim has elected to receive a lump sum of $300 on the Effective Date in lieu of distributions such Holder will otherwise receive over the term of the Plan. |
| ***Conversion Order*** | means an Order of the Court converting a Case to Chapter 7. |
| ***Corporation*** | has the meaning set forth in § 101(9) of the Bankruptcy Code. |
| ***Court*** | means the United States Bankruptcy Court for the Central District of California having jurisdiction over the Case. |
| ***Creditor*** | has the meaning set forth in § 101(10) of the Bankruptcy Code. |
| ***CSA Partners*** | means CSA Partners, LLC. |
| ***Cure Claim*** | means a monetary Claim in an amount, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) at the time such contract or lease is assumed by the Debtors pursuant to §§ 365 or 1123 of the Bankruptcy Code. |
| ***Dallas Premises*** | means AVR California's location servicing the Dallas/Fort Worth International Airport, located at 3312 Valley View Lane, Irving, Texas. |
| ***Danning Gill*** | means Danning, Gill, Israel & Krasnoff, LLP. |
| ***DART*** | means Dallas Area Rapid Transit. |
| ***DART Agreement*** | means, collectively, any and all operative documents arising out of or relating to DART's award of a vanpool services contract to AVR Vanpool. |
| ***Debtors*** | means, collectively, AVR California and AVR Vanpool. |
| ***Debtor in Possession -or- DIP*** | means a Debtor in its capacity as debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. |
| ***Denver Premises*** | means AVR California's location servicing the Denver International Airport, located at 17901 81st Avenue, Commerce City, Colorado. |

***DIP Financing*** means the postpetition financing facility issued pursuant to the 1st Source Settlement Agreement, consisting of a $5.4 million senior secured multiple draw term loan credit facility.

***Disallowed*** means any Claim (or any portion thereof) that (1) has been disallowed by Final Order or settlement, (2) is listed on the Schedules in an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed, deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court, or otherwise deemed timely filed under applicable law, or (3) is not listed on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Court pursuant to the Bankruptcy Code or any Final Order of the Court, or otherwise deemed timely filed under applicable law.  "Disallow" and "Disallowance" shall have correlative meanings.

***Disclosure Statement*** means the disclosure statement relating to the Plan, as it may be amended or modified, from time to time, together with all addenda, exhibits, schedules, supplements or other attachments.

***Disclosure Statement Order*** means the *Order Granting Debtors' Motion for Order (1) Approving Disclosure Statement, (2) Establishing Voting, Plan Confirmation and Other Procedures, (3) Scheduling Plan Confirmation Hearing and Setting Other Related Dates and Deadlines, and (4) Providing Other Ancillary And Related Relief* entered on May 27, 2022 (docket no. 924), as amended, supplemented, or modified from time to time.

***Disputed*** means, with respect to any Claim, a Claim (or any portion thereof) that is not yet Allowed or Disallowed.

***District Court*** means the United States District Court for the Central District of California having jurisdiction over the CDTFA Appeal.

***Docket*** means the official docket maintained by the Clerk for AVR California's Case.

| | |
|---|---|
| ***Effective Date*** | means, with respect to the Plan, the date that is a Business Day on which (1) no stay of the Confirmation Order is in effect, (2) all conditions precedent specified in Section III of the Plan have been satisfied or waived, and (3) the Plan is declared effective by the Debtors.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date. |
| ***EIDL*** | means the Economic Injury Disaster Loan made by the SBA to AVR California pursuant to the EIDL Loan Documents. |
| ***EIDL Loan Documents*** | means the Loan Authorization and Agreement dated March 25, 2020, between the SBA and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Elkins Kalt*** | means Elkins Kalt Weintraub Reuben Gartside LLP. |
| ***Entity*** | has the meaning set forth in § 101(15) of the Bankruptcy Code. |
| ***Estate*** | means the bankruptcy estate created upon the filing of a Case pursuant to § 541 of the Bankruptcy Code. |
| ***Exculpated Party*** | means each of the following in their capacity as such: (1) the Debtors; (2) the Estates; (3) the Debtors' directors and officers serving after the Petition Date; (4) the Committee; (5) each of the Committee members, solely in its capacity as a Committee member; and (6) with respect to each of the foregoing Entities in clauses (1) through (5), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, officers, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; *provided that* any exculpations afforded under the Plan or Confirmation Order shall be granted only to the extent provided for and permitted by § 1125(e) of the Bankruptcy Code. |

| | |
|---|---|
| ***Exculpated Party (continued)*** | Notwithstanding the foregoing or any other term or provision in the Plan, Kevin Tierney (individually, in his capacity as the Debtors' turnaround management consultant and financial advisor, or in any other capacity) is not and shall not be deemed to be an Exculpated Party. |
| ***Executory Contract*** | means a contract to which a Debtor is a party and that is subject to assumption or rejection under §§ 365 or 1123 of the Bankruptcy Code. |
| ***Expedia*** | means Expedia, Inc., individually and on behalf of its affiliates and certain related Entities. |
| ***Expedia Prepetition Agreement*** | means the Vehicle Rental Supply Agreement dated June 29, 2016, between Expedia and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Expedia Postpetition Agreement*** | means the Vehicle Rental Supply Agreement dated April 14, 2021, between Expedia and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Federal Judgment Rate*** | means 0.11% per annum, which is the interest rate on federal judgments for the calendar week preceding the Petition Date, and is based on the weekly average one-year constant maturity Treasury yield, as published by the Federal Reserve. |
| ***Final Order*** | means, as applicable, an order or judgment of the Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or |

1689360.4  26988

13

| | |
|---|---|
| *Final Order (continued)* | judgment was appealed or from which certiorari was sought; *provided that* the possibility that a request for relief under FRCP 60, or any analogous rule under the FRBP, the Local Rules, or applicable non-bankruptcy law, may be filed relating to such order shall not prevent such order from being a Final Order. |
| *Force 10* | means Force Ten Partners, LLC, the Debtors' investment banker. |
| *Force 10 Agreement* | means the engagement letter attached as Exhibit 1 to the Statement of Disinterestedness appended to the Debtors' application for authority to employ Force 10 as their investment banker (docket no. 849). |
| *Force 10 Order* | means the *Order (1) Granting Application for Authority to Employ Force Ten Partners, LLC, as Investment Banker Pursuant to 11 U.S.C. § 328, and (2) Approving Sale Procedures* entered by the Court on May 6, 2022 (docket no. 890). |
| *Former Principal Office* | means 5235 West 104th Street, Los Angeles, California. |
| *FRBP* | means the Federal Rules of Bankruptcy Procedure. |
| *FRCP* | means the Federal Rules of Civil Procedure. |
| *General Unsecured Claim* | means any Unsecured Claim that is not (1) an Administrative Expense Claim or (2) a Priority Claim. |
| *Georgia DOR* | means the Georgia Department of Revenue. |
| *Glaser* | means Joel Glaser, APC. |
| *Governmental Unit* | has the meaning set forth in § 101(27) of the Bankruptcy Code. |
| *Hawthorne Premises* | means the premises at which AVR California maintains its corporate office in the Los Angeles area, located at 12911 Cerise Avenue, Hawthorne, California. |
| *H19* | means H19 Sutton Leasing, LLC, as successor in interest to Sutton with respect to the Sutton Lease Agreement, as evidenced by the *Transfer of Claim Other than for Security* filed with the Court on or about December 15, 2021 (docket no. 737). |
| *Hincklease* | means Hinckley's, Inc. dba Hincklease. |

| | |
|---|---|
| ***Hincklease Agreement*** | means the Master Lease Agreement dated September 20, 2013, between Hincklease and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Hitachi*** | means Hitachi Capital America Corp. |
| ***Hitachi Loan Documents*** | means the Motor Vehicle Security Agreement dated May 4, 2018, between Hitachi and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***HKG*** | means HKG LLP. |
| ***Holder*** | means an Entity holding a Claim or an Interest. |
| ***Houston Premises*** | means AVR California's location servicing the George Bush Intercontinental Airport, located at 5650 Greens Road, Houston, Texas. |
| ***Impaired*** | means, with respect to any Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of § 1124 of the Bankruptcy Code. |
| ***Initial Distribution Date*** | means the date on which the Reorganized Debtors shall make initial distributions to certain Holders of Claims entitled to quarterly distributions under the Plan, which shall be the 45th day of the calendar quarter following the date on which the Confirmation Order becomes a Final Order. |
| ***Insider*** | has the meaning set forth in § 101(31) of the Bankruptcy Code. |
| ***Interest*** | has the same meaning as "equity security" set forth in § 101(16) of the Bankruptcy Code. |
| ***Irani Cash Contribution*** | means the $850,000 of Cash to be contributed by the Iranis to the Reorganized Debtors on the Effective Date, consisting of a $350,000 settlement payment and a $500,000 new value contribution. |

| | |
|---|---|
| *Irani Contribution Agreement* | means the Settlement and Contribution Agreement between the Debtors, on the one hand, and the Iranis, on the other hand, appended as Exhibit 1 hereto. |
| *Iranis* | means, collectively, Yazdan and Kimberly Irani. |
| *IRS* | means the Internal Revenue Service. |
| *Las Vegas Premises* | means AVR California's location servicing the Harry Reid International Airport, located at 7040 Gilespie Street, Las Vegas, Nevada. |
| *LCA* | means LCA Bank Corporation. |
| *LCA Agreement* | means the Equipment Finance and Security Agreement between AVR California and LCA, executed on or about April 2, 2019. |
| *Lease Assumption Period* | means the time set forth in § 365(d)(4)(A) of the Bankruptcy Code for a chapter 11 debtor to assume, assign, or reject Unexpired Leases of nonresidential real property. |
| *Lien* | has the meaning set forth in § 101(37) of the Bankruptcy Code. |
| *Liquidation Analysis* | means the liquidation analysis attached as Exhibit E to the Disclosure Statement. |
| *Local Rules* | means the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California. |
| *Los Angeles Premises* | means AVR California's location servicing the Los Angeles International Airport, located at the Four Points by Sheraton Los Angeles Airport. |
| *McClellan* | means McClellan Davis, LLC. |
| *Merchants* | means Merchants Fleet Management. |
| *Merchants Lease Documents* | means the Open-End Master Lease Agreement dated May 14, 2019, between Merchants and AVR California, among others, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |

| | |
|---|---|
| ***M&R*** | means Michelman & Robinson, LLP, the Debtors' special insurance counsel. |
| ***MiFleet*** | means United Rental Group, LLC dba United Rental System. |
| ***MiFleet Agreement*** | means the Commercial Motor Vehicle Lease Agreement entered into on or about July 2, 2019, by MiFleet and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***MMR Value*** | means the value of a vehicle or vehicles according to the Manheim Market Report. |
| ***MOR*** | means a Monthly Operating Report filed by a Debtor during the pendency of its Case. |
| ***Nevada DOT*** | means the Nevada Department of Taxation. |
| ***Nevada Residence*** | means the Iranis' personal residence in Las Vegas, Nevada. |
| ***NIE*** | means North Iowa Equity, LLC, an Iowa limited liability company. |
| ***NIE Lease Documents*** | means the Master Vehicle Lease Agreement between NIE and AVR California, the form of which was approved by an Order of the Court entered on May 7, 2021 (docket no. 393), and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***NIE Settlement Agreements*** | means, collectively, the NIE-Mifleet Settlement Agreement and the NIE-Hincklease Settlement Agreement. |
| ***NIE-MiFleet Settlement Agreement*** | means the Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement dated March 24, 2021, approved by the Court by Order entered on May 7, 2021 (docket no. 393). |

| | |
|---|---|
| ***NIE-Hincklease Settlement Agreement*** | means the Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement dated May 18, 2021, approved by the Court by Order entered on June 17, 2021 (docket no. 490). |
| ***Order*** | means an order or judgment of the Court as entered on the Docket or, if the context requires, the official docket maintained by the Clerk for AVR Vanpool's Case. |
| ***Other Administrative Expense Claim*** | means an Administrative Expense Claim other than (1) a Claim for U.S. Trustee Fees, (2) a Professional Fee Claim, and (3) a Section 503(b)(9) Claim. |
| ***Other Priority Claim*** | means a Claim entitled to priority in right of payment under § 507(a) of the Bankruptcy Code, other than (1) an Administrative Expense Claim, (2) a Priority Wage Claim, or (3) a Priority Tax Claim. |
| ***Person*** | has the meaning set forth in § 101(41) of the Bankruptcy Code. |
| ***Petition*** | has the meaning set forth in § 101(42) of the Bankruptcy Code. |
| ***Petition Date*** | means December 11, 2020. |
| ***PJ Holdings*** | means PJ D&D Holdings, LLC, a Nevada limited liability company. |
| ***Plan*** | means the Debtors' *First Amended Chapter 11 Plan of Reorganization Dated May 24, 2022*, as it may be amended or modified, from time to time, together with all addenda, exhibits, schedules, supplements or other attachments, if any. |
| ***Plan Compromise Agreement*** | means the Binding Term Sheet Agreement among (1) the Debtors, (2) the Committee, (3) CDTFA, (4) Yazdan Irani, (5) Kimberly Irani, (6) Aria Irani, and (7) Cesar Leyva, appended as Exhibit 5 hereto. |
| ***Plan Disbursing Agent*** | means the Person selected to administer the Settlement Fund and make distributions therefrom to Holders of Allowed Unsecured Priority Tax Claims and Allowed General Unsecured Claims. |
| ***Plan Exclusivity Period*** | means the period after the commencement of a Chapter 11 case during which the debtor has the exclusive right to file a proposed Chapter 11 plan. |
| ***POC \**** | means the Proof of Claim filed in a Case and assigned the particular claim number by the Clerk. |

1689360.4  26988

18

*Postpetition*                    means the time after the Petition Date.

*Postpetition Tax Claims*    means Administrative Expense Claims and other Claims by a Governmental Unit for taxes owed by or assessed against a Debtor (and for a reasonable rate of interest related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date.

*PPP Loan*                    means the loan made by 1st Source to AVR California pursuant to the PPP Loan Documents.

*PPP Loan Documents*    means the Loan Agreement (Unsecured) (Paycheck Protection Program) dated April 9, 2020, between 1st Source and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements.

*Preserved Claim*            means any Cause of Action held by a Debtor or an Estate on the Effective Date, including Avoidance Actions, except any and all Causes of Action expressly waived or released by the Plan.

*Priceline*                    means priceline.com LLC.

*Priceline Agreement*        means the Retail Car Rental Service Participation Agreement between AVR California and Priceline dated February 1, 2016, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements.

*Priority Claim*              means a Claim, other than an Administrative Expense Claim, entitled to priority in right of payment under § 507 of the Bankruptcy Code.

| | |
|---|---|
| ***Priority Tax Claim*** | means a Claim of a Governmental Unit entitled to priority in right of payment pursuant to § 507(a)(8) of the Bankruptcy Code, including a Secured Claim which would otherwise meet the description of an Unsecured Claim of a Government Unit under § 507(a)(8) of the Bankruptcy Code but for the Secured status of such Claim. |
| ***Priority Wage Claim*** | means a Claim of a Creditor entitled to priority in right of payment pursuant to § 507(a)(4) or (a)(5) of the Bankruptcy Code. |
| ***Pritchard*** | means Pritchard Auto Company, an Iowa corporation. |
| ***Pro Rata*** | means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable. |
| ***Professional*** | means an Entity (1) employed by the Debtors or the Committee at the expense of an Estate pursuant to §§ 327, 328, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to §§ 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code, or (2) awarded compensation and reimbursement by the Court pursuant to § 503(b)(4) of the Bankruptcy Code. |
| ***Professional Fee Claim*** | means all Claims for fees and expenses incurred by a Professional on or after the Petition Date through the Effective Date. |
| ***Professional Fee Escrow*** | means the account established and funded, or the funds otherwise earmarked, pursuant to Section V.A.3 of the Plan to pay Allowed Professional Fee Claims after the Effective Date. |
| ***Proof of Claim*** | means a proof of Claim filed in a Case and recorded by the Clerk on the Claims Register. |
| ***Quarterly Distribution Date*** | means the 45th day after the end of each quarterly calendar period occurring after the Effective Date. |
| ***Quest*** | means Quest Auto Body Care, Inc., a California corporation. |

1689360.4  26988

| | |
|---|---|
| ***Rejection Damages Claim*** | means a Claim arising from the rejection, under § 365 of the Bankruptcy Code or under the Plan, of an Executory Contract or Unexpired Lease, and allowable under § 502(g) of the Bankruptcy Code. |
| ***Released Party*** | means each of the following in their capacity as such: (1) the Debtors; (2) the Reorganized Debtors; (3) the Debtors' Estates; (4) the Committee; (5) each of the Committee members, solely in its capacity as a Committee member; and (6) with respect to each of the foregoing Entities in clauses (1) through (5), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such.  Notwithstanding the foregoing or any other term or provision in the Plan, Kevin Tierney (individually, in his capacity as the Debtors' turnaround management consultant and financial advisor, or in any other capacity) is not and shall not be deemed to be a Released Party. |
| ***Reorganized Debtor*** | means AVR California, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date. |
| ***Reorganized Debtors*** | means, collectively, AVR California and AVR Vanpool, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date; *provided that* after AVR Vanpool is dissolved this term shall refer only to the Reorganized Debtor (i.e., AVR California). |
| ***Resolution Event*** | means, with respect to a Disputed Claim that is the subject of an objection other than a "reclassify" or "reduce and allow" objection, the occurrence of one or more of the following events on or before the Resolution Event Deadline:  (1) entry of an Order of the Court, after notice and a hearing, Allowing such Claim pursuant to § 502(b) of the Bankruptcy Code; (2) entry of an Order of the Court, after notice and a hearing, granting a motion brought under FRBP 3018(a) and temporarily Allowing such Claim for voting purposes; |

21

| | |
|---|---|
| **Resolution Event (continued)** | (3) execution of a stipulation or other agreement between the Holder of a Disputed Claim and the Debtors resolving the objection and Allowing such Claim for voting purposes in an agreed-upon amount or otherwise fixing an amount of the Claim for voting purposes; or (4) the pending objection is voluntarily withdrawn by the objecting party. |
| **Resolution Event Deadline** | means the date identified as the "Resolution Event Deadline" in the Disclosure Statement Order. |
| **Responsible Persons** | means Yazdan Irani, Kimberly Irani, Aria Irani and Cesar Leyva if and to the extent they are or could be deemed legally responsible under non-bankruptcy law for tax obligations of the Debtors that are afforded treatment under the Plan. |
| **Revenue-Sharing Payment** | means a payment to be made by the Reorganized Debtor to the Plan Disbursing Agent, measured as a percentage of revenue received by the Debtors and the Reorganized Debtor, pursuant to the Plan Compromise Agreement. |
| **RMT** | means RMT Investments, LLC, a Nevada limited liability company. |
| **San Francisco Premises** | means AVR California's location servicing the San Francisco International Airport, located at 820 Malcolm Road, Burlingame, California. |
| **SANDAG** | means the San Diego Association of Governments. |
| **SBA** | means the United States Small Business Administration. |
| **SBA Loan Documents** | means the Loan Authorization and Agreement dated March 25, 2020, between the SBA and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| **Scheduled** | means set forth on the Schedules. |
| **Schedules** | means the schedules of assets and liabilities filed by AVR California pursuant to § 521 of the Bankruptcy Code, as the same has been or may be further amended, modified, or supplemented from time to time. |

| | |
|---|---|
| **SDCRAA** | means San Diego County Regional Airport Authority. |
| **Section 503(b)(9) Claim** | means a Claim entitled to administrative priority pursuant to § 503(b)(9) of the Bankruptcy Code. |
| **Secured** | means, when referring to a Claim, a Claim secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by a Final Order, or that is subject to setoff pursuant to § 553 of the Bankruptcy Code, to the extent of the value of the applicable Creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to § 506(a) of the Bankruptcy Code. |
| **Securities Act** | means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder. |
| **Security** | has the meaning set forth in § 101(49) of the Bankruptcy Code. |
| **Security Agreement** | has the meaning set forth in § 101(50) of the Bankruptcy Code. |
| **Security Interest** | has the meaning set forth in § 101(51) of the Bankruptcy Code. |
| **Segregated Account** | means the account established pursuant to the Plan Compromise Agreement for the purpose of holding monies to be paid to the Plan Disbursing Agent on the Effective Date. |
| **Selig** | means Selig Leasing Co., Inc. |
| **Selig Lease Agreement** | means the Master Vehicle Lease Agreement (Open End) dated May 11, 2018, between Selig and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| **Selig Settlement Agreement** | means the Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement dated July 14, 2021, approved by the Court by Order entered on August 13, 2021 (docket no. 579). |

1689360.4  26988                          23

| | |
|---|---|
| ***Settlement Fund*** | means the post-confirmation settlement fund established pursuant to the Plan Compromise Agreement. |
| ***Solicitation Date*** | means the date set forth in the Disclosure Statement Order by which the Debtors are required to serve the Solicitation Package. |
| ***Solicitation Package*** | means the Disclosure Statement, Ballot(s), and other documents served on Holders of Claims and Interests entitled to vote to accept or reject the Plan. |
| ***Statutory Lien*** | has the meaning set forth in § 101(53) of the Bankruptcy Code. |
| ***Substantive Consolidation Motion*** | means the *Motion for Order Substantively Consolidating Bankruptcy Estates* filed in AVR California's Case on February 3, 2021 (docket no. 165). |
| ***Sumitomo*** | means Sumitomo Mitsui Finance and Leasing Company Limited. |
| ***Sumitomo Loan Documents*** | means the Equipment Financing Agreement dated March 16, 2020, between Jules and Associates, Inc., and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Sutton*** | means Sutton Leasing, Inc. |
| ***Sutton Lease Agreement*** | means the Vehicle Lease Agreement dated October 18, 2019, between Sutton and AVR Vanpool, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Tax Code*** | means the Internal Revenue Code of 1986, as amended. |
| ***Temporary Enforcement Injunction*** | means the temporary injunction imposed by Section XI.F of the Plan with respect to liability under non-bankruptcy law, if any, of the Responsible Persons for certain tax obligations of the Debtors that are afforded treatment under the Plan. |
| ***Texas Comptroller*** | means the Texas Comptroller of Public Accounts. |

| | |
|---|---|
| ***Tierney Claims*** | means any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities the Estates have or may have against Kevin Tierney (individually, in his capacity as the Debtors' turnaround management consultant and financial advisor, or in any other capacity), including any and all Claims for disgorgement of fees and expenses paid by the Debtors to Mr. Tierney on an interim basis during the Case. |
| ***U.S. Trustee*** | means the United States trustee, including his or her designees, for Region 16 of the United States Trustee Program or such other region that oversees the administration of bankruptcy cases in the Central District of California. |
| ***U.S. Trustee Fees*** | means fees or charges arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717. |
| ***Unexpired Lease*** | means a lease to which a Debtor is a party and that is subject to assumption or rejection under §§ 365 or 1123 of the Bankruptcy Code. |
| ***Unimpaired*** | means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of § 1124 of the Bankruptcy Code. |
| ***Union*** | means Union Leasing, Inc. |
| ***Union Lease Agreement*** | means the Master Vehicle Lease Agreement dated March 5, 2014, between Union and AVR California, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Union Settlement Agreement*** | means the Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement (Union Leasing) dated January 19, 2022, approved by the Court by Order entered on March 4, 2022 (docket no. 806). |
| ***Union-H19 Settlement Agreement*** | means the Settlement Agreement, Adequate Protection Stipulation, and Plan Support Agreement (Vehicles Acquired from H19 Sutton leasing, LLC) dated January 19, 2022, approved by the Court by Order entered on March 4, 2022 (docket no. 806). |

| | |
|---|---|
| ***United Leasing*** | means United Leasing, Inc. |
| ***United Leasing Loan Documents*** | means the Master Loan Agreement dated August 8, 2014, between United Leasing and the Debtor, and any and all operative documents relating thereto, including addenda, amendments, assignments, change in term agreements, deferral agreements, exhibits, financing statements and related continuation statements, guarantees, modification agreements, powers of attorney, promissory notes, schedules, and security agreements. |
| ***Unsecured*** | means, with respect to any Claim, a Claim that is not a Secured Claim. |
| ***Voting Deadline*** | means July 28, 2022, at 4:00 p.m. (prevailing Pacific time), which is the deadline for submitting Ballots to accept or reject the Plan in accordance with § 1126 of the Bankruptcy Code, subject to any extension granted by the Debtors or the Court in accordance with the solicitation procedures adopted by the Court in the Disclosure Statement Order. |
| ***Voting Instructions*** | means the instructions for voting on the Plan contained in Section II of the Disclosure Statement and the Ballots. |
| ***Voting Record Date*** | means June 1, 2022, the date designated by the Court and set forth in the Disclosure Statement as the date for determining the Holders of Claims and Interests entitled to vote to accept or reject the Plan. |

**B.    Rules of Interpretation**

For purposes of this Plan:

1.    unless otherwise specified, the rules of construction set forth in § 102 of the Bankruptcy Code shall apply;

2.    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender;

3.    the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation";

4.    unless otherwise specified, all references to "Sections" or "Exhibits" are references to the Plan's sections (including subsections) or exhibits;

1689360.4  26988                                    26

5.      unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan;

6.      captions and headings to Sections are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

7.      any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions;

8.      any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof;

9.      in the appropriate context, references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable;

10.     any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and permitted assigns;

11.     except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and

12.     any term that is used but not defined herein has the meaning attributed to that term, if any, in the Bankruptcy Code or the FRBP.

**C.      Computation of Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of FRBP 9006(a) shall apply.

**D.      Governing Law**

Unless a rule of law or procedure is supplied by (1) federal law (including the Bankruptcy Code and FRBP), or (2) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflict of laws thereof.

**E.      Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.  Any conversion required to convert foreign currency to United States dollars shall be done using the applicable exchange rates on the Petition Date.

**F.      Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**G.      Controlling Document**

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Confirmation Order and the Plan or the Disclosure Statement, the Confirmation Order shall control.

**III.**
**EFFECTIVE DATE CONDITIONS**

**A.      Conditions to the Effectiveness of the Plan**

The following events shall occur and be satisfied on or before the Effective Date for the Plan to be effective on the Effective Date:

1.      Entry on the Docket of a Confirmation Order in a form and substance acceptable to the Debtors.  The Conformation Order shall, among other things:

(a)      confirm and approve the Plan;

(b)      authorize and approve all documents, instruments and agreements to be executed and delivered in connection with the confirmation and effectiveness of the Plan, including the Irani Contribution Agreement and the Plan Compromise Agreement; and

(c)      order that the transfers contemplated under the Plan (i) are or shall be legal, valid and effective transfers of property for fair and reasonable consideration, (ii) vest or shall vest in the transferee good title to such property free and clear of all Liens, Claims and other

interests of any kind and in accordance with § 1123(a)(5) and (b)(5) of the Bankruptcy Code, except those expressly provided for under the Plan, (iii) do not and shall not constitute fraudulent conveyances or transfers or unlawful distributions under any applicable law, and (iv) do not and shall not subject the Debtors, the Estates, any of their current or future officers, directors, employees, owners, partners, beneficiaries, members, professionals, agents or representatives, or any of the property transferred to any liability by reason of such transfer under any applicable law, including any laws relating to fiduciary duty or successor or transferee liability.

2.      Deposit of $850,000 in the Segregate Account, to be transferred by the Debtors or the Reorganized Debtors to the Plan Disbursing Agent on the Effective Date.

3.      The Professional Fee Escrow shall have been established and funded, or funds shall have been earmarked, in accordance with Section V.3 of the Plan.

4.      Any stay of enforcement of the Confirmation Order has expired or is otherwise no longer in effect.

5.      Execution and delivery of all documents, instruments and agreements to be executed in connection with the Plan.

The fourth and fifth conditions set forth above may be waived or modified in whole or in part by the Debtors.  The first, second and third conditions may not be waived or modified.

**B.      Effect of Entry of Order Denying Confirmation of the Plan**

If an Order denying confirmation of the Plan is entered, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall (1) be deemed to be an admission by the Debtors or the Estates with respect to any matter discussed in the Plan and Disclosure Statement, including liability on any Claim or the propriety of any Claim's classification, (2) constitute a waiver or release of any Claim against or Interest in the Debtors and the Estates, (3) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors and the Estates, or (4) prejudice in any manner any right, remedy or claim of the Debtors or the Estates.

**C.      Effect of Failure of Conditions to the Effectiveness of the Plan**

If a Confirmation Order is entered but the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, upon notification submitted by the Debtors to the Court: (1) the Confirmation Order shall be vacated, (2) no distributions under the Plan shall be made, (3) the Debtors, the Estates, and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (4) the Debtors' and the Estates'

1689360.4  26988                                    29

obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors, the Estates, or any other Entity, or to prejudice in any manner the rights of the Debtors, the Estates, or any other Entity in any further proceedings.

**IV.**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

**A.** **General Overview**

As required by the Bankruptcy Code, the Plan classifies Claims and Interests according to their right to priority of payment as provided in the Bankruptcy Code. Except for certain types of Claims that do not get put into classes, the Plan classifies Claims for all purposes, including voting, confirmation and distributions under the Plan. A Claim is classified in a particular Class only to the extent that it falls within the class description.

**B.** **Unclassified Claims**

Certain types of Claims are not placed into voting classes; they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to a specific treatment provided for them in the Bankruptcy Code. Unclassified Claims consist of (1) Administrative Expense Claims and (2) Unsecured Priority Tax Claims.

**C.** **Classified Claims and Interests**

All other Claims and Interests are separated into the following voting classes:[3]

- Class 1 consists of the Secured Claim of 1st Source. Class 1 is **Impaired**. The Holder of the Class 1 Claim is entitled to vote to accept or reject the Plan.

- Class 2 consists of the Secured Claim of 1st Source, as successor in interest to AFC. Class 2 is **Impaired**. The Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

---

[3] The Court has not made any determination as to whether any particular Class is Impaired or Unimpaired. Pursuant to Section XIV.C of this Plan, any controversy regarding whether any Claim or Interest, or any Class of Claims of Claims or Interests, is Impaired, must be determined on or before the Confirmation Date.

- <u>Class 3</u> consists of the Secured Claim of Sumitomo. Class 3 is **Impaired**. The Holder of the Class 3 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 4</u> consists of the Secured Claim of Hitachi.  Class 4 is **Impaired**.  The Holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 5</u> consists of the Secured Claim of United Leasing.  Class 5 is **Impaired**.  The Holder of the Class 5 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 6</u> consists of the Secured Claim of the SBA.  Class 6 is **Impaired**.  The Holder of the Class 6 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 7</u> consists of the Secured Claim of LCA.  Class 7 is <u>Unimpaired</u>.  The Holder of the Class 7 Claim is <u>not</u> entitled to vote to accept or reject the Plan.

- <u>Class 8</u> consists of the Secured Claim of the SDCRAA.  Class 8 is <u>Unimpaired</u>.  The Holder of the Class 8 Claim is <u>not</u> entitled to vote to accept or reject the Plan.

- <u>Class 9</u> consists of the Secured Claim of the Colorado DOR.  Class 9 is **Impaired**. The Holder of the Class 9 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 10</u> consists of the Secured Claim of Commerce City.  Class 10 is **Impaired**. The Holder of the Class 10 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 11</u> consists of the Secured Claim of the Texas Comptroller relating to motor vehicle rental taxes.  Class 11 is **Impaired**.  The Holder of the Class 11 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 12</u> consists of the Secured Claim of the Texas Comptroller relating to franchise taxes. Class 12 is **Impaired**.  The Holder of the Class 12 Claim is entitled to vote to accept or reject the Plan.

- <u>Class 13</u> consists of Priority Wage Claims.  Class 13 is <u>Unimpaired</u>.  The Holders of the Class 13 Claims are <u>not</u> entitled to vote to accept or reject the Plan.

- <u>Class 14</u> consists of Convenience Class Claims.  Class 14 is <u>Unimpaired</u>.  The Holders of the Class 14 Claims are <u>not</u> entitled to vote to accept or reject the Plan.

- <u>Class 15</u> consists of General Unsecured Claims other than Convenience Class Claims.  Class 15 is **Impaired**.  The Holders of the Class 15 Claims are entitled to vote to accept or reject the Plan.

- <u>Class 16</u> consists of Interests in AVR California. Class 16 is <u>Unimpaired</u>. The Holder of the Class 16 Interests is <u>not</u> entitled to vote to accept or reject the Plan.

- Class 17 consists of Interests in AVR Vanpool.  Class 17 is <u>Unimpaired</u>.  The Holder of the Class 17 Interests is <u>not</u> entitled to vote to accept or reject the Plan.

## V.
## ALLOWANCE AND TREATMENT OF UNCLASSIFIED CLAIMS

**A.    Administrative Expense Claims**

**1.    Administrative Expense Claims Arising in the Ordinary Course of the Debtors' Business**

*Allowance*.............Claims arising from liabilities incurred by the Estates in the ordinary course of business after the Petition Date shall be deemed Allowed Claims.

*Treatment* ............Each such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim.  Nothing in the Plan shall be construed to preclude the payment of interest on Administrative Expense Claims if required by contract, statute, or other applicable law.

**2.    U.S. Trustee fees**

*Amount*.................$44,000 (estimated).

*Allowance*.............Allowed in accordance with 28 U.S.C. § 1930.

*Treatment* ............All fees due and payable pursuant to 28 U.S.C. § 1930 prior to the Effective Date shall be paid by the Debtors on or before the Effective Date.  After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable.

[*Continued on next page.*]

1689360.4  26988

3.      **Professional Fee Claims**

*Professionals* ........Entities known or believed by the Debtors to hold or otherwise assert Professional Fee Claims are as follows:

| Professional | Role |
| --- | --- |
| Danning Gill | Debtors' bankruptcy counsel |
| Kevin Tierney | Debtors' turnaround management consultant and financial advisor |
| CSA Partners | Debtors' financial consultant |
| Glaser | Debtors' special business litigation counsel |
| Barnes & Thornburg | Debtors' special corporate counsel |
| M&R | Debtors' special insurance counsel |
| McClellan | Debtors' special sales tax counsel |
| HKG | Debtors' tax accountants |
| Armanino | Debtors' valuation expert |
| Force 10 | Debtors' investment banker |
| Elkins Kalt | Committee's bankruptcy counsel |
| B. Riley | Committee's financial advisor |

*Estimates..............*Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than 5 Business Days prior to the Effective Date.  A Professional's estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of its Professional Fee Claim.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

*Escrow .................*As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash based on the Debtors' evaluation of the estimated Professional Fee Claims,

and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow in any way.  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (1) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtor and (2) shall be held in trust for the Professionals and for no other Entity until all Professional Fee Claims have been irrevocably paid in full; *provided, however*, that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtor. Allowed Professional Fee Claims shall be paid in Cash to Professionals from funds held in the Professional Fee Escrow when such Professional Fee Claims are Allowed by an Order of the Court.

The Debtors' obligations with respect to Professional Fee Claims shall not be limited or deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.  If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow by the Reorganized Debtor without any further notice to, action, order, or approval of the Court or by any other Entity.

*Allowance*.............A Professional Fee Claim shall be Allowed only if:  (1) on or before the Administrative Expense Claim Bar Date, the Holder of the Professional Fee Claim files with the Court a final fee application or a motion requesting Allowance of the Professional Fee Claim; and (2) the Court enters an Order Allowing the Professional Fee Claim.

Notice of the hearing on the fee application or motion shall be given in accordance with Local Rule 2016-1(c), on not less than 21 days' notice.  The Debtors or any other party in interest may file an objection to the application or motion within the time provided by the Local Rules, or within any other period that the Court establishes.

**HOLDERS OF PROFESSIONAL FEE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE FINAL FEE APPLICATIONS OR MOTIONS REQUESTING ALLOWANCE OF THE PROFESSIONAL FEE CLAIMS BY THE ADMINISTRATIVE**

1689360.4  26988

34

**EXPENSE CLAIM BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH PROFESSIONAL FEE CLAIMS AGAINST THE DEBTORS, THE ESTATES, THE REORGANIZED DEBTORS, OR THEIR PROPERTY, AND SUCH PROFESSIONAL FEE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

*Treatment* ............Unless otherwise agreed by the Holder of an Allowed Professional Fee Claim, the Reorganized Debtor shall pay the full Allowed amount of such Professional Fee Claim in Cash on or before 10 Business Days after the date on which the Court enters an Order allowing such Professional Fee Claim.

If the Court enters an Order allowing a Professional Fee Claim, and an appeal of the Order is filed by the Holder of the Professional Fee Claim or a party that objected to Allowance of the Professional Fee Claim, the Reorganized Debtor shall pay the Allowed amount of the Professional Fee Claim on or before 10 Business Days after the date on which the Court enters the Order allowing such Professional Fee Claim.  Until the Order becomes a Final Order, such payment shall be deemed an interim payment subject to disgorgement or supplement in the event that an appeal is filed and the Professional Fee Claim ultimately is Allowed in a different amount, or Disallowed, by a Final Order.

4.    **Section 503(b)(9) Claims**

*Claimant* ...............Southern Counties Lubricants, LLC

*Amount* .................$2,010.07 (POC 17)

*Allowance* .............The Claim shall be deemed an Allowed Claim.

*Treatment* ............The Claim shall be paid in full on the Effective Date.

5.    **Other Administrative Expense Claims**

*Allowance* .............Except as otherwise provided in the Plan (including Section XIV.R of the Plan, which provides that settlements that have been approved by the Court survive consummation of the Plan), an Other Administrative Expense Claim shall be Allowed

only if:  (1) on or before the Administrative Expense Claim Bar Date, the Holder of the Other Administrative Expense Claim files with the Court a motion requesting Allowance of such Claim; and (2) the Court enters an Order Allowing the Other Administrative Expense Claim.

The motion shall be filed and determined pursuant to Local Rule 9013-1(o), upon notice of opportunity to object and request a hearing.  The Reorganized Debtors or any other party in interest may file and serve a response and request a hearing on or before 30 days after the Administrative Expense Claim Bar Date, unless such time period is extended by the Court.  If the response period expires without the filing of any response and request for hearing, the Holder of the Other Administrative Expense Claim shall file a declaration and lodge a proposed order pursuant to Local Rule 9013-1(o)(3).  If a timely response and request for hearing is filed, the Holder of the Other Administrative Expense Claim shall schedule a hearing and give not less than 14 days' notice of the hearing pursuant to Local Rule 9013-1(o)(4).

**HOLDERS OF OTHER ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE REQUESTS FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE EXPENSE CLAIM BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTORS, THE ESTATES, THE REORGANIZED DEBTORS, OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE EXPENSE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

*Treatment* ............Unless otherwise agreed by the Holder, an Allowed Other Administrative Expense Claim shall be paid in the full Allowed amount of such Claim in Cash on or before 10 Business Days after the date on which any Order determining such Claim to be an Allowed Other Administrative Expense Claim becomes a Final Order.

*§ 503(b)(1)(D)* .......Section 503(b)(1)(D) of the Bankruptcy Code provides that "notwithstanding the requirements of subsection (a), a governmental unit shall not be required to file a request for the payment of an expense described in [§ 503(b)(2)(B) or (C)] as a condition of its being an allowed administrative expense."

Similarly, notwithstanding anything in this section governing Other Administrative Expense Claims, a Governmental Unit that is the holder of an Other Administrative Expense Claim of a type described in § 503(b)(1)(B) and (C) of the Bankruptcy Code shall not be required to file a request for payment of such Claim as a condition of its being an Allowed Other Administrative Expense Claim.

### 6.   Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtors may, in the ordinary course of business and without any further notice to or action, Order, or approval of the Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and consummation of the Plan that are incurred by the Reorganized Debtors.

Upon the Effective Date, any requirement that Professionals comply with §§ 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention, compensation for services rendered, or reimbursement for expenses incurred, on or after the Effective Date shall terminate, and the Reorganized Debtors may employ any Professional in the ordinary course of business without any further notice to or action, Order, or approval of the Court.

### B.   Unsecured Priority Tax Claims (Not Including the CDTFA Disputed Priority Tax Claim)

*Claimants* .........................Not including the CDTFA Disputed Priority Tax Claim, Entities known or believed by the Debtors to hold or otherwise assert Unsecured Priority Tax Claims, and the alleged amounts of such Claims, are as follows:

| Claimant | POC | Amount | Rate |
|---|---|---|---|
| Utah State Tax Commission | POC 2 | $75,517.02 | 2.0% |
| Internal Revenue Service | POC 7 (AVR CA) | $100.00 | 3.0% |
| Internal Revenue Service | POC 1 (Vanpool) | $1,100.00 | 3.0% |

1689360.4  26988

37

| Claimant | POC | Amount | Rate |
|---|---|---|---|
| Cal. Franchise Tax Board | POC 63 (AVR CA) | $1,693.85 | 3.0% |
| Cal. Franchise Tax Board | POC 4 (Vanpool) | $823.34 | 3.0% |
| CDTFA Undisputed Priority Tax Claim | POC 76 | $495,301.11 | 6.0% |
|  |  | **$574,535.32** |  |

*Allowance* ......................... An Unsecured Priority Tax Claim shall be Allowed only if it satisfies the definitional requirements of an Allowed Claim. Notwithstanding the foregoing sentence, in accordance with the Plan Compromise Agreement, the CDTFA Undisputed Priority Tax Claim shall be Allowed in the amount of $495,301.11.

*Treatment* ....................... In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Unsecured Priority Tax Claim, each Allowed Unsecured Priority Tax Claim shall be paid in full from the $850,000 paid into the Settlement Fund on the Effective Date.  In accordance with Section IX.J of the Plan, the Plan Disbursing Agent shall pay each Holder of an Allowed Unsecured Priority Tax Claim, in full, within 10 Business Days after the Effective Date.

C.    **Allowance and Treatment of the CDTFA Disputed Priority Tax Claim**

*Claimant* ........................... In addition to the CDTFA Undisputed Priority Tax Claim, CDTFA asserts a CDTFA Disputed Priority Tax Claim in the amount of $4,789,477.03.

*Allowance* ......................... The CDTFA Disputed Priority Tax Claim shall be Allowed as an Unsecured Priority Tax Claim in the amount of $4,789,477.03.

*Treatment* ....................... The treatment of the CDTFA Disputed Priority Tax Claim shall be consistent in all respects with the Plan Compromise Agreement.  If the terms of the Plan are inconsistent with the terms of the Plan Compromise Agreement, the terms of the

Plan Compromise Agreement shall supersede any inconsistent terms of the Plan.

The Plan Disbursing Agent shall make distributions on account of the CDTFA Disputed Priority Tax Claim as if the CDTFA Disputed Priority Tax Claim were Allowed as a General Unsecured Claim instead of a Priority Tax Claim. Accordingly, CDTFA shall receive a Pro Rata share of all distributions made by the Plan Disbursing Agent to Holders of Allowed Class 15 Claims, as if the CDTFA Disputed Priority Tax Claim is an Allowed Class 15 Claim.[4]

After the 5-year anniversary of the Effective Date, the Reorganized Debtor shall pay CDTFA an additional $1.9 million in accordance with the Plan Compromise Agreement.

## VI.
## CLASSIFICATION, ALLOWANCE AND TREATMENT OF CLASSIFIED CLAIMS

A.    **Class 1 – 1st Source**

*Classification* ...................Class 1 consists of the Secured Claim of 1st Source arising out of and related to the 1st Source Loan Documents.

*Value of Collateral*............$5,450,775 (MMR Value as of 2/15/22).

*Guarantor(s)*.....................Yazdan and Kimberly Irani.

---

[4] For example, if the total amount of Allowed Class 15 Claims is $3,652,456.21, and if the CDTFA Disputed Priority Claim were Allowed as a Class 15 Claim instead of an Unsecured Priority Tax Claim, the total amount of Allowed Class 15 Claims would be $8,441,933.24 and CDTFA's Class 15 Claim would comprise approximately 56.73% of the Allowed Class 15 Claims. Assuming those facts, after making distributions to Holders of Unsecured Priority Tax Claims in accordance with Section V.B of the Plan, the Plan Disbursing Agent shall distribute 56.73% of the remaining funds to CDTFA and 43.27% of the remaining funds to Holders of Allowed Class 15 Claims.

1689360.4  26988                              39

*Allowance*.........................In accordance with the 1st Source Settlement Agreement,[5] the Class 1 Claim has been Allowed in the aggregate amount of $5,663,189.61.  The Holder of the Class 1 Claim has made an election under § 1111(b) to have such Claim treated as a Secured Claim to the full extent the Claim is Allowed.

*Treatment* ........................The Holder of the Class 1 Claim shall retain all Security Interests in and Liens on property presently securing AVR California's obligations under the 1st Source Settlement Agreement, derived from the Security Interests in and Liens on property that secured AVR California's obligations under the 1st Source Loan Documents – i.e., the "1st Source Vehicles" (as that term is defined in the 1st Source Settlement Agreement) and the proceeds thereof.

Pursuant to the 1st Source Settlement Agreement, the Class 1 Claim has been bifurcated.  The 1st Source 1-A Claim has been Allowed as a fully Secured Claim in the amount of $4,368,650.00 and the 1st Source 1-B Claim has been Allowed as a fully Secured Claim in the amount of $1,294,539.61.  The 1st Source Loan Documents have been amended and restated consistent with the terms of the 1st Source Settlement Agreement.  After the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 1 Claim, the Holder of the Class 1 Claim shall receive (1) payment in full, in Cash, of the unpaid portion of the 1st Source 1-A Claim in accordance with the 1st Source Settlement Agreement, and (2) payment, at least in part, in Cash, of the unpaid portion of the 1st Source 1-B Claim in accordance with the 1st Source Settlement Agreement.

*Voting*...............................Class 1 is Impaired.  The Holder of the Class 1 Claim is entitled to vote to accept or reject the Plan.

---

[5] Copies of the documents comprising the 1st Source Settlement Agreement are attached as Exhibit I to the Disclosure Statement.

**B.**    <u>**Class 2 – 1st Source (from AFC)**</u>

*Classification* ....................Class 2 consists of the Secured Claim of 1st Source arising out of and related to the AFC Loan Documents.

*Value of Collateral*............At least $4,754,700 (MMR Value as of 2/15/22).

*Guarantor(s)*.....................Yazdan and Kimberly Irani.

*Allowance*.........................In accordance with the 1st Source Settlement Agreement,[6] the Class 2 Claim has been Allowed in the aggregate amount of $4,364,305.50. The Holder of the Class 2 Claim has made an election under § 1111(b) to have such Claim treated as a Secured Claim to the full extent the Claim is Allowed.

*Treatment* ........................The Holder of the Class 2 Claim shall retain all Security Interests in and Liens on property presently securing AVR California's obligations under the 1st Source Settlement Agreement, derived from the Security Interests in and Liens on property that secured AVR California's obligations under the AFC Loan Documents – i.e., all assets of AVR California and its Estate.

Pursuant to the 1st Source Settlement Agreement, the Class 2 Claim has been bifurcated. The 1st Source 2-A Claim has been Allowed as a fully Secured Claim in the amount of $3,812,475.00 and the 1st Source 2-B Claim has been Allowed as a fully Secured Claim in the amount of $551,830.50. The AFC Loan Documents have been amended and restated consistent with the terms of the 1st Source Settlement Agreement. After the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 2 Claim, the Holder of the Class 2 Claim shall receive (1) payment in full, in Cash, of the unpaid portion of the 1st Source 2-A Claim in accordance with the 1st Source Settlement Agreement, and (2) payment in full, in Cash, of the unpaid portion of the 1st Source 2-B Claim in accordance with the 1st Source Settlement Agreement.

*Voting*...............................Class 2 is Impaired. The Holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

---

[6] Copies of the documents comprising the 1st Source Settlement Agreement are attached as Exhibit I to the Disclosure Statement.

**C.**     **Class 3 – Sumitomo**

*Classification* ....................Class 3 consists of the Secured Claim of Sumitomo arising out of and related to the Sumitomo Loan Documents.

*Claim Amount* ..................On January 21, 2021, Sumitomo filed a Proof of Claim stating that the total amount owed was $405,037.49 (POC 19).  As of March 2, 2022, the total amount owed to Sumitomo was approximately $347,785.

*Value of Collateral*............$321,100 (MMR Value as of 2/15/22).

*Allowance*.........................On the Effective Date: (1) if the MMR Value of the vehicles securing AVR California's obligations under the Sumitomo Loan Documents is greater than the unpaid amount of Sumitomo's Claim, Sumitomo shall have an Allowed Secured Claim in the full unpaid amount of Sumitomo's Claim; but (2) if the MMR Value of such vehicles is less than the unpaid amount of Sumitomo's Claim, Sumitomo's Claim shall be bifurcated into (a) an Allowed Secured Claim in an amount equal to the MMR Value of such vehicles and (b) an Allowed General Unsecured Claim in an amount equal to the unpaid amount of Sumitomo's Claim minus the MMR Value of such vehicles.  In either event, the Allowed Secured Claim is referred to herein as the "**Class 3 Claim**."

Notwithstanding the foregoing, if the Holder of the Class 3 Claim makes an election under § 1111(b) to have such Claim treated as a Secured Claim to the full extent the Claim is Allowed, the Class 3 Claim shall be Allowed in the full amount owed as of the Effective Date.

*Treatment* .......................The Holder of the Class 3 Claim shall retain any and all Liens securing the Class 3 Claim to the extent of the Allowed amount of the Class 3 Claim.

In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 3 Claim, the Holder of the Allowed Class 3 Claim shall receive deferred Cash payments totaling at least the Allowed amount of the Class 3 Claim, of a value, as of the Effective Date, of at least the value of the Holder's interest in the AVR California Estate's interest in property subject to Liens securing the Class 3 Claim.

1689360.4  26988                             42

Payments shall continue to be made monthly, over a period of 36 months from the Effective Date.  Interest on the declining principal balance shall accrue at a rate of 3.0% per annum through December 31, 2022, and 6.0% per annum thereafter.  Upon the sale of a vehicle securing AVR California's obligations under the Sumitomo Loan Documents, the full amount of the net sale proceeds (after payment of costs of sale, including auction costs) shall be paid to the Holder of the Class 3 Claim.  All outstanding principal and accrued interest shall be paid when the 36th installment payment is made.

*Voting* .............................. Class 3 is Impaired.  The Holder of the Class 3 Claim is entitled to vote to accept or reject the Plan.

**D.    Class 4 – Hitachi**

*Classification* ................... Class 4 consists of the Secured Claim of Hitachi arising out of and related to the Hitachi Loan Documents.

*Claim Amount* ................. On February 10, 2021, Hitachi filed a Proof of Claim stating that the total amount owed was $393,126.00 (POC 25).  As of March 14, 2022, the total amount owed to Hitachi was approximately $252,558.

*Value of Collateral* ........... $306,475 (MMR Value as of 2/15/22).

*Guarantor(s)* ..................... Yazdan and Kimberly Irani; and Fleet Transportation Services.

*Allowance* ........................ The Holder of the Class 4 Claim has made an election under § 1111(b) to have such Claim treated as a Secured Claim to the full extent the Claim is Allowed (docket no. 853).  Accordingly, the Class 4 Claim shall be Allowed in the full amount owed as of the Effective Date.

*Treatment* ........................ The Holder of the Class 4 Claim shall retain any and all Liens securing the Class 4 Claim to the extent of the Allowed amount of the Class 4 Claim.

In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 4 Claim, the Holder of the Allowed Class 4 Claim shall receive deferred Cash payments totaling at least the Allowed amount of the Class 4 Claim, of a value, as of the Effective Date, of at least the value

of the Holder's interest in the AVR California Estate's interest in property subject to Liens securing the Class 4 Claim.

Payments shall continue to be made monthly, over a period of 36 months from the Effective Date. Interest on the declining principal balance shall accrue at a rate of 3.0% per annum through December 31, 2022, and 6.0% per annum thereafter. Upon the sale of a vehicle securing AVR California's obligations under the Hitachi Loan Documents, the full amount of the net sale proceeds (after payment of costs of sale, including auction costs) shall be paid to the Holder of the Class 4 Claim. All outstanding principal and accrued interest shall be paid when the 36th installment payment is made.

*Voting*.............................Class 4 is Impaired. The Holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

**E.** **Class 5 – United Leasing**

*Classification* ...................Class 5 consists of the Secured Claim of United Leasing arising out of and related to the United Leasing Loan Documents.

*Claim Amount* ..................On March 1, 2021, United Leasing filed a Proof of Claim stating that the total amount owed was $94,005.86 (POC 35). As of March 12, 2022, the total amount owed to United Leasing was approximately $70,467.

*Value of Collateral*............$168,500 (MMR Value as of 2/15/22).

*Guarantor(s)*.....................Yazdan and Kimberly Irani.

*Allowance*.........................On the Effective Date: (1) if the MMR Value of the vehicles securing AVR California's obligations under the United Leasing Loan Documents is greater than the unpaid amount of United Leasing's Claim, United Leasing shall have an Allowed Secured Claim in the full unpaid amount of United Leasing's Claim; but (2) if the MMR Value of such vehicles is less than the unpaid amount of United Leasing's Claim, United Leasing's Claim shall be bifurcated into (a) an Allowed Secured Claim in an amount equal to the MMR Value of such vehicles and (b) an Allowed General Unsecured Claim in an amount equal to the unpaid amount of United Leasing's Claim minus the MMR Value of such

vehicles.  In either event, the Allowed Secured Claim is referred to herein as the "**Class 5 Claim**."

Notwithstanding the foregoing, if the Holder of the Class 5 Claim makes an election under § 1111(b) to have such Claim treated as a Secured Claim to the full extent the Claim is Allowed, the Class 5 Claim shall be Allowed in the full amount owed as of the Effective Date.

*Treatment* .......................The Holder of the Class 5 Claim shall retain any and all Liens securing the Class 5 Claim to the extent of the Allowed amount of the Class 5 Claim.

In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 5 Claim, the Holder of the Allowed Class 5 Claim shall receive deferred Cash payments totaling at least the Allowed amount of the Class 5 Claim, of a value, as of the Effective Date, of at least the value of the Holder's interest in the AVR California Estate's interest in property subject to Liens securing the Class 5 Claim.

Payments shall continue to be made monthly, over a period of 36 months from the Effective Date.  Interest on the declining principal balance shall accrue at a rate of 3.0% per annum through December 31, 2022, and 6.0% per annum thereafter. Upon the sale of a vehicle securing AVR California's obligations under the United Leasing Loan Documents, the full amount of the net sale proceeds (after payment of costs of sale, including auction costs) shall be paid to the Holder of the Class 5 Claim. All outstanding principal and accrued interest shall be paid when the 36th installment payment is made.

*Voting*..............................Class 5 is Impaired.  The Holder of the Class 5 Claim is entitled to vote to accept or reject the Plan.

[*Continued on next page.*]

1689360.4  26988

45

**F.**     **Class 6 – SBA**

*Classification* ...................Class 6 consists of the Secured Claim of the SBA arising out of and related to the SBA Loan Documents.

*Claim Amount* ..................On March 4, 2021, the SBA filed a Proof of Claim stating that the total amount owed was $507,560.79 (POC 38).  As of March 9, 2022, the total amount owed to the SBA was approximately $499,225.

*Value of Collateral*............As a result of the limiting language in the SBA's loan agreement, the value of the SBA's collateral may be equal to the value of machinery, equipment, furniture, fixtures, and non-automotive inventory located at the Former Principal Office on August 31, 2020, plus the value of AVR California's accounts receivables that (a) were outstanding when AVR California vacated the Former Principal Office and (b) remained outstanding on the Petition Date.  The Debtors have not calculated the value of the SBA's collateral under that interpretation of the agreements.  If the language in the security agreement controls, the value of the SBA's collateral is equal to the value of AVR California's machinery, equipment, furniture, fixtures, non-automotive inventory, and accounts receivable as of the Petition Date.  The Debtors estimate that, under that interpretation of the agreements, the SBA was fully secured as of the Petition Date. Pursuant to the Court's Orders authorizing the Debtors' use of Cash Collateral, the SBA has replacement liens on all assets of the Estates, excluding Avoidance Actions and recoveries, to the extent that the Debtors' use of the SBA's Cash Collateral resulted in a decrease in the value of the SBA's interest in Cash Collateral.

*Guarantor(s)*....................Yazdan and Kimberly Irani.

*Allowance*.........................On the Effective Date, the unpaid amount of the SBA's Claim shall be an Allowed Secured Claim.

*Treatment* ........................As of the Effective Date, the SBA Loan Documents shall be deemed amended as follows:

1.     The SBA is granted a Security Interest and Lien in and to all of the Reorganized Debtor's present and future right, title and interest in the following property, wherever located, whether now owned or hereafter acquired:

1689360.4 26988                      46

machinery; equipment; furniture; fixtures; accounts; and non-automotive inventory.

2.      The Reorganized Debtor is authorized to seek and accept loans and future advances under AVR California's agreements with 1st Source secured by senior Liens on any and all assets of the Reorganized Debtor, provided that the aggregate amount owed to 1st Source under such agreements does not at any particular time exceed $15 million.

3.      The Reorganized Debtor is authorized to seek and accept loans and future advances from other financing companies whose loans and/or advances are used by the Reorganized Debtor to purchase vehicles for use in the Reorganized Debtor's business, secured by Liens on such vehicles and the proceeds and products thereof.

4.      Otherwise, the Reorganized Debtor shall neither seek nor accept future advances under any superior Liens on the collateral securing the Class 6 Claim without the prior written consent of the Holder of the Class 6 Claim.

The Security Interest and Lien granted hereby shall be deemed automatically perfected by entry of the Confirmation Order, and shall have the same priority as the SBA's existing Security Interest and Lien in and to the SBA Collateral.  The SBA is authorized to file a financing statement in any filing office in any Uniform Commercial Code jurisdiction and describe its collateral consistent with the terms of the Plan.

The Reorganized Debtor shall continue to make payments to the Holder of the Class 6 Claim in accordance with the SBA Loan Documents.  Without limiting or modifying the terms set forth in the SBA Loan Documents:  Interest shall accrue at the rate of 3.75% per annum; the Reorganized Debtor shall make installment payments, including principal and interest, in the amount of $2,437.00 per month; each payment shall be applied first to interest accrued to the date of receipt of each payment, and the balance (if any) shall be applied to principal; and the balance of principal and interest shall be payable on March 25, 2050.

*Voting* ............................. Class 6 is Impaired.  The Holder of the Class 6 Claim is entitled to vote to accept or reject the Plan.

1689360.4 26988                          47

**G.** **Class 7 – LCA Bank Corporation**

*Classification* ...................Class 7 consists of the Secured Claim of LCA arising out of and related to the LCA Agreement.

*Claim Amount* .................As of December 23, 2021, the total amount owed to LCA was approximately $39,429.00.

*Value of Collateral*............Unknown.

*Allowance*........................The Holder of the Class 7 Claim shall have an Allowed Secured Claim in the full amount of its Claim (the "**Class 7 Claim**").

*Treatment* .......................The Holder of the Class 7 Claim shall retain any and all Liens securing the Class 7 Claim to the extent of the Allowed amount of the Class 7 Claim. The Reorganized Debtor shall continue to make payments as and when required by the LCA Agreement.

*Voting*..............................Class 7 is Unimpaired. The Holder of the Class 7 Claim is not entitled to vote to accept or reject the Plan because it is deemed to have accepted the Plan.

**H.** **Class 8 – San Diego County Regional Airport Authority**

*Classification* ...................Class 8 consists of the Secured Claim of the San Diego County Regional Airport Authority.

*Claim Amount* .................According to the SDCRAA's Proof of Claim (POC 53), the total amount of the SDCRAA's Claim is $45,075.81.

*Value of Collateral*............$8,708.00 (security deposit).

*Allowance*........................The SDCRAA shall have an Allowed Secured Claim in the amount of $8,708 (the "**Class 8 Claim**"). The balance of the SDCRAA's Allowed Claim, if any, shall be a General Unsecured Claim.

*Treatment* .......................On the Effective Date, the Holder of the Class 8 Claim shall be entitled to retain the security deposit and set it off against the Holder's total Claim.

*Voting*..............................Class 8 is Unimpaired. The Holder of the Class 8 Claim is not entitled to vote to accept or reject the Plan because it is deemed to have accepted the Plan.

**I.**    **Class 9 – Colorado Department of Revenue**

*Classification* ....................Class 9 consists of the Secured Claim of the Colorado DOR.

*Claim Amount* ..................According to the Colorado DOR's Proof of Claim (POC 37), the total amount of the Claim is $65,910.50.  Of this amount, $45,752.50 is for tax and interest, and $20,158.00 is for penalties.

*Value of Collateral*............Unknown.  According to the Colorado DOR's Proof of Claim, it has a "first and prior lien upon the goods and business fixtures of or used by [AVR California], excepting stock of goods sold or for sale in the ordinary course of business, and shall take precedence on all such property over other liens or claims of whatsoever kind or nature."  Colorado Revised Statutes § 39-26-117(1)(a).  Also according to the Proof of Claim, "The lien applies to tax and interest but not to penalties."

*Allowance*.........................The Colorado DOR's total Claim shall be deemed Allowed in the amount of $65,910.50.  Regardless of the value of the collateral securing the Allowed Claim, the Claim shall be an Allowed Secured Claim in the amount of $45,752.50 (the "**Class 9 Claim**") and a General Unsecured Claim in the amount of $20,158.00.

*Treatment* ........................In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 9 Claim:

1.    As of the Effective Date, the Debtors, on behalf of themselves, the Estates and the Reorganized Debtors, shall waive and release any and all claims for avoidance of the Lien(s) securing the Class 9 Claim, and claims for disallowance of the Class 9 Claim pursuant to § 502(d) of the Bankruptcy Code.

2.    The Holder of the Class 9 Claim shall retain any and all Liens securing the Class 9 Claim to the extent of the Allowed amount of the Class 9 Claim.

3.    Except to the extent that the Holder of the Class 9 Claim and the Debtors agree (whether before or after the Effective Date) to a less favorable treatment, the Allowed Class 9 Claim shall be paid in accordance with § 1129(a)(9)(D) of the Bankruptcy Code.  The Holder of the Allowed Class 9 Claim shall receive interest on such

1689360.4  26988

Claim after the Effective Date in accordance with §§ 511 and 1129(a)(9)(D) of the Bankruptcy Code; the applicable interest rate is 6.00% per annum.

Commencing on the Initial Distribution Date, the Reorganized Debtor shall make quarterly payments to the Holder of the Class 9 Claim.  To the extent that the Initial Distribution Date occurs after January 1, 2022, the first distribution shall include quarterly distributions that would have been made but for the non-occurrence of the Effective Date.  Each subsequent distribution shall be made on or before the Quarterly Distribution Date. The final distribution shall be made on before December 10, 2025.  The Debtors estimate that distributions will be made as follows:

| Period | Amount | | Period | Amount |
|---|---|---|---|---|
| 1Q22 | $2,790 | | 1Q24 | $3,415 |
| 2Q22 | $2,790 | | 2Q24 | $3,415 |
| 3Q22 | $2,790 | | 3Q24 | $3,415 |
| 4Q22 | $2,790 | | 4Q24 | $3,415 |
| | | | | |
| 1Q23 | $3,213 | | 1Q25 | $3,888 |
| 2Q23 | $3,213 | | 2Q25 | $3,888 |
| 3Q23 | $3,213 | | 3Q25 | $3,888 |
| 4Q23 | $3,213 | | 4Q25* | $3,888 |

* The amount of the final distribution shall be equal to the remaining principal balance owed, plus interest through the date the final distribution is made.  Because interest will not start accruing until the Effective Date, the Debtors anticipate that the amount of the final distribution will be less than the amount shown.

*Voting*..............................Class 9 is Impaired.  The Holder of the Class 9 Claim is entitled to vote to accept or reject the Plan.

[*Continued on next page.*]

1689360.4  26988

**J.**    **Class 10 – City of Commerce City, Colorado**

*Classification* ....................Class 10 consists of the Secured Claim of Commerce City.

*Claim Amount* ..................According to Commerce City's Proof of Claim (POC 43), the total amount of the Claim is $18,554.69.  Of this amount, $16,931.24 is for tax and interest, and $1,623.45 is for penalties.

*Value of Collateral*............Unknown.  According to Commerce City's Proof of Claim, it has a Lien pursuant to City of Commerce City Sales and Use Tax Code § 20-13.  That section provides, in relevant part, "Sales and use tax shall be a first and prior lien upon perfection as provided in Sections 13-6 and 13-7 on tangible personal property sold, purchased, stored, used, distributed, or consumed.  When such tax is collected by retailers or agents, the sales or use tax imposed by the Code shall be a first and prior lien upon all goods and business fixtures of or used by any retailer under lease, title-retaining contract or other contract arrangement, and shall take precedence on all such property over other liens or claims of whatsoever kind or nature."  City of Commerce City Sales and Use Tax Code § 20-13-1.  To perfect such a Lien, the City Manager must issue a notice to the taxpayer by certified mail advising that Commerce City claims a first and prior lien therefor on the real and tangible personal property of the taxpayer.  City of Commerce City Sales and Use Tax Code § 20-13-6.  No such notice was appended to the Proof of Claim.

*Allowance*........................Commerce City's total Claim shall be deemed an Allowed Secured Claim in the amount of $18,554.69 (the "**Class 10 Claim**").

*Treatment* .......................In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 10 Claim:

1.    As of the Effective Date, the Debtors, on behalf of themselves, the Estates and the Reorganized Debtors, shall waive and release any and all claims for avoidance of the Lien(s) securing the Class 10 Claim, and claims for disallowance of the Class 10 Claim pursuant to § 502(d) of the Bankruptcy Code.

2.    The Holder of the Class 10 Claim shall retain any and all Liens securing the Class 10 Claim to the extent of the Allowed amount of the Class 10 Claim.

1689360.4  26988                                51

3.     Except to the extent that the Holder of the Class 10 Claim and the Debtors agree (whether before or after the Effective Date) to a less favorable treatment, the Allowed Class 10 Claim shall be paid in accordance with § 1129(a)(9)(D) of the Bankruptcy Code. The Holder of the Allowed Class 10 Claim shall receive interest on such Claim after the Effective Date in accordance with §§ 511 and 1129(a)(9)(D) of the Bankruptcy Code; the applicable interest rate is 6.00% per annum.

Commencing on the Initial Distribution Date, the Reorganized Debtor shall make quarterly payments to the Holder of the Class 10 Claim. To the extent that the Initial Distribution Date occurs after January 1, 2022, the first distribution shall include quarterly distributions that would have been made but for the non-occurrence of the Effective Date. Each subsequent distribution shall be made on or before the Quarterly Distribution Date. The final distribution shall be made on before December 10, 2025. The Debtors estimate that distributions will be made as follows:

| Period | Amount | | Period | Amount |
|--------|--------|---|--------|--------|
| 1Q22 | $1,131 | | 1Q24 | $1,385 |
| 2Q22 | $1,131 | | 2Q24 | $1,385 |
| 3Q22 | $1,131 | | 3Q24 | $1,385 |
| 4Q22 | $1,131 | | 4Q24 | $1,385 |
| | | | | |
| 1Q23 | $1,303 | | 1Q25 | $1,577 |
| 2Q23 | $1,303 | | 2Q25 | $1,577 |
| 3Q23 | $1,303 | | 3Q25 | $1,577 |
| 4Q23 | $1,303 | | 4Q25* | $1,577 |

* The amount of the final distribution shall be equal to the remaining principal balance owed, plus interest through the date the final distribution is made. Because interest will not start accruing until the Effective Date, the Debtors anticipate that the amount of the final distribution will be less than the amount shown.

*Voting* ............................... Class 10 is Impaired. The Holder of the Class 10 Claim is entitled to vote to accept or reject the Plan.

**K.**    **Class 11 – Texas Comptroller of Public Accounts (Motor Vehicle Rental Taxes)**

*Classification* ...................Class 11 consists of the Secured Claim of the Texas Comptroller relating to motor vehicle rental taxes.

*Claim Amount* .................According to the Texas Comptroller's Proof of Claim for motor vehicle rental taxes (POC 5), the total amount of such Claim is $306,299.32.

*Value of Collateral*............Unknown.   According to the Proof of Claim, the Texas Comptroller has a "statutory lien on all real and personal property owned, claimed or acquired by" AVR California.  *See also* Texas Tax Code § 113.001 (taxes, interest and penalties "are secured by a lien on all of the person's property that is subject to execution.").

*Allowance*.........................The Texas Comptroller's Claim for motor vehicle rental taxes shall be deemed an Allowed Secured Claim in the amount of $306,299.32 (the "**Class 11 Claim**").

*Treatment* ........................In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 11 Claim:

1.    As of the Effective Date, the Debtors, on behalf of themselves, the Estates and the Reorganized Debtors, shall waive and release any and all claims for avoidance of the Lien(s) securing the Class 11 Claim, and claims for disallowance of the Class 11 Claim pursuant to § 502(d) of the Bankruptcy Code.

2.    The Holder of the Class 11 Claim shall retain any and all Liens securing the Class 11 Claim to the extent of the Allowed amount of the Class 11 Claim.

3.    Nothing provided in the Plan shall affect or impair any statutory or common law setoff rights of the Holder of the Class 11 Claim in accordance with § 553 of the Bankruptcy Code.

4.    A failure by the Reorganized Debtor to make a plan payment to the Holder of the Class 11 Claim shall be an Event of Default.  If the Reorganized Debtor fails to cure an Event of Default as to the Holder of the Class 11 Claim within 10 days after service of a written notice of default, then such Holder may (a) enforce the entire

amount of its Claim; (b) exercise any and all rights and remedies available under applicable non-bankruptcy law; and (c) seek such relief as may be appropriate in the Court. The Reorganized Debtor can receive up to 3 notices of default; *provided, however*, the third default cannot be cured.

5. Notwithstanding anything to the contrary in Section XI.F of the Plan, as to the Class 11 Claim, the Temporary Enforcement Injunction shall continue in effect until the earliest of the following: (1) all distributions required to be made on account of the Class 11 Claim have been paid; (2) the Cases are dismissed or converted to Chapter 7; and (3) the Reorganized Debtor fails to timely cure an Event of Default in accordance with the immediately preceding paragraph, thereby entitling the Holder of the Class 11 Claim to, among other things, exercise any and all rights and remedies available under applicable non-bankruptcy law. The Holder of the Class 11 Claim shall not be required to obtain a Final Order by the Court terminating the Temporary Enforcement Injunction prior to exercising such rights.

6. Except as may be provided in the immediately preceding paragraph, nothing provided in the Plan shall affect or impair any rights of the Holder of the Class 11 Claim to pursue any non-Debtor third parties for tax debts or Claims.

7. Except to the extent that the Holder of the Class 11 Claim and the Debtors agree (whether before or after the Effective Date) to a less favorable treatment, the Allowed Class 11 Claim shall be paid in accordance with § 1129(a)(9)(D) of the Bankruptcy Code. The Holder of the Allowed Class 11 Claim shall receive interest on such Claim after the Effective Date in accordance with §§ 511 and 1129(a)(9)(D) of the Bankruptcy Code; the applicable interest rate is 4.25% per annum.

Commencing on the Initial Distribution Date, the Reorganized Debtor shall make quarterly payments to the Holder of the Class 11 Claim. To the extent that the Initial Distribution Date occurs after January 1, 2022, the first distribution shall include quarterly distributions

1689360.4  26988

54

that would have been made but for the non-occurrence of the Effective Date.  Each subsequent distribution shall be made on or before the Quarterly Distribution Date.  The final distribution shall be made on before December 10, 2025.  The Debtors estimate that distributions will be made as follows:

| Period | Amount | | Period | Amount |
|---|---|---|---|---|
| 1Q22 | $17,337 | | 1Q24 | $22,077 |
| 2Q22 | $17,337 | | 2Q24 | $22,077 |
| 3Q22 | $17,337 | | 3Q24 | $22,077 |
| 4Q22 | $17,337 | | 4Q24 | $22,077 |
| | | | | |
| 1Q23 | $20,419 | | 1Q25 | $25,597 |
| 2Q23 | $20,419 | | 2Q25 | $25,597 |
| 3Q23 | $20,419 | | 3Q25 | $25,597 |
| 4Q23 | $20,419 | | 4Q25* | $25,597 |

* The amount of the final distribution shall be equal to the remaining principal balance owed, plus interest through the date the final distribution is made.  Because interest will not start accruing until the Effective Date, the Debtors anticipate that the amount of the final distribution will be less than the amount shown.

*Voting*..............................Class 11 is Impaired.  The Holder of the Class 11 Claim is entitled to vote to accept or reject the Plan.

L.      **Class 12 – Texas Comptroller of Public Accounts (Franchise Taxes)**

*Classification* ...................Class 12 consists of the Secured Claim of the Texas Comptroller relating to franchise taxes.

*Claim Amount* ..................According to the Texas Comptroller's Proof of Claim for franchise taxes (POC 6), the total amount of such Claim is $12,560.86.

*Value of Collateral*............Unknown.   According to the Proof of Claim, the Texas Comptroller has a "statutory lien on all real and personal property owned, claimed or acquired by" AVR California.  *See also* Texas Tax Code § 113.001 (taxes, interest and penalties "are secured by a lien on all of the person's property that is subject to execution." Texas Tax Code § 113.001. Based on the

documents attached to the Proof of Claim, AVR California contends that the Texas Comptroller has not recorded a lien notice against AVR California with respect to the Texas Comptroller's alleged Claim relating to franchise taxes.

*Allowance*.........................The Texas Comptroller's Claim for franchise taxes shall be deemed an Allowed Secured Claim in the amount of $12,560.86 (the "**Class 12 Claim**").

*Treatment* ........................In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for the Class 12 Claim:

1.      As of the Effective Date, the Debtors, on behalf of themselves, the Estates and the Reorganized Debtors, shall waive and release any and all claims for avoidance of the Lien(s) securing the Class 12 Claim, and claims for disallowance of the Class 12 Claim pursuant to § 502(d) of the Bankruptcy Code.

2.      The Holder of the Class 12 Claim shall retain any and all Liens securing the Class 12 Claim to the extent of the Allowed amount of the Class 12 Claim.

3.      Nothing provided in the Plan shall affect or impair any statutory or common law setoff rights of the Holder of the Class 12 Claim in accordance with § 553 of the Bankruptcy Code.

4.      A failure by the Reorganized Debtor to make a plan payment to the Holder of the Class 12 Claim shall be an Event of Default.  If the Reorganized Debtor fails to cure an Event of Default as to the Holder of the Class 12 Claim within 10 days after service of a written notice of default, then such Holder may (a) enforce the entire amount of its Claim; (b) exercise any and all rights and remedies available under applicable non-bankruptcy law; and (c) seek such relief as may be appropriate in the Court.  The Reorganized Debtor can receive up to 3 notices of default; *provided, however*, the third default cannot be cured.

5.      Notwithstanding anything to the contrary in Section XI.F of the Plan, as to the Class 12 Claim, the Temporary Enforcement Injunction shall continue in effect until the earliest of the following: (1) all distributions required to

be made on account of the Class 12 Claim have been paid; (2) the Cases are dismissed or converted to Chapter 7; and (3) the Reorganized Debtor fails to timely cure an Event of Default in accordance with the immediately preceding paragraph, thereby entitling the Holder of the Class 12 Claim to, among other things, exercise any and all rights and remedies available under applicable non-bankruptcy law.  The Holder of the Class 12 Claim shall not be required to obtain a Final Order by the Court terminating the Temporary Enforcement Injunction prior to exercising such rights.

6.      Except as may be provided in the immediately preceding paragraph, nothing provided in the Plan shall affect or impair any rights of the Holder of the Class 12 Claim to pursue any non-Debtor third parties for tax debts or Claims.

7.      Except to the extent that the Holder of the Class 12 Claim and the Debtors agree (whether before or after the Effective Date) to a less favorable treatment, the Allowed Class 12 Claim shall be paid in accordance with § 1129(a)(9)(D) of the Bankruptcy Code.  The Holder of the Allowed Class 12 Claim shall receive interest on such Claim after the Effective Date in accordance with §§ 511 and 1129(a)(9)(D) of the Bankruptcy Code; the applicable interest rate is 4.25% per annum.

Commencing on the Initial Distribution Date, the Reorganized Debtor shall make quarterly payments to the Holder of the Class 12 Claim.  To the extent that the Initial Distribution Date occurs after January 1, 2022, the first distribution shall include quarterly distributions that would have been made but for the non-occurrence of the Effective Date.  Each subsequent distribution shall be made on or before the Quarterly Distribution Date.  The final distribution shall be made on before December 10, 2025.  The Debtors estimate that distributions will be made as follows:

[*Continued on next page.*]

| Period | Amount | | Period | Amount |
|---|---|---|---|---|
| 1Q22 | $711 | | 1Q24 | $905 |
| 2Q22 | $711 | | 2Q24 | $905 |
| 3Q22 | $711 | | 3Q24 | $905 |
| 4Q22 | $711 | | 4Q24 | $905 |
| | | | | |
| 1Q23 | $837 | | 1Q25 | $1,050 |
| 2Q23 | $837 | | 2Q25 | $1,050 |
| 3Q23 | $837 | | 3Q25 | $1,050 |
| 4Q23 | $837 | | 4Q25* | $1,050 |

\* The amount of the final distribution shall be equal to the remaining principal balance owed, plus interest through the date the final distribution is made. Because interest will not start accruing until the Effective Date, the Debtors anticipate that the amount of the final distribution will be less than the amount shown.

*Voting* ............................. Class 12 is Impaired. The Holder of the Class 12 Claim is entitled to vote to accept or reject the Plan.

**M.    Class 13 – Priority Wage Claims**

*Classification* ................... Class 13 consists of Priority Wage Claims listed in the Schedules, as well as Priority Wage Claims listed in the schedules of assets and liabilities filed by AVR Georgia, AVR Nevada, and AVR Texas in their respective bankruptcy cases.

*Allowance*........................ Except as provided in the Plan Compromise Agreement with respect to Priority Wage Claims in favor of Yazdan Irani, Kimberly Irani, Aria Irani, and Cesar Leyva, Priority Wage Claims shall be Allowed in the full Scheduled Amount, less any and all payments made by the Debtors to the Holders of such Claims since the Petition Date.

*Treatment* ....................... Except as provided in the Plan, Allowed Priority Wage Claims shall be paid in full by the Reorganized Debtor in the ordinary course of business.

*Voting* ............................. Class 13 is Unimpaired. The Holders of Allowed Class 13 Claims are not entitled to vote to accept or reject the Plan because they are deemed to have accepted the Plan.

1689360.4 26988

**N.**    **Class 14 – Convenience Class Claims**

*Classification* ...................Class 14 consists of Convenience Class Claims.

*Claim Amount* .................In the aggregate, Convenience Class Claims total $2,350.67.

*Allowance*........................Each Convenience Class Claim shall be deemed Allowed in the full amount of the Claim, up to $300.

*Treatment* .......................In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, the Reorganized Debtor shall pay to each Holder of an Allowed Class 14 Claim, in one installment, Cash in the full amount of the Allowed Class 14 Claim, without interest, on the Effective Date.

*Voting*..............................Class 14 is Unimpaired.  The Holders of Allowed Class 14 Claims are not entitled to vote to accept or reject the Plan because they are deemed to have accepted the Plan.

**O.**    **Class 15 – General Unsecured Claims**

*Classification* ...................Class 15 consists of General Unsecured Claims in excess of $300.

*Election Available* .............Each Holder of a General Unsecured Claim in excess of $300 may elect to receive a lump sum of $300 on the Effective Date in lieu of the distributions such Holder will otherwise receive over the term of the Plan.  This election shall be made on a Ballot received by the Debtors on or before the Voting Deadline.

*Claim Amount* .................The Debtors estimate that, in the aggregate, Class 15 Claims (1) for which Proofs of Claims were timely filed in accordance with the Bar Date Notice, (2) listed in the Schedules as not contingent, not unliquidated, and not disputed, and (3) that have not been paid or compromised, currently total approximately $8.88 million.  The Debtors anticipate that if (1) Yazdan Irani releases his General Unsecured Claim pursuant to the Irani Contribution Agreement, and (2) the CDTFA Disputed Priority Tax Claim is Allowed as an Unsecured Priority Tax Claim pursuant to the Plan Compromise Agreement, the aggregate amount of Class 15 Claims will total approximately $3.65 million.

*Allowance*.........................A Class 15 Claim shall be Allowed only if and to the extent it satisfies the definitional requirements of an Allowed Claim.

*Treatment* ........................The Reorganized Debtor shall make payments to the Plan Disbursing Agent at the times and in the amounts set forth in the Plan Compromise Agreement.  From the Settlement Fund, the Plan Disbursing Agent shall make distributions to Holders of Allowed Class 15 Claims no later than 10 Business Days after receiving each payment from the Reorganized Debtor. Distributions to Holders of Class 15 Claims shall be made by the Plan Disbursing Agent on a Pro Rata basis, based upon the Allowed amounts of such Claims.

The Debtors project that at least $1.41 million will be distributed to Holders of Allowed Class 15 Claims pursuant to the Plan, resulting in aggregate distributions of at least 38.8% of Allowed Class 15 Claims.

*Voting*...............................Class 15 is Impaired.  The Holders of Allowed Class 15 Claims are entitled to vote to accept or reject the Plan.

## P.    Class 16 – Interests in AVR California

*Classification* ....................Class 16 consists of Interests in AVR California.

*Treatment* ........................The sole Holder of Class 16 Interests (Yazdan Irani) shall retain his Interests.

*Voting*...............................Class 16 is Unimpaired.  The Holder of Class 16 Interests is not entitled to vote to accept or reject the Plan because he is deemed to have accepted the Plan.

## Q.    Class 17 – Interests in AVR Vanpool

*Classification* ....................Class 17 consists of Interests in AVR Vanpool.

*Treatment* ........................The sole Holder of Class 17 Interests (Yazdan Irani) shall retain his Interests.

*Voting*...............................Class 17 is Unimpaired.  The Holder of Class 17 Interests is not entitled to vote to accept or reject the Plan because he is deemed to have accepted the Plan.

1689360.4  26988                              60

**VII.**
**CONFIRMABILITY OF THE PLAN AND CRAMDOWN**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by an Impaired Class of Claims or Interests.  The Debtors may seek confirmation of the Plan pursuant to § 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

**VIII.**
**CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS;**
**SETOFF AND RECOUPMENT**

**A.    Allowance of Claims**

After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any Order entered in a Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim.

**B.    Disallowance of Claims**

Any Claim held by an Entity from which property is recoverable under §§ 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to § 502(d) of the Bankruptcy Code, and the Holder of such a Claim shall not receive any distributions on account of such Claim until such time as such Causes of Action against that Entity have been settled or an Order with respect thereto has been entered by the Court and all sums due, if any, to a Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor.

**Except as otherwise provided herein or otherwise agreed by the Debtors or the Reorganized Debtors, any Proof of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice or action, Order, or approval of the Court, and the Holder of such Claim shall not receive any distributions on account of such Claim, unless the Court determines, by Final Order entered on or before Confirmation Date, that cause exists to extend the Claims Bar Date as to such Proof of Claim on the basis of excusable neglect.**

1689360.4  26988                                        61

**C.    Objections to Claims**

After the Effective Date, the Reorganized Debtors shall have the authority to file, withdraw, or litigate to judgment objections to Claims.  Except as provided in Section V.A.3 of the Plan (regarding Professional Fee Claims), any objection to a Claim shall be filed on or before the Claims Objection Deadline.  If an objection to a Claim is filed before and remains pending on the Claims Objection Deadline, such Claim shall be deemed a Disputed Claim until the Claim is Allowed or Disallowed by a Final Order.

**D.    Disputed Claims and Estimations**

**1.    No Distributions with Respect to Disputed Claims**

Notwithstanding any other provision of the Plan, no distributions shall be made by the Reorganized Debtor on account of any Disputed Claim until such Claim becomes an Allowed Claim.

If a Class 15 Claim is Disputed and is not an Allowed Claim when a distribution is made, funds sufficient to make the pro rata distribution to the Holder of such Claim after entry of a Final Order determining that the Claim is an Allowed Claim shall be retained in the Segregated Account.  The amount so retained shall be equal to the amount of the distribution that would have been made to the Holder of the Disputed Claim if such Claim had been Allowed in the full amount asserted by the Holder thereof.

The Reorganized Debtor may, at any time, request that the Court estimate any contingent or unliquidated Claim pursuant to § 502(c) of the Bankruptcy Code, irrespective of whether the Debtors or Reorganized Debtor, as applicable, previously objected to such Claim or whether the Court has ruled on any such objection.  The Court shall retain jurisdiction to estimate any contingent or unliquidated Claim at any time during litigation concerning any objection to the Claim, including during the pendency of any appeal relating to any such objection.  If the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Claim.  All of these objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

**2.    Distributions on Account of Disputed Claims Once They Are Allowed**

On the first Quarterly Distribution Date after the calendar quarter in which a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor shall commence making distributions on account of such Claim.  Such distributions shall be made pursuant to the provisions of the Plan

governing the applicable Class.  The Holder of a Disputed Claim that is ultimately Allowed shall also be entitled to receive, on the basis of the amount ultimately Allowed, matured and payable interest, if any, at the rate provided for the Class to which such Claim belongs.

### 3.      Allowance of Claims Subject to § 502(d) of the Bankruptcy Code

Except as provided in the Plan or the Confirmation Order, Allowance of Claims shall be in all respects subject to the provisions of § 502(d) of the Bankruptcy Code.

### E.      Extension of the Claims Objection Deadline

After the Effective Date, the Reorganized Debtors may file a motion or motions with the Court to extend the Claims Objection Deadline.  The filing of such a motion shall automatically extend the Claims Objection Deadline.  If the motion is denied by the Court, or approved by the Court and reversed on appeal, the Claims Objection Deadline shall be the later of the then-current Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Claims Objection Deadline.

### F.      Authority to Compromise Disputed Claims

After the Effective Date, the Reorganized Debtors may settle and compromise a Disputed Claim in their sole discretion without Court approval.

### G.      Setoff and Recoupment

The Reorganized Debtor may set off, recoup, or withhold against distributions to be made on account of any Allowed Claim any claims that the Debtors, the Estates, or the Reorganized Debtor may have against the Holder of such Allowed Claim.  The Reorganized Debtor shall not waive or release any claim against those Entities by failing to effect such a setoff or recoupment, by Allowing any Claim against the Debtors or the Estates, or by making a distribution on account of an Allowed Claim.

[*Continued on next page.*]

1689360.4  26988

**IX.**
**MEANS FOR IMPLEMENTATION**

**A.      Overview of Plan Implementation**

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtor to make payments pursuant to the Plan shall be obtained from the Reorganized Debtor's cash balances existing on the Effective Date, from the operations of the Reorganized Debtor's business, from the Irani Cash Contribution, and from any other lawful source.

**B.      Deposit of $850,000 in the Segregated Account**

On or before the Effective Date, the Debtors shall deposit $850,000 into the Segregated Account.  On the Effective Date, the funds in the Segregated Account shall be transferred to the Plan Disbursing Agent in accordance with the Plan Compromise Agreement.

**C.      From the Confirmation Date to the Effective Date**

Although the Plan will become effective only on the Effective Date, on and after the Confirmation Date until the Effective Date the Debtors shall take or cause to be taken all actions which are necessary or appropriate to enable the Plan to become effective on the Effective Date and to implement and perform the Plan on and after the Effective Date.

**D.      Management of the Reorganized Debtors**

**1.      AVR California**

On and after the Effective Date, the Reorganized Debtor shall be managed by the following Persons in the following capacities:

Chief Executive Officer...................................Aria Irani

President .......................................................Yazdan Irani

VP of Fleet Operations and
VP of Business Development .........................Cesar Leyva

Corporate Secretary......................................Kimberly Irani

In addition, for the term of the Plan, the Reorganized Debtor shall retain CSA Partners to assist and advise the Reorganized Debtor regarding distributions to be made by the Reorganized Debtor, and other actions to be taken by the Reorganized Debtor, to comply with the Plan and the Confirmation Order.

### 2.    AVR Vanpool

On and after the Effective Date, AVR Vanpool shall be managed by Yazdan Irani as Chief Executive Officer and President, and by Kimberly Irani as Corporate Secretary.

### E.    Dissolution of AVR Vanpool

Within a reasonable time after the Effective Date, AVR Vanpool shall comply with California law applicable to corporations that elect to dissolve and file a Certificate of Dissolution with the California Secretary of State.

### F.    Reorganized Debtor's Business Operations

From and after the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise Claims arising after the Confirmation Date without supervision by the Court and free of any restrictions of the Bankruptcy Code, the FRBP, or the Local Rules, other than any restrictions expressly imposed by the Plan and the Confirmation Order.

### G.    The Plan Compromise Agreement

The Debtors, the Committee, CDTFA, Yazdan Irani, Kimberly Irani, Aria Irani and Cesar Leyva have executed the Plan Compromise Agreement attached as Exhibit 5 hereto.  The Plan shall constitute a motion for approval of the Plan Compromise Agreement pursuant to FRBP 9019 and a finding by the Court that the Plan Compromise Agreement is in the best interests of the Debtors and their Estates.  If the Effective Date does not occur, the Plan Compromise Agreement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

1689360.4  26988                        65

**H.      The Irani Contribution Agreement**

The Debtors, on the one hand, and the Iranis, on the other hand, have executed the Irani Contribution Agreement attached as Exhibit 1 hereto.  The Plan shall constitute a motion for approval of the Irani Contribution Agreement pursuant to FRBP 9019 and a finding by the Court that the Irani Contribution Agreement is in the best interests of the Debtors and their Estates.  If the Effective Date does not occur, the Irani Contribution Agreement shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

On or before the Effective Date, the Iranis shall make the Irani Cash Contribution to the Debtors in accordance with and subject to the terms and conditions of the Irani Contribution Agreement.  If the Iranis make the Irani Cash Contribution and the Debtors determine that the Effective Date will not occur, the Debtors shall return the Irani Cash Contribution to the Iranis immediately upon making a determination that the Effective Date will not occur.  On and after the Effective Date, the Reorganized Debtor may use the Irani Cash Contribution, at its discretion, for post-confirmation operating expenses and the payment of the Reorganized Debtor's obligations under the Plan.

In accordance with the Irani Contribution Agreement, $350,000 of the Irani Cash Contribution shall constitute a payment made by the Iranis in settlement of claims or potential claims that the Debtors and their Estates have, or may have, against the Iranis.  This amount shall not be refunded to the Iranis if, for any reason, the Cases are converted to Chapter 7 after the Effective Date, and the mutual releases in the Irani Contribution Agreement shall survive any such conversion and be binding on any Chapter 7 trustee appointed in the Cases.

In accordance with the Irani Contribution Agreement, $500,000 of the Irani Cash Contribution shall constitute an equity contribution in the Reorganized Debtor.

**I.      New Leases for the Premises Used by AVR California for Its Denver and Las Vegas Operations, and for Its Office in Hawthorne**

AVR California and AVR Denver, LLC, have executed the Lease Agreement attached as Exhibit 2 hereto, regarding the Denver Premises.  AVR California and PJ D&D Holdings, LLC, have executed the Lease Agreement attached as Exhibit 3 hereto, regarding the Las Vegas Premises. AVR California and Quest Auto Body Care, LLC, have executed the Lease Agreement attached as Exhibit 4 hereto, regarding the Hawthorne Premises.  The Plan shall constitute a motion for approval of the lease agreements and a finding by the Court that they are in the best interests of the Debtors and their Estates.  As of the Effective Date, the lease agreements shall replace and supersede any existing lease agreements regarding the Denver Premises, the Las Vegas Premises, and the Hawthorne Premises, respectively.  If the Effective Date does not occur, the lease agreements shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

1689360.4  26988                                      66

**J.**      **Disbursing Agent**

Except as set forth in the Plan Compromise Agreement, the Reorganized Debtor shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Reorganized Debtor shall serve in this capacity without bond.

In accordance with the Plan Compromise Agreement (and subject to the limitation set forth therein with respect to distributions to be made on account of the CDTFA Disputed Priority Tax Claim), Howard B. Grobstein, or such other Person selected by the parties to the Plan Compromise Agreement, shall act as the Plan Disbursing Agent for the purpose of making distributions to the Beneficiaries.

The Plan Disbursing Agent shall receive all payments from the Reorganized Debtor, Kevin Tierney, and/or other sources in trust for the Beneficiaries.  Within 10 Business Days after receiving a payment, after deducting or reserving for any fees, costs or other expenses of administration of the Settlement Fund, the Plan Disbursing Agent shall distribute all funds in the Settlement Fund to the Beneficiaries in accordance with the Plan.  The failure of the Plan Disbursing Agent to make distributions to the Beneficiaries shall not constitute a default by the Reorganized Debtor under the Plan, unless the Plan Disbursing Agent's failure to make such distributions is the result of a payment default or other interference by the Reorganized Debtor.

The Plan Disbursing Agent shall have the authority to enforce all post-confirmation obligations of the Reorganized Debtor with respect to the Settlement Fund and under the Plan Compromise Agreement.  This includes the authority to file any report or other document that the Plan Disbursing Agent deems reasonably necessary to file in the Case.

The Plan Disbursing Agent shall receive compensation in the amount of $15,000 per year for each year in which the Reorganized Debtor makes payments into the Settlement Fund.  Such compensation shall be paid by the Reorganized Debtor, and shall not be deducted from the Settlement Fund.  The first payment of compensation shall be made on the Effective Date.  Each subsequent payment of compensation shall be made on or before the anniversary date of the Effective Date.   If the Effective Date is September 30, 2022, the Debtors project that compensation will be paid to the Plan Disbursing Agent as follows:

September 30, 2022..................................... $15,000
September 30, 2023..................................... $15,000
September 30, 2024..................................... $15,000
September 30, 2025..................................... $15,000
September 30, 2026..................................... $15,000
September 30, 2030..................................... $15,000

Except for the Plan Disbursing Agent's fees, any and all fees, costs or other expenses of administration of the Settlement Fund, including the Plan Disbursing Agent's or his professionals' fees and expenses, shall be paid exclusively from the Settlement Fund.

1689360.4  26988                                    67

The Plan Disbursing Agent shall be deemed to act in his or her official capacity, and not in his or her individual capacity.  The Plan Disbursing Agent shall have no liability for any Cause of Action except for Causes of Action arising from gross negligence, fraud, breach of fiduciary duty (but not mere or ordinary negligence), or willful misconduct.

If the Plan Disbursing Agent resigns or becomes incapacitated or otherwise unable or unwilling to perform the duties of the Plan Disbursing Agent under the Plan, upon application of the Debtors, any Creditor, or the U.S. Trustee, the Court shall designate a successor Plan Disbursing Agent who shall have all of the powers and duties of the Plan Disbursing Agent as set forth herein and in the Plan Compromise Agreement.

**K.      Delivery of Distributions on Account of Allowed General Unsecured Claims**

The Reorganized Debtor or Plan Disbursing Agent, as applicable, shall make distributions to Holders of Allowed General Unsecured Claims at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; *provided that* the address for each Holder of an Allowed General Unsecured Claim shall be deemed to the address set forth in any Proof of Claim filed by that Holder or the address provided to the Reorganized Debtor or Plan Disbursing Agent, as applicable, by the Holder in writing after the Effective Date, or, if no Proof of Claim has been filed, the address set forth in the Schedules.

**L.      Undeliverable or Non-Negotiated Distributions**

If any distribution made by the Plan Disbursing Agent is returned as undeliverable, (1) the Plan Disbursing Agent shall make reasonable efforts to determine the address of such Creditor and (2) no further distributions to the applicable Creditor shall be made unless and until the Plan Disbursing Agent is notified in writing of such Creditor's then-current address, at which time the undelivered distribution(s) shall be made to such Creditor without interest or dividends.  All undeliverable distributions that remain unclaimed for one year after attempted distribution shall indefeasibly revert to the Settlement Fund.  Upon such reversion, the Creditor's entitlement to the distribution shall be automatically discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**M.      Allocations**

Except as provided in the Plan, the Confirmation Order or governing documents pursuant to which distributions are made to Holders of Claims under the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal

1689360.4  26988                                  68

amount of the Claims, to any portion of such Claims for accrued but unpaid interest to the extent Allowed herein.

**N.        No Postpetition or Default Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, other Order of the Court, an agreement approved by an Order of the Court prior to the Confirmation Date (e.g., the 1st Source Settlement Agreement), or required by applicable bankruptcy law, Postpetition and default interest shall not accrue or be paid on any Claim and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

**O.        Preservation of Causes of Action**

Except as otherwise provided in the Plan, each Cause of Action shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest on the Effective Date exclusively in the Reorganized Debtor.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an Order of the Court, such Cause of Action is expressly reserved for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the confirmation of the Plan, the terms of the Plan, the vesting of such Cause of Action in the Reorganized Debtor, or any Order of the Court in this Case.  The Reorganized Debtor shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, Order, or approval of the Court. **The Debtors or the Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action**.

No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Reorganized Debtor will not pursue such Cause of Action.

Unless otherwise ordered by the Court, nothing in this Section shall limit the ability of any party in interest to object to any Claim prior to the Claims Objection Deadline.

**P.        Amendments to the Debtors' Articles of Incorporation and/or Bylaws**

Promptly after the Effective Date, the Debtors shall amend their Articles of Incorporation or Bylaws, as appropriate, to include a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the class(es) of securities possessing voting power, an appropriate

1689360.4  26988

69

distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

If and to the extent the Plan provides for the transfer of all or any part of the property of the Estates to one or more Corporations, whether organized before or after the confirmation of the Plan, or a merger or consolidation of the Debtors with one or more Corporations, promptly after the Effective Date, all such Corporations shall amend their Articles of Incorporation or Bylaws, as appropriate, to include a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the class(es) of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.

## X.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, all Executory Contracts and Unexpired Leases shall be deemed assumed by the Reorganized Debtor pursuant to §§ 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (1) have been assumed (or assumed and assigned) by a Final Order entered prior to the Confirmation Date, (2) have been rejected by an Order entered prior to the Confirmation Date, (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date, and (4) are rejected by the Confirmation Order. The terms of any Final Order entered by the Court prior to the Confirmation Date that provides for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

Entry of the Confirmation Order shall constitute approval of the assumption of Executory Contracts and Unexpired Leases as set forth herein, all pursuant to §§ 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

The Debtors are authorized to abandon any of the Debtors' personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

1689360.4  26988                              70

Subject to applicable law, including § 365(d)(4) of the Bankruptcy Code, any motion to assume or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Court on or after the Effective Date.  Unless the Order on such motion provides otherwise, the disposition of such motion shall be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed (or assumed and assigned) pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption (or assumption and assignment) of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**B.      [Intentionally Omitted]**

**C.      Rejection of Specific Executory Contracts**

On the Effective Date, the following Executory Contracts and Unexpired Leases (or alleged Executory Contracts and Unexpired Leases, as the case may be) shall be deemed rejected pursuant to §§ 365 and 1123 of the Bankruptcy Code *unless* the Executory Contract or Unexpired Lease (1) is assumed by the applicable Debtor pursuant to a Final Order entered prior to the Effective Date or (2) is the subject of a motion to assume the Executory Contract or Unexpired Lease that is pending on the Effective Date:

1.      any Executory Contract in effect, as of the Effective Date, between AVR California and SANDAG;

2.      the DART Agreement, if still in effect as of the Effective Date;

3.      the CarRentals.com Agreement;

4.      the Expedia Prepetition Agreement;[7]

5.      the Priceline Agreement;[8]

---

[7] For the avoidance of doubt: The Plan does *not* propose to reject the Expedia Postpetition Agreement.

[8] Priceline served a notice of non-renewal of the Priceline Agreement on December 31, 2020; therefore, the term of the Priceline Agreement expired on or about February 1, 2021.

6.      any Unexpired Lease in effect, as of the Effective Date, with respect to the Denver Premises;

7.      any Unexpired Lease in effect, as of the Effective Date, with respect to the Hawthorne Premises; and

8.      any Unexpired Lease in effect, as of the Effective Date, with respect to the Las Vegas Premises.

**D.**      **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

A Proof of Claim asserting a Rejection Damages Claim shall be filed by the later of 30 days from (1) the date of entry of an Order of the Court (including the Confirmation Order) approving such rejection, and (2) the effective date of the rejection of the affected Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, Order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as Class 15 Claims and such Claims may be objected to in accordance with the Plan. If no objection to the Rejection Damages Claim is filed on or before the Claims Objection Deadline, the Rejection Damages Claim shall become an Allowed Claim.

**E.**      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than 10 Business Days following the Effective Date, or on such other terms as the parties to such

---

Notwithstanding the non-renewal of the Priceline Agreement, AVR California has continued to participate as a "Retail Car Rental Service provider" and has continued to compensate Priceline as if the Priceline Agreement were still in force. Out of an abundance of caution, the Plan provides for rejection of the already-expired Priceline Agreement. For the avoidance of doubt: The Plan does *not* propose to reject any subsequent contract entered into by AVR California with Priceline after the Petition Date.

Executory Contracts or Unexpired Leases may otherwise agree.  The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, Order, or approval of the Court.

Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan shall be filed no later than the date by which parties must file objections to confirmation of the Plan.

**Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the Debtors to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of § 365 of the Bankruptcy Code) or the Debtors' designation of its Cure Claim as being zero dollars ($0.00) shall be (1) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (2) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim and/or from asserting any Claim against the Debtors, the Estates or the Reorganized Debtors arising under § 365(b)(1) of the Bankruptcy Code.**

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor assumes such Executory Contract or Unexpired Lease; *provided, however*, that the Debtors or the Reorganized Debtors, as applicable, shall remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption.  Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that is assumed under the Plan shall be deemed Disallowed and expunged, without further notice to or action, Order, or approval of the Court upon payment of the applicable Cure Claim (if any).

**F.    Assumption Dispute Resolution**

In the event of a timely filed objection regarding (1) the amount of any Cure Claim, (2) the ability of the Debtors to provide "adequate assurance of future performance" (within the meaning of § 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption of an Executory Contract or Unexpired Lease or payment of a Cure Claim required by § 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Court (which may be the

1689360.4  26988                                    73

Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the applicable Debtor may assume the Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; *provided, however*, that the Debtors shall reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease.  To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtor, the Debtor or the Reorganized Debtor, as applicable, may reject the Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Court after the Confirmation Hearing.

**G.      Contracts and Leases Entered Into After the Petition Date**

After the Effective Date, any contract or lease entered into by the Debtors after the Petition Date shall be performed by the Reorganized Debtor in the ordinary course of its operations.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

**XI.
SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

**A.      Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to § 1123 of the Bankruptcy Code and FRBP 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan,

pursuant to FRBP 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

**B.    Discharge of Claims**

Pursuant to § 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan (including the Plan Compromise Agreement with respect to the CDTFA Claim), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to § 501 of the Bankruptcy Code, (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to § 502 of the Bankruptcy Code, or (3) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

**C.    Releases by the Debtors**

**Pursuant to §  1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the Debtors, the Estates, the Reorganized Debtors and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and the Estates, including any successor to the Debtors or any Estate representative appointed or selected pursuant to § 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or**

1689360.4  26988                            75

**otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the DIP Financing, the Irani Cash Contribution, the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Cases, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance or distribution of any Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.**

For the avoidance of doubt, Kevin Tierney (individually, in his capacity as the Debtors' turnaround management consultant and financial advisor, or in any other capacity) is not and shall not be deemed an Released Party, and therefore is not entitled to any and all benefits and protections afforded to Released Parties pursuant to this Section.

Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section shall not release (1) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, (2) any and all Tierney Claims, or (3) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement executed to implement the Plan.  For the avoidance of doubt, the releases set forth in this Section shall not release any Released Party from any and all obligations under the Plan Compromise Agreement.

### D.    Exculpation

**Except as otherwise specifically provided in the Plan or the Confirmation Order, none of the Exculpated Parties shall have or incur any liability to any Holder of a Claim or Interest for any act or omission occurring on or after the Petition Date in connection with, related to, or arising out of the Cases, pursuit of confirmation of the Plan, consummation or administration of the Plan, or property to be distributed under the Plan, except for willful misconduct or gross negligence.  In all respects, the Exculpated Parties shall be entitled to rely on the advice of their respective counsel with respect to their duties and responsibilities in connection with the Cases and the Plan.  The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan.  Nothing in this Section shall limit the liability of any Entity for breach of any express obligation such Entity has under the terms of the Plan, or under any Postpetition agreement or other Postpetition document entered into by such Entity, or in accordance with the terms of the Plan, or for any breach of a duty of care owed to any other Entity occurring after the Effective Date.**

For the avoidance of doubt, Kevin Tierney (individually, in his capacity as the Debtors' turnaround management consultant and financial advisor, or in any other capacity) is not and shall not be deemed an Exculpated Party, and therefore is not entitled to any and all benefits and protections afforded to Exculpated Parties pursuant to this Section.  Also for the avoidance of doubt, the exculpations set forth in this Section shall not release or relieve any Exculpated Party from any and all obligations under the Plan Compromise Agreement.

E.      **Injunction**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT ARE DISCHARGED PURSUANT TO SECTION XI.B OF THE PLAN, RELEASED PURSUANT TO SECTION XI.C OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION XI.D OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO SECTION XI.D OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE COURT IN ACCORDANCE WITH THE TERMS OF THIS PLAN EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.**

For the avoidance of doubt, the foregoing injunction shall not enjoin any party to the Plan Compromise Agreement from taking any action to enforce any other party's obligations under the Plan Compromise Agreement.

1689360.4  26988                                    77

**F.**    **Temporary Enforcement Injunction Re Claims Against Responsible Persons**

Certain Governmental Units have alleged or may allege that one or more of the Responsible Persons are legally responsible under non-bankruptcy law for certain tax obligations of the Debtors that are afforded treatment under the Plan.

**THE CONFIRMATION ORDER SHALL ACT AS A TEMPORARY INJUNCTION TO STAY AND RESTRAIN THE TAKING OF ANY OF THE FOLLOWING ACTIONS AGAINST THE RESPONSIBLE PERSONS IN THEIR CAPACITY AS RESPONSIBLE PERSONS UNDER NON-BANKRUPTCY LAW, OR AGAINST PROPERTY IN WHICH THE RESPONSIBLE PERSONS HOLD AN INTEREST, ON ACCOUNT OF ANY JUDGMENTS, CLAIMS OR CAUSES OF ACTION THAT ARISE OUT OF OR RELATE TO TAX CLAIMS AGAINST THE DEBTORS OR THE ESTATES:  (1) COMMENCING OR CONTINUING ANY JUDICIAL, ADMINISTRATIVE, OR OTHER ACTION OR PROCEEDING; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; AND (3) CREATING, PERFECTING OR ENFORCING ANY LIEN, SECURITY INTEREST, OR OTHER ENCUMBRANCE.**

This Temporary Enforcement Injunction shall continue in effect until the earliest of the following:

1.    all of the distributions required to be made to the affected Creditor under the Plan have been paid;

2.    the Cases are dismissed or converted to Chapter 7; and

3.    entry of a Final Order by the Court terminating the Temporary Enforcement Injunction as to a particular Creditor due to the Reorganized Debtor's default under the Plan and failure to cure such default within 15 calendar days from the date on which the affected Creditor gives written notice to the Reorganized Debtor and the relevant Responsible Person(s) of such default.

## XII.
## EFFECTS OF CONFIRMATION

**A.**    **Binding Effect of the Plan**

Except as provided in § 1141(d)(3) of the Bankruptcy Code, the provisions of the Plan bind the Debtors, any entity acquiring property under the Plan, any Creditor or Holder of an Interest in a Debtor, and their successors, assigns, heirs, executors, administrators and representatives, whether or not the Claim or Interest of such Creditor or Holder of an Interest is Impaired under the Plan and whether or not such Creditor or Holder of an Interest has accepted the Plan.

1689360.4  26988

**B.**    **Vesting of Assets**

Except as otherwise provided in the Plan or the Confirmation Order, or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in the Estates, all the Debtors' and the Estates' Causes of Action, all Executory Contracts and Unexpired Leases assumed, but not assigned, by the Debtors, and any property acquired by the Debtors, shall vest in AVR California (as the Reorganized Debtor) free and clear of all Liens, Claims, charges, or other encumbrances.  For the avoidance of doubt, as of the Effective Date, all assets and liabilities of AVR Vanpool and AVR Vanpool's Estate shall be deemed assigned, conveyed or otherwise transferred to AVR California (as the Reorganized Debtor).

**C.**    **Dissolution of the Committee**

On the Effective Date, the Committee shall dissolve; *provided that* following the Effective Date the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes:  (1) Claims and/or applications, and any relief related thereto, for compensation by Professionals and requests for Allowance of Administrative Claims for substantial contribution pursuant to § 503(b)(3)(D) of the Bankruptcy Code; (2) any and all proceedings pending on the Effective Date with respect to the Tierney Claims, and (3) any appeals of the Confirmation Order.  Upon the dissolution of the Committee, the Committee members and the Committee's Professionals shall cease to have any duty, obligation or role arising from or related to the Cases and shall be released and discharged from all rights and duties from or related to the Cases.

**D.**    **No Liability for Solicitation or Participation**

As specified in § 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

[*Continued on next page.*]

1689360.4  26988                                  79

## XIII.
## RETENTION OF JURISDICTION

The Court shall retain jurisdiction over the Cases after the Effective Date to the fullest extent permitted by law, including jurisdiction to:

1.  hear and determine any dispute arising under the Plan, its implementation and the execution of any necessary documents thereunder;

2.  enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

3.  grant extensions of any deadline set forth in the Confirmation Order as may be appropriate;

4.  enforce all discharge, release and injunction provisions of the Plan and the Confirmation Order;

5.  consider and rule upon requests for final compensation;

6.  hear and determine all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Reorganized Debtors after the Effective Date;

7.  resolve any matters related to the assumption or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

8.  ensure that distributions to Holders of Allowed Claims are accomplished as provided herein;

9.  [intentionally omitted];

10. hear and determine any motion seeking conversion of the Cases to Chapter 7 of the Bankruptcy Code if there is a material default by the Reorganized Debtors with respect to the Plan;

11. resolve disputes as to the ownership of any Claim;

12. hear and determine objections to Claims (including Administrative Expense Claims);

1689360.4  26988

80

13.   enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

14.   issue Orders in aid of execution of the Plan, to the extent authorized by § 1142 of the Bankruptcy Code;

15.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Order of the Court, including the Confirmation Order;

16.   hear and determine all applications for compensation and reimbursement of expenses of Professionals under §§ 330, 331 and 503(b) of the Bankruptcy Code;

17.   hear and determine any issue for which the Plan or Confirmation Order requires a Final Order of the Court;

18.   hear and determine matters concerning state, local, and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

19.   hear and determine Causes of Action preserved under the Plan, including Avoidance Actions;

20.   hear and determine any matter regarding the existence, nature, and scope of the releases, exculpation, indemnification and injunctions provided in the Plan;

21.   hear and determine any and all disputes pertaining to the Irani Contribution Agreement, including the enforcement and interpretation of any of its terms;

22.   hear and determine any and all disputes pertaining to the Plan Compromise Agreement, including the enforcement and interpretation of any of its terms; and

23.   enter a final decree (or final decrees) closing the Cases.

The foregoing list is illustrative only and not intended to limit in any way the Court's exercise of jurisdiction.  If the Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Cases, including matters set forth above, this Section shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

[*Continued on next page.*]

1689360.4  26988

81

XIV.
**MISCELLANEOUS PROVISIONS**

**A.    Elimination of Vacant Classes**

Any Class of Claims that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to § 1129(a)(8) of the Bankruptcy Code.

**B.    Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holder(s) of such Claims in such Class.

**C.    Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, is Impaired, the Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**D.    Additional Documents**

On or before the Effective Date, the Debtors may file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**E.    Exemption from Transfer Taxes**

Pursuant to § 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other Security Interest, the making or assignment or any lease or sublease, or the making or delivery of any

deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, license transfer or other similar tax.  For the avoidance of doubt, the transactions contemplated under the Plan include the transfer of all of the Debtors' right, title and interest in property of the Estates to the Reorganized Debtor.

**F.**      **Expedited Tax Determination**

The Reorganized Debtors may request an expedited determination of taxes under § 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors or the Reorganized Debtors for all taxable periods ending on or before the Effective Date.

**G.**      **Payment of Statutory Fees**

All fees due and payable on or before the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors in full in Cash on or before the Effective Date.  After the Effective Date, the Reorganized Debtor shall pay in full in Cash all fees payable under 28 U.S.C. § 1930 until the Cases are closed, dismissed, or converted.

**H.**      **Amendment, Modification or Withdrawal of the Plan**

The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend, modify (subject to Court approval), or withdraw the Plan prior to the entry of the Confirmation Order. Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to § 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under FRBP 3019.  After entry of the Confirmation Order, the Reorganized Debtors may amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan, in accordance with the Bankruptcy Code and in such a manner as may be necessary to carry out the purpose and intent of the Plan.

**I.**      **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions there under shall be subject to any such withholding and reporting requirements.

1689360.4  26988                                                 83

**J.**      **Waiver of FRBP 7062**

The Debtors may request that the Confirmation Order include (1) a finding that FRCP 62(a), made applicable by FRBP 7062, shall not apply to the Confirmation Order, and (2) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

**K.**      **Exhibits and Schedules**

All exhibits and schedules to the Plan are incorporated into and constitute a part of the Plan as if set forth herein.

**L.**      **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, trustee, administrator, successor or assign of such Entity.

**M.**      **Saturday, Sunday or Legal Holiday**

If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the completion of acts required to comply with such deadline may be completed on the next day that is a Business Day, in which event the payment, distribution or act shall be deemed to have been completed or to have occurred on the required date.

**N.**      **Post-Effective Date Effect of Evidences of Claims or Interests**

Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

1689360.4  26988

**O.**     **Non-severability of Plan Provisions**

If, before the Confirmation Date, the Court holds that any Plan term or provision is invalid, void, or unenforceable, the Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; *provided that* at the request of the Debtors the Court shall have the power to alter such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered provided that any such alteration shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable under its terms.

**P.**     **Balloting**

Each Holder of an Allowed Claim or an Allowed Interest entitled to vote on the Plan shall receive a Ballot.  The Ballot shall contain two boxes, one indicating acceptance of the Plan and the other indicating rejection of the Plan.  Holders of Allowed Claims or Allowed Interests who elect to vote on the Plan shall mark one or the other box pursuant to the instructions contained on the Ballot.  Any executed Ballot that does not indicate acceptance or rejection of the Plan shall be deemed to constitute an acceptance of the Plan.

**Q.**     **No Admissions or Waiver of Objections**

If the Plan is not confirmed, if the Effective Date does not occur, or if the Plan is revoked pursuant to § 1144 of the Bankruptcy Code, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall (1) be deemed to be an admission by the Debtors or the Estates with respect to any matter discussed in the Plan and Disclosure Statement, including liability on any Claim or the propriety of any Claim's classification, (2) constitute a waiver or release of any Claim against or Interest in the Debtors and the Estates; (3) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors and the Estates; or (4) prejudice in any manner any right, remedy or claim of the Debtors or the Estates.

**R.**     **Survival of Settlements**

All settlements approved by the Court pursuant to FRBP 9019 or otherwise, including the Selig Settlement Agreement, shall survive consummation of the Plan.  If the terms of the Plan are inconsistent with the terms of any Court-approved settlement, the terms of the Court-approved settlement shall supersede any inconsistent terms of the Plan.

1689360.4  26988                                85

**S.    Effect of Post-Confirmation Conversion to Chapter 7**

After the Effective Date, if the Court enters a Conversion Order in AVR California's Case, the Reorganized Debtor's assets shall vest in the Chapter 7 Estate immediately upon entry of the Conversion Order unless the Conversion Order expressly provides that such conversion shall be effective on a different date.

After the Effective Date, if the Court enters a Conversion Order in AVR Vanpool's Case, no assets shall vest in the Chapter 7 Estate.

**T.    Final Decree**

Once AVR Vanpool has dissolved, the Reorganized Debtor shall file a motion with the Court to obtain a final decree to close AVR Vanpool's Case.

Once AVR California's Estate has been fully administered within the meaning of FRBP 3022, the Reorganized Debtor shall file a motion with the Court to obtain a final decree to close AVR California's Case.

Dated: August 12, 2022          _/s/ Yazdan Irani_
                                       Yazdan Irani
Chief Executive Officer of Airport Van Rental, Inc., a California corporation, and AVR Vanpool, Inc., a California corporation

Dated: August 12, 2022          DANNING, GILL, ISRAEL & KRASNOFF, LLP

                                     _/s/ John N. Tedford, IV_
                                       John N. Tedford, IV
Attorneys for Airport Van Rental, Inc., a California corporation, and AVR Vanpool, Inc., a California corporation

1689360.4  26988                                      86

EXHIBIT 1

**SETTLEMENT AND CONTRIBUTION AGREEMENT**

**(*Yazdan and Kimberly Irani*)**

This Settlement and Contribution Agreement ("**Agreement**") is entered into as of March 16, 2022, by and between (i) Airport Van Rental, Inc., a California corporation ("**AVR California**"), and AVR Vanpool, Inc., a California corporation ("**AVR Vanpool**") (collectively "**AVR**"), on the one hand, and (ii) Yazdan Irani ("**Yazdan**") and Kimberly Irani ("**Kimberly**") (collectively the "**Iranis**"), on the other hand.  AVR and the Iranis are referred to collectively as the "**Parties**" and each, individually, as a "**Party**."

RECITALS

A.      In 2007, the Iranis incorporated AVR California in the state of California.  Presently, Yazdan owns 100% of the equity interests in AVR California.

B.      In 2011, another entity called "Airport Van Rental, Inc.," was incorporated in the state of Nevada ("**AVR Nevada**").  Presently, Yazdan owns 100% of the equity interests in AVR Nevada.

C.      In June 2019, AVR Vanpool was incorporated in the state of California.  Presently, Yazdan owns 100% of the equity interests in AVR Vanpool.

D.      In 2012, the Iranis sought to acquire certain residential real property located in Las Vegas, Nevada (the "**Nevada Residence**") pursuant to a lease with an option to purchase. The owner, Ronde M. Thompson, agreed to lease/sell the Nevada Residence to the Iranis but insisted that the lease/purchase agreement be with an AVR entity so that, in the event of a default, Ms. Thompson would not be required to comply with consumer laws.  To address Ms. Thompson's stated concerns, the Iranis agreed to make AVR Nevada the lessee/purchaser.

E.      In July 2012, Ms. Thompson conveyed her interest in the Nevada Residence to RMT Investments, LLC ("**RMT**").  RMT and AVR Nevada then entered into a lease with option to purchase (the "**Lease**").  The term of the Lease was from July 1, 2012, through June 30, 2017.  The Lease gave AVR Nevada the option to purchase the Nevada Residence for $950,000 (the "**Purchase Price**").

F.      The Lease required AVR Nevada to make a down payment of $150,000, which would be applied to the Purchase Price.  The Lease also provided that $1,000 of each monthly Lease payment would be applied to (or would otherwise reduce) the Purchase Price.  At the end of the Lease Term, AVR Nevada would be required to pay $740,000 to purchase the Nevada Residence.

1671877.4  26988

G.      The Iranis personally paid the $150,000 down payment and all of the monthly Lease payments.  Neither AVR California nor AVR Nevada made those payments.

H.      In July 2017, the Iranis caused AVR Nevada to exercise the purchase option.  After credits given for the down payment and monthly payments made by the Iranis personally, and other closing adjustments, the amount needed to exercise the option was $731,000.  The Iranis were unable to obtain a personal loan in such amount at that time, in no small part because AVR California was dealing with the ramifications of a former CFO's embezzlement of millions of dollars.  At the same time, RMT was unwilling to extend the term of the Lease and insisted that the final balance of $731,000 be paid.  Therefore, the payment was made by AVR California.  In the Iranis' mind, this was a loan by AVR California to the Iranis.  In July 2017, a deed conveying the Nevada Residence from RMT to AVR Nevada was recorded in Clark County, Nevada.

I.       In December 2019, a deed conveying the Nevada Residence from AVR Nevada to the Iranis was recorded in Clark County, Nevada.  (Another deed, correcting a typographical error in the first deed, was recorded in February 2020.)  At the same time, a *Deed of Trust* was recorded with respect to a loan obtained by the Iranis from CalCon Mutual Mortgage LLC dba OneTrust Home Loans ("**CalCon**") in the amount of $484,350.

J.       When they took out the loan, the Iranis paid $484,000 (effectively, all of the money received from the refinance) to AVR California.  In the Iranis' mind, this was a partial repayment of the $731,000 made by AVR California to the Iranis.

K.      The Iranis have personally paid all of the monthly payments to CalCon.

L.       Regardless of how the transactions were recorded in AVR California's records, AVR California and the Iranis have agreed to treat the payment made by AVR California to RMT (for the benefit of the Iranis) as if it were a loan by AVR California to the Iranis, and to treat the payment made by the Iranis to AVR California as a partial repayment of that loan.  With interest calculated at 4% per annum, the Parties calculate that the total amount owed by the Iranis to AVR California on June 30, 2022, will be approximately $350,000, calculated as follows:

| | |
|---|---:|
| Pmt made by AVR California on 7/24/17 | 731,000.00 |
| Plus: Interest at 4% per annum from 7/24/17 to 12/13/19 | 69,855.56 |
| | 800,855.56 |
| Less: Payment made on 12/13/19 | 484,000.00 |
| | 316,855.56 |
| Plus: Interest at 4% per annum from 12/13/19 to 6/30/22 | 32,258.50 |
| | 349,114.06 |

M.      After an audit, the Nevada Department of Taxation (the "**Nevada DOT**") determined that substantial amounts were owed for sales and use taxes, and other state and county fees (and related interest and penalties).  In 2019, "Airport Van Rental, Inc." entered into a payment agreement with the Nevada DOT, pursuant to which it agreed to pay approximately $3.3 million of delinquent taxes, interest and penalties (the "**Nevada Payment Agreement**").  The

1671877.4  26988

Nevada Payment Agreement did not expressly say whether the contracting party was AVR California or AVR Nevada.  The relevant entity's obligations under the Nevada Payment Agreement was personally guaranteed by the Iranis (the "**Nevada Guaranty**").

N.      On November 11, 2020, the Iranis borrowed $100,000 from AVR California, evidenced by a promissory note secured by a deed of trust on real property located at 4216 North Power Mountain Road, Eden, Utah (the "**2020 Loan**").  The Iranis are current on their payment obligations to AVR California under the applicable loan documents.

O.      On December 11, 2020 (the "**Petition Date**"), AVR California filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Code**"), in the United States Bankruptcy Court for the Central District of California (the "**Court**").  AVR California's case number is 2:20-bk-20876-BB.

P.      On the Petition Date, AVR Nevada also filed a voluntary petition for relief under chapter 11 of the Code.  On July 30, 2021, the Court entered an order dismissing AVR Nevada's bankruptcy case.  AVR Nevada's case number was 2:20-bk-20878-BB.

Q.      On the Petition Date, AVR Vanpool also filed a voluntary petition for relief under chapter 11 of the Code.  AVR Vanpool's case number is 2:20-bk-20883-BB.  AVR Vanpool's case is being jointly administered with AVR California's case.  In this Agreement, the two cases are referred to collectively as the "**Case**."

R.      On January 8, 2021, AVR California filed its schedules and statement of financial affairs in the Case.  According to AVR California's schedules:

1.      Kimberly holds a priority wage claim against AVR California, for vacation, personal and sick leave, in the amount of $10,595.44.

2.      Yazdan holds a priority wage claim against AVR California, for vacation, personal and sick leave, in the amount of $16,729.52.

3.      Yazdan holds a non-priority claim against AVR California in the amount of $442,121.85, related primarily to the payment made by Yazdan to AVR California in December 2019.

S.      Over the years, one or both of the Iranis have personally guaranteed numerous debts owed by AVR California to its creditors.  These include, but are not limited to, AVR California's debts and payment obligations to (1) 1st Source Bank, (2) AFC Cal, LLC (which has been assigned to 1st Source Bank), (3) Hitachi Capital America Corp., (4) Selig Leasing Co., Inc., (5) Union Leasing Trust, (6) United Leasing, Inc., and (7) the U.S. Small Business Administration.

T.      In AVR Nevada's case, the Nevada DOT timely filed a proof of claim in the total amount of $3,123,094, consisting of a Priority Claim of $1,073,008 and a non-Priority Claim of $2,050,086.  This claim was for taxes and fees incurred as a result of AVR California's and/or AVR Nevada's operations in the state of Nevada.  Prior to dismissal of AVR Nevada's case, AVR filed a

1671877.4  26988

motion for an order substantively consolidating AVR California's, AVR Nevada's, and certain related entities' estates.  If the motion was granted, the Nevada DOT's claim would have constituted a claim against the consolidated estate.  The motion ultimately was withdrawn.  The Nevada DOT did not timely file a proof of claim in AVR California's case, and the Iranis chose not to (1) file a proof of claim in AVR California's case relating to the Nevada Guaranty, (2) exercise their right to file a proof of claim pursuant to Federal Rule of Bankruptcy Procedure 3005, or (3) notify the Nevada DOT of its need to file a proof of claim in AVR California's case if it believes that AVR California should be responsible for payment of the debt.  For the avoidance of doubt: AVR does not concede that AVR is liable to the Nevada DOT under the Nevada Payment Agreement or that the Nevada DOT would hold an Allowable claim against AVR California's estate if it had filed a proof of claim in AVR California's case.

U.      In AVR California's case, the California Department of Tax and Fee Administration ("**CDTFA**") timely filed a proof of claim in the total amount of $13,674,407.44, including $4,789,477.03 for sales taxes incurred from 2011 through 2017 (the "**CDTFA Disputed Priority Tax Claim**").  In February 2022, the Court entered an order determining that the CDTFA Disputed Priority Tax Claim is not entitled to priority under the Code.  CDTFA has appealed the Court's order (the "**CDTFA Appeal**").

V.      AVR has filed or intends to file a proposed chapter 11 plan (generally, the "**Plan**") pursuant to which AVR will make quarterly payments equal to 1.70% of AVR's gross revenues to holders of (1) tax claims entitled to payment in accordance with section 1129(a)(9)(C) and (D) of the Code and (2) general unsecured claims.  To facilitate confirmation and consummation of the Plan, the Iranis have agreed to contribute a total of $850,000 to AVR on the Effective Date.  Of this amount, the Parties have agreed that $350,000 will constitute a settlement of AVR California's potential claim against the Iranis relating to the Nevada Residence.  The Parties have agreed that the remaining $500,000 will constitute an equity contribution that will be returned to the Iranis, with interest, if the Case is converted to chapter 7 of the Code because of an adverse ruling in the CDTFA Appeal.

AGREEMENT

1.      Recitals Acknowledged.  Each of the Parties acknowledges that, to the best of the Party's knowledge, each of the above recitals is true and correct in every material respect.

2.      Conditions.

(a)      This Agreement and the Parties' obligations under this Agreement are expressly conditioned upon Yazdan Irani's retention of his equity interests in AVR under the Plan. If AVR's equity interests are canceled and new interests are issued to a Prevailing Bidder (as that term is used in the Plan), this Agreement shall terminate immediately without prejudice to the respective positions of the Parties.

1671877.4  26988

(b)     This Agreement and the Parties' obligations under this Agreement are expressly conditioned upon approval of the Court in connection with confirmation of the Plan. The Plan shall provide that it constitutes a motion for (i) approval of this Agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 and (ii) a finding by the Court that this Agreement is in the best interests of AVR and AVR's estate(s).

(c)     If AVR's request for an order confirming the Plan is denied, this Agreement shall be deemed withdrawn without prejudice to the respective positions of the Parties.

(d)     If AVR's request for an order confirming the Plan is granted, the order confirming the Plan (the "**Confirmation Order**") shall provide that this Agreement is approved pursuant to Federal Rule of Bankruptcy Procedure 9019, and shall contain a finding by the Court that this Agreement is in the best interests of AVR and AVR's estate(s).  If the Confirmation Order does not contain such an approval and such a finding, this Agreement shall be deemed withdrawn without prejudice to the respective positions of the Parties.

(e)     If the effective date of the Plan (the "**Effective Date**") does not occur, this Agreement shall be deemed withdrawn without prejudice to the respective positions of the Parties.

3.      Payment by the Iranis to AVR California.

(a)     After the date on which the Confirmation Order is entered by the Court (the "**Confirmation Date**"), and on or before the Effective Date, the Iranis shall make a payment to AVR California in the amount of eight hundred fifty thousand dollars ($850,000.00) (the "**Irani Cash Contribution**").

(b)     If the Irani Cash Contribution is made but AVR determines that the Effective Date will not occur, AVR shall return the Irani Cash Contribution to the Iranis immediately upon making a determination that the Effective Date will not occur.

4.      Settlement.

(a)     Three hundred fifty thousand dollars ($350,000) (the "**Settlement Payment**") of the Irani Cash Contribution shall constitute a payment made in full and final settlement of any and all claims or potential claims that AVR and their estates have, or may have, against the Iranis.

(b)     As of the Effective Date, and except as may be provided in this Agreement, AVR, on behalf of itself and its estate, hereby releases, remises, relieves, waives, relinquishes and discharges the Iranis and their respective officers, employees, members, shareholders, agents, representatives, attorneys, successors and assigns, of and from any and all rights, claims, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or causes of action of every nature, character and description, whether known or unknown, suspected or unsuspected, which AVR had, now has, or may hereafter claim to have

1671877.4  26988

by reason of any matter, cause or circumstance, _except_ any and all rights, claims, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or causes of action relating to the 2020 Loan.

(c)    As of the Effective Date, and except as may be provided in this Agreement, the Iranis hereby release, remise, relieve, waive, relinquish and discharge AVR and AVR's estates, and their respective officers, employees, members, shareholders, agents, representatives, attorneys, successors and assigns, of and from any and all rights, claims, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or causes of action of every nature, character and description, whether known or unknown, suspected or unsuspected, which the Iranis had, now have, or may hereafter claim to have by reason of any matter, cause or circumstance, _except_ (1) claims against AVR's estate that are entitled to priority pursuant to section 507(a)(4) of the Code, and (2) if the Case is converted to chapter 7 of the Code after the Effective Date, claims against AVR and AVR's estate, arising out of or related to the Nevada Guaranty, that may be asserted pursuant to section 502(e) of the Code, Federal Rule of Bankruptcy Procedure 3005, or any other statute or rule under which a co-debtor or guarantor may assert claims for reimbursement, contribution, indemnity, or similar grounds.

(d)    The Parties acknowledge that they have read and are familiar with California Civil Code § 1542, and affirm that the intent of the Parties is that this Agreement be broadly interpreted to release any and all claims capable of being released.  The foregoing waiver further includes without limitation an express waiver, to the full extent permitted by law, by the Parties of any and all rights under any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code § 1542.  That section reads as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

(e)    As of the Effective Date, Yazdan's general unsecured claim against AVR and the estate shall be deemed withdrawn and disallowed without need for any further notice or order of the Court.  For the avoidance of doubt:  The withdrawal and disallowance of Yazdan's general unsecured claim is without prejudice to Yazdan filing a proof of claim for claims arising out of or related to the Nevada Guaranty if the Case is converted to chapter 7 of the Code after the Effective Date.

(f)    For the avoidance of doubt:  The Settlement Payment shall not be refunded to the Iranis if, for any reason, the Case is converted to chapter 7 of the Code after the Effective Date.  The releases and waivers contained herein shall survive any such conversion and be binding on any chapter 7 trustee appointed in the Case.

1671877.4  26988

5.      New Value Contribution.

(a)      Five hundred thousand dollars ($500,000) (the "**New Value Contribution**") of the Irani Cash Contribution shall constitute an equity contribution in AVR California.

(b)      If the Case is to be converted, or is converted, to chapter 7 of the Code as a result of an adverse ruling in the CDTFA Appeal (an "**Adverse Determination**"), AVR California shall pay the Iranis $500,000 plus interest from the Effective Date through the date on which the payment is made by AVR California.  The rate of interest shall be equal to the U.S. Prime Rate in effect on the Effective Date, as published in *The Wall Street Journal*.  The payment shall be made promptly after the Adverse Determination is made.

(c)      If the payment is not made by AVR California prior to the effective date of the order converting the Case (the "**Conversion Date**"), the Iranis shall have an allowed super-priority administrative expense claim against AVR California's estate senior in priority to all administrative expense claims entitled to distributions pursuant to section 726(a)(1) or any other section of the Code.  The amount of the Iranis' allowed super-priority administrative expense claim shall be equal to $500,000, less any payments made by AVR California on account of such claim prior to the Conversion Date, plus interest from the Effective Date through the Conversion Date.[1]  The chapter 7 trustee shall pay such amount as promptly as possible after his or her appointment.

(d)      To secure the repayment of the New Value Contribution in the event of an Adverse Determination, as of the Effective Date, AVR California unconditionally and irrevocably assigns, pledges and grants to the Iranis a continuing security interest and lien in and to all present and future right, title and interest of AVR California and the estate(s) (including any chapter 7 estate(s)) in the following property, wherever located, whether owned and existing on the Effective Date or thereafter acquired:  (1) accounts, including receivables; (2) deposit accounts; and (3) all proceeds and products of the foregoing.

(e)      AVR California irrevocably authorizes the Iranis at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that describes the collateral consistent with this Agreement.

(f)      For the avoidance of doubt:  References to "AVR California" in this Paragraph 5 include the reorganized AVR California after the Effective Date.

---

[1] For example, if (1) the Effective Date is July 1, 2022, (2) after an Adverse Determination AVR California pays the Iranis $400,000 on July 1, 2023, (3) the Conversion Date is August 1, 2023, and (4) the Prime Rate on the Effective Date is 3.25% per annum, the Iranis will have an Allowed super-priority Administrative Expense Claim in the amount of approximately $116,570.88.  This is $500,000, plus $16,250 of interest accrued through July 1, 2023, minus $400,000 ($16,250 is applied to the accrued interest, leaving a principal balance of $116,250), plus $320.88 of interest accrued through August 1, 2023.

1671877.4  26988

6.      Notices.   Any notices, demands or communications made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered in person or electronic mail as follows:

(a)      To AVR:          Airport Van Rental, Inc.
                                    ATTN:  Aria Irani
                                    *aria@airportvanrental.com*

        with a copy to          John N. Tedford, IV
                                    Danning, Gill, Israel & Krasnoff, LLP
                                    *jtedford@DanningGill.com*

        with a copy to          Kevin Tierney
                                    *kevie48@gmail.com*

(b)      To the Iranis:          Yazdan and Kimberly Irani
                                    *yaz@airportvanrental.com*

        with a copy to          Gary B. Rudolph
                                    Sullivan Hill
                                    600 B Street, 17th Floor
                                    San Diego, CA  92101
                                    *rudolph@sullivanhill.com*

7.      Successors and Assigns.   This Agreement is binding upon and shall inure to the benefit of the Parties hereto, and their respective attorneys, agents, heirs, administrators, predecessors, successors and assigns, and any subsequently appointed trustee under chapter 11 or chapter 7 of the Code.

8.      Severability.   If any portion of this Agreement is found to be void, voidable or unenforceable at law, the remaining terms and conditions of this Agreement may be enforced.

9.      Governing Law and Jurisdiction.   This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California.  Prior to entry of a final decree in the Case, the Court shall retain exclusive jurisdiction to resolve any and all disputes pertaining to this Agreement, including without limitation the enforcement and interpretation of any of its terms, and the Parties agree to submit to the jurisdiction of the Court for the purpose of resolving such disputes.  After entry of a final decree in the Case, resolution of any dispute in connection with, or action to interpret or enforce, this Agreement, shall take place exclusively in the County of Los Angeles, State of California, before a court of competent jurisdiction.

10.      Further Assurances.  Each Party shall execute all instruments and documents and take all actions as may be reasonably required to effectuate the purpose of this Agreement.

1671877.4  26988

11.     Modification. This Agreement may be modified only by a writing executed by the Party to this Agreement against whom enforcement of such modification is sought.

12.     Attorneys' Fees and Expenses. Each Party shall bear his, her or its own attorneys' fees, court costs and related expenses incurred by or on behalf of said Party in connection with the preparation of this Agreement and seeking requisite approvals thereof.

13.     Interpretation. This Agreement has been negotiated at arms' length, and between persons sophisticated and knowledgeable in matters dealt with in this Agreement. Accordingly, any rule of law, statute, legal decision or common law principle that would require interpretation of any ambiguities in this Agreement against the Party that has drafted it is not applicable, and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purpose and intent of this Agreement.

14.     Authority to Sign. The person signing below on behalf of each Party, and each Party, represents that the signing person has the authority to execute this Agreement on behalf of said Party, and that it is not necessary for any other Party to inquire further into the validity of execution or authority to execute.

15.     Counterparts. This Agreement may be executed in two or more counterparts, *each of which shall be deemed an original, but all of which together shall constitute one and the same document.* Counterparts may be delivered via facsimile, electronic mail (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, California's Uniform Electronic Transaction Act (Cal. Civ. Code § 1633.1 et seq.) or other applicable law) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

AIRPORT VAN RENTAL, INC., a California corporation

By:     Aria Irani
Its:     Chief Executive Officer
        (as of the Effective Date of the Plan)

_____
Yazdan Irani, an individual

_____
Kimberly Irani, an individual

1671877.4  26988

EXHIBIT 2

## LEASE AGREEMENT

This Lease Agreement is made between AVR DENVER LLC, A COLORADO LIMITED LIABILITY COMPANY as the "Landlord," and AIRPORT VAN RENTAL, INC, A CALIFORNIA CORPORATION, as the "Tenant," together referred to as the "Parties."

### Leased Premises

The Parties agree that the Tenant shall lease from the Landlord the Landlord's interest in the property located at 17901 E. 81st Avenue, Commerce City, Colorado (the "Premises").

### Term

Tenant agrees to rent the leased premises on a month-to-month basis. The tenancy shall continue for each month until terminated by either party. Termination shall be effective upon a thirty day advance written notice delivered by the terminating party to the other party to this agreement.

### Rent

Tenant shall pay to Sublandlord Landlord base rent and additional rent as follows:

1. Initial Base Rent in the amount of $7,154.16 per month, subject to 3% increases on each twelve month anniversary thereafter.

2. Additional Rent as billed or directed by the Landlord to be paid by the Tenant. Additional Rent shall include all operating expenses incurred or about to be incurred by the Landlord, including but not limited to:  Real estate and property taxes, insurance, maintenance and repair of the building, parking, landscaping, lighting, cleaning and snow removal, water, and utilities.

3.  Base Rent and Additional Rent shall due and payable on the 1st day of each month during the term   of this agreement.

### Use

Tenant shall use and occupy the Premises only for the agreed use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Tenant shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste, or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.

## Tenant's Obligations

Tenant shall, at Tenant's sole expense, keep the Premises, utility Installations (intended for Tenant's exclusive use, no matter where located), and alterations in good order, condition, and repair including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors (including floor coverings), windows, doors, plate glass, and skylights.  Tenant in keeping the Premises in good order, condition, and repair, shall exercise and perform good maintenance practices necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition, and state of repair.

## Indemnity

Except for Landlord's gross negligence or willful misconduct, Tenant shall indemnify, protect, defend, and hold harmless the Premises, Landlord and its agents, partners, and lenders, from and against all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Tenant. If any action or proceeding is brought against Landlord by reason of any of the foregoing matters, Tenant shall upon notice defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord and Landlord shall cooperate with Tenant in such defense. Landlord need not have first paid any such claim to be defended or indemnified.

## Governing Law, Attorneys Fees, Jury Trial Waiver

This Lease shall be governed by and construed pursuant to the laws of the State of Colorado. Any action or proceeding arising from or related to this Lease shall be brought only in the district court in the County of Adams, State of Colorado, and the parties each consent to the jurisdiction of such court. In the event of any litigation or proceeding (including arbitration) between the parties relating to this Lease, or the Premises, the prevailing party shall be awarded, as part of the judgment or settlement, all reasonable attorneys' fees, costs, and expenses incurred in connection with such litigation or proceeding, except as may be limited by applicable law. The parties each hereby waive all rights to a trial by jury in any claim, action, proceeding, or counterclaim arising out of or in any way connected with this Lease or the Premises.

## Successors

All the covenants, agreements, terms, conditions, provisions and undertakings in this Lease shall inure to the benefit of, and shall extend to and be binding upon, the parties hereto and their respective heirs, executors, legal representatives, successors and assigns, subject to the restrictions contained in this Lease with respect to assignment and subletting.

**Severability**

If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement effective as of this _____ Day of _____, 20_____.

LANDLORD:  AVR DENVER LLC, A COLORADO LIMITED LIABILITY COMPANY

By: _____

Title: _____

Date: _____

TENANT:  AIRPORT VAN RENTAL, INC, A CALIFORNIA CORPORATION

By: _____

Title: _____

Date: _____

EXHIBIT 3

**LEASE AGREEMENT**

This Lease Agreement is made between PJD&D HOLDINGS, LLC A NEVADA LIMITED LIABILITY COMPANY as the "Landlord," and AIRPORT VAN RENTAL, INC, A CALIFORNIA CORPORATION, as the "Tenant," together referred to as the "Parties."

**Leased Premises**

The Parties agree that the Tenant shall lease from the Landlord the Landlord's interest in the property located at 7040 Gillespie St., Las Vegas, Nevada 89119 (the "Premises").

**Term**

Tenant agrees to rent the leased premises on a month-to-month basis. The tenancy shall continue for each month until terminated by either party. Termination shall be effective upon a thirty day advance written notice delivered by the terminating party to the other party to this agreement.

**Rent**

Tenant shall pay to Landlord base rent and additional rent as follows:

1. Initial Base Rent in the amount of $3,440.41 per month, subject to 3% increases on each twelve-month anniversary thereafter.

2. Additional Rent as billed or directed by the Landlord to be paid by the Tenant. Additional Rent shall include all operating expenses incurred or about to be incurred by the Landlord, including but not limited to: Real estate and property taxes, insurance, maintenance and repair of the building, parking, landscaping, lighting, cleaning and snow removal, water, and utilities.

3. Base Rent and Additional Rent shall due and payable on the 1st day of each month during the term  of this agreement.

**Use**

Tenant shall use and occupy the Premises only for the agreed use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Tenant shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste, or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.

**Tenant's Obligations**

Tenant shall, at Tenant's sole expense, keep the Premises, utility Installations (intended for Tenant's exclusive use, no matter where located), and alterations in good order, condition, and repair including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors (including floor coverings), windows, doors, plate glass, and skylights.  Tenant in keeping the Premises in good order, condition, and repair, shall exercise and perform good maintenance practices necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition, and state of repair.

**Indemnity**

Except for Landlord's gross negligence or willful misconduct, Tenant shall indemnify, protect, defend, and hold harmless the Premises, Landlord and its agents, partners, and lenders, from and against all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Tenant. If any action or proceeding is brought against Landlord by reason of any of the foregoing matters, Tenant shall upon notice defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord and Landlord shall cooperate with Tenant in such defense. Landlord need not have first paid any such claim to be defended or indemnified.

**Governing Law, Attorneys Fees, Jury Trial Waiver**

This Lease shall be governed by and construed pursuant to the laws of the State of Nevada. Any action or proceeding arising from or related to this Lease shall be brought only in the district court in the County of Clark, State of Nevada, and the parties each consent to the jurisdiction of such court. In the event of any litigation or proceeding (including arbitration) between the parties relating to this Lease, or the Premises, the prevailing party shall be awarded, as part of the judgment or settlement, all reasonable attorneys' fees, costs, and expenses incurred in connection with such litigation or proceeding, except as may be limited by applicable law. The parties each hereby waive all rights to a trial by jury in any claim, action, proceeding, or counterclaim arising out of or in any way connected with this Lease or the Premises.

**Successors**

All the covenants, agreements, terms, conditions, provisions and undertakings in this Lease shall inure to the benefit of, and shall extend to and be binding upon, the parties hereto and their respective heirs, executors, legal representatives, successors and assigns, subject to the restrictions contained in this Lease with respect to assignment and subletting.

**Severability**

If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement effective as of this _____Day of _____, 20_____.

LANDLORD: PJD&D HOLDINGS, LLC, A NEVADA LIMITED LIABILITY COMPANY

By: _____

Title: _____

Date: _____

TENANT:  AIRPORT VAN RENTAL, INC, A CALIFORNIA CORPORATION

By: _____

Title: _____

Date: _____

EXHIBIT 4

**LEASE AGREEMENT**

This Lease Agreement is made between QUEST AUTO BODY CARE, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY as the "Landlord," and AIRPORT VAN RENTAL, INC, A CALIFORNIA CORPORATION, as the "Tenant," together referred to as the "Parties."

**Leased Premises**

The Parties agree that the Tenant shall lease from the Landlord 33%, or approximately 4,000 square feet, the Landlord's interest in the property located at 12911 Cerise Ave., Hawthorne, California 90250, which approximates a total of 12,654 square feet of office and industrial warehouse space (the "Premises").

**Term**

Tenant agrees to rent the leased premises on a month-to-month basis. The tenancy shall continue for each month until terminated by either party. Termination shall be effective upon a thirty day advance written notice delivered by the terminating party to the other party to this agreement.

**Rent**

Tenant shall pay the Landlord base rent and additional rent as follows:

1.  Initial Base Rent in the amount of $3,500.00 per month, subject to 3% increases on each twelve month anniversary thereafter.

2.  Additional Rent as billed or directed by the Landlord to be paid by the Tenant. Additional Rent shall include all operating expenses incurred or about to be incurred by the Landlord, including but not limited to:  Real estate and property taxes, insurance, maintenance and repair of the building, parking, landscaping, lighting, cleaning and snow removal, water, and utilities. Tenant agrees to pay its proportionate share of Additional Rent based on the ratio of the square footage of the Premises to the total square footage of the rentable space in the entire property.

3.   Base Rent and Additional Rent shall due and payable on the 1st day of each month during the term   of this agreement.

**Use**

Tenant shall use and occupy the Premises only for the agreed use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Tenant shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste, or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.

**Tenant's Obligations**

Tenant shall, at Tenant's sole expense, keep the Premises, utility Installations (intended for Tenant's exclusive use, no matter where located), and alterations in good order, condition, and repair including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors (including floor coverings), windows, doors, plate glass, and skylights.  Tenant in keeping the Premises in good order, condition, and repair, shall exercise and perform good maintenance practices necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition, and state of repair.

**Indemnity**

Except for Landlord's gross negligence or willful misconduct, Tenant shall indemnify, protect, defend, and hold harmless the Premises, Landlord and its agents, partners, and lenders, from and against all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Tenant. If any action or proceeding is brought against Landlord by reason of any of the foregoing matters, Tenant shall upon notice defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord and Landlord shall cooperate with Tenant in such defense. Landlord need not have first paid any such claim to be defended or indemnified.

**Governing Law, Attorneys Fees, Jury Trial Waiver**

This Lease shall be governed by and construed pursuant to the laws of the State of California. Any action or proceeding arising from or related to this Lease shall be brought only in the district court in the County of Los Angeles, State of California, and the parties each consent to the jurisdiction of such court. In the event of any litigation or proceeding (including arbitration) between the parties relating to this Lease, or the Premises, the prevailing party shall be awarded, as part of the judgment or settlement, all reasonable attorneys' fees, costs, and expenses incurred in connection with such litigation or proceeding, except as may be limited by applicable law. The parties each hereby waive all rights to a trial by jury in any claim, action, proceeding, or counterclaim arising out of or in any way connected with this Lease or the Premises.

**Successors**

All the covenants, agreements, terms, conditions, provisions and undertakings in this Lease shall inure to the benefit of, and shall extend to and be binding upon, the parties hereto and their respective heirs, executors, legal representatives, successors and assigns, subject to the restrictions contained in this Lease with respect to assignment and subletting.

**Severability**

If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement effective as of this _____ Day of _____, 20_____.

LANDLORD:  QUEST AUTO BODY CARE, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

By: _____

Title: _____

Date: _____

TENANT:  AIRPORT VAN RENTAL, INC, A CALIFORNIA CORPORATION

By: _____

Title: _____

Date: _____

EXHIBIT 5

**<u>BINDING TERM SHEET AGREEMENT AMONG:</u>**

AIRPORT VAN RENTAL, INC., and AVR VANPOOL, INC. (collectively the "Debtors")
and
OFFICIAL COMMITTEE OF UNSECURED CREDITORS (the "Committee")
and
CALIFORNIA DEPARTMENT OF TAX AND FEE ADMINISTRATION ("CDTFA")
and
YAZDAN IRANI, KIMBERLY IRANI, ARIA IRANI and CESAR LEYVA

**<u>General Terms</u>**

1.     **Definitions**.  The following terms have the following definitions in this Agreement:

a.     "Agreement" means this Binding Term Sheet Agreement.

b.     "CDTFA Appeal" means that certain appellate proceeding captioned as *California Department of Tax and Fee Administration v. Airport Van Rental, Inc.* (*In re Airport Van Rental, Inc.*), case no. 2:22-cv-01708-SSS, pending in the United States District Court for the Central District of California.

c.     "CDTFA Claim" means the Claim asserted by CDTFA for sales taxes incurred during the 2011 through 2020 tax years, for environmental fees incurred during the 2017 and 2020 tax years, and interest on such taxes and fees.

d.     "CDTFA Disputed Priority Tax Claim" means the CDTFA Claim to the extent it is for sales taxes owed to CDTFA for the 2011 through 2017 tax years, and interest thereon.

e.     "CDTFA Undisputed Priority Tax Claim" means the CDTFA Claim to the extent it is for sales taxes owed to CDTFA for the 2018 through 2020 tax years, for environmental fees incurred during the 2017 and 2020 tax years, and interest on such taxes and fees.

f.     "Class 15 Claim" means a general unsecured claim assigned to Class 15 of the Plan.

g.     "Parties" means, collectively, the Debtors, the Committee, CDTFA, Yazdan Irani, Kimberly Irani, Aria Irani, and Cesar Leyva.

h.     "Plan" means the Debtors' First Modified First Amended Chapter 11 Plan of Reorganization Dated May 24, 2022, as it may be amended or modified, from time to time, together with all addenda, exhibits, schedules, supplements or other attachments, if any, provided that any such amendments or modifications are consistent with the terms and purposes of this Agreement.

i.      "Plan Disbursing Agent" means the person selected by the Parties to administer the Settlement Fund and make distributions therefrom to holders of allowed unsecured priority tax claims and allowed Class 15 Claims.

j.      "Tierney Claims" means any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities the Debtors' estates have or may have against Kevin Tierney, including any and all claims for disgorgement of fees and expenses paid by the Debtors to Mr. Tierney on an interim basis during the Debtors' case.

2.      **Binding.**  This Agreement is binding on the Parties.  The Parties intend to submit this Agreement for approval of the Bankruptcy Court in connection with confirmation of the Plan.

3.      **Bankruptcy Court Approval.**  The Agreement is subject to Bankruptcy Court approval in connection with confirmation of the Plan.  If an oral ruling by the Court is not obtained on or before September 15, 2022 (subject to extension by mutual agreement of the Parties), the Agreement shall terminate and the Parties shall be returned to their respective positions.  The Debtors shall seek an order authorizing them to modify their current First Amended Chapter 11 Plan of Reorganization Dated May 24, 2022, to be consistent with the terms of this Agreement.

4.      **Mediation Settlement.**  This Agreement memorializes the global settlement terms agreed to by the Parties through mediation before the Honorable Randall Newsome, Retired Bankruptcy Judge, who served as the Mediator for the Parties on July 20, 2022.  The Parties agree that, unless and until this Agreement is approved by the Court, Judge Newsome shall be the arbitrator of any disputes regarding the terms hereof.  Once approved, the Bankruptcy Court shall have exclusive jurisdiction over the enforcement of the Agreement.

5.      **Cooperation.**  The Parties shall work cooperatively to effectuate the intent of this Agreement which may involve extensions of time or deadlines, modifications or amendments to the Debtors' current proposed plan, and/or other logistical or procedural stipulations and agreements.  The intent is that this Agreement will result in the Committee and CDTFA supporting the Plan and there will be no litigation between the Parties in connection with the confirmation of the Plan or any other remaining disputes between these Parties.

## Specific Terms

6.      **Post-Confirmation Settlement Fund.**

a.      A post-confirmation settlement fund (the "Settlement Fund") shall be created to be the conduit for receipt of proceeds and distribution to Holders of Allowed Unsecured Priority Tax Claims and Holders of Allowed General Unsecured Claims.

b.      Howard Grobstein shall be the Plan Disbursing Agent and shall handle all payments in connection with the Settlement Fund (but no other Plan payments).  If Mr. Grobstein is or becomes unavailable, the Parties shall agree to an alternative mutually agreeable Plan Disbursing Agent within 10 business days.  If the Parties are unable to agree by the tenth business day (the "Date of Impasse"), each Party shall submit a list of three proposed disinterested

1689514.4  26988
4679382.1

2

disbursing agents, along with the qualifications of each, to the Bankruptcy Court within 10 business days from the Date of Impasse.  The Bankruptcy Court shall then have exclusive jurisdiction to select the Plan Disbursing Agent.

c.      Commencing on the Effective Date of the Plan, the Plan Disbursing Agent shall receive annual compensation from the Reorganized Debtors of only $15,000 to serve as disbursing agent.  Any additional expenses, fees, costs, or other expenses of administration of the Settlement Fund, including the Plan Disbursing Agent's or the Plan Disbursing Agent's professionals' fees and expenses, shall be paid exclusively from the Settlement Fund.

d.      The Plan Disbursing Agent shall have the authority to enforce all post-confirmation obligations under this Agreement, including, but not limited to, filing anything the Plan Disbursing Agent deems reasonably necessary in the Bankruptcy Court.

e.      The beneficiaries of the Settlement Fund shall be (1) Holders of Allowed Unsecured Priority Tax Claims and (2) Holders of Allowed Class 15 Claims (collectively the "Beneficiaries").  For the avoidance of doubt, the Revenue-Sharing Payments shall not be used to pay any secured tax claims, but shall be used to pay unsecured priority tax claims (held by CDTFA or other taxing authorities).

f.      Except as otherwise provided in this Agreement, all distributions by the Reorganized Debtor on account of the Beneficiaries' Allowed Claims shall be made to the Settlement Fund.  The failure of the Plan Disbursing Agent to make distributions to the Beneficiaries shall not constitute a default by the Reorganized Debtor under the Plan, unless such default is the result of a payment default or other interference by the Reorganized Debtor.

7.    **Initial Funding of the Settlement Fund.**

a.      Prior to, and as a non-waivable condition of, the Effective Date of the Plan, the Debtors shall deposit $850,000 into the Segregated Account (as that term is used in the Plan).

b.      On the Effective Date, the Debtors or the Reorganized Debtors shall transfer $850,000 from the Segregated Account into an account established by the Plan Disbursing Agent for purposes of holding and distributing the Settlement Fund.

c.      The Reorganized Debtor shall pay $500,000 to the Settlement Fund by February 1, 2023.  The payment of such $500,000 shall be subject to a confession of judgment in such amount in a form mutually acceptable to the Parties, which shall be Exhibit A hereto.  The Reorganized Debtor shall execute the confession of judgment on the Effective Date and shall transmit the original executed document to the Committee's counsel so that it is received no later than five business days after the Effective Date.  No enforcement of such confession of judgment may occur unless and until February 2, 2023, and only if the Reorganized Debtor defaults on such obligation.

8.    **Revenue-Sharing Payments.**

a.      The Reorganized Debtor shall make revenue-sharing payments to the Settlement Fund for the benefit of the Beneficiaries (the "Revenue-Sharing Payments") in

1689514.4  26988
4679382.1

3

accordance with the schedule set forth in Exhibit B hereto.  Each semi-annual or quarterly period identified in Exhibit B is a "Payment Period."

b.  The Reorganized Debtor shall pay to the Settlement Fund the following percentages of the Debtors' and the Reorganized Debtor's gross revenues: for revenues received during the first, second and third years after the Effective Date, 1.25%; for revenues received during the fourth year after the Effective Date, 1.55%; and for revenues received during the fifth year after the Effective Date, 1.65%.

c.  On or before the last business day of the month following the end of each Payment Period, the Reorganized Debtor shall provide the Plan Disbursing Agent: (1) a detailed financial statement sufficient for the Plan Disbursing Agent to independently verify the gross revenue for the Payment Period; and (2) the Revenue-Sharing Payment.

d.  The aggregate amount of Revenue-Sharing Payments made to the Settlement Fund shall not be less than $1.8 million.  If $1.8 million has not been paid to the Settlement Fund by the last business day of the month following the fifth anniversary of the Effective Date, the Reorganized Debtor shall continue to make quarterly payments to the Settlement Fund, equal to 1.65% of gross revenues, until the aggregate amount paid to the Settlement Fund is $1.8 million.

9.  **Sale or Payout.**

a.  If the ownership of the Reorganized Debtor, or substantially all of Reorganized Debtor's assets, is sold within eight (8) years after the Effective Date of the Plan, and if at the time of such sale the Reorganized Debtor has fulfilled its obligations to pay the Revenue-Sharing Payments to the Settlement Fund pursuant to paragraph 8 of this Agreement, then at the time of closing of such sale:

(1)  the Settlement Fund shall receive the greater of (a) 6.5% of the net sales proceeds and (b) $700,000; and

(2)  CDTFA shall receive the balance of the $1.9 million required to be paid pursuant to paragraph 10(c)(2) of this Agreement, with credit given for (a) any installment payments made prior to closing of the sale, and (b) the amount to be paid to CDTFA by the Plan Disbursing Agent from the funds received under paragraph 9(a)(1) of this Agreement.

b.  If the ownership of the Reorganized Debtor, or substantially all of Reorganized Debtor's assets, is sold within eight (8) years after the Effective Date of the Plan, and if at the time of such sale the Reorganized Debtor has not fulfilled its obligations to pay the Revenue-Sharing Payments to the Settlement Fund pursuant to paragraph 8 of this Agreement, then at the time of closing of such sale:

(1)  the Reorganized Debtor shall make a lump sum payment to the Settlement Fund so that the aggregate amount of Revenue-Sharing Payments made to the Settlement Fund is equal to $1.8 million (in this event, the Reorganized Debtor's obligations under paragraph 8 of this Agreement shall be deemed satisfied);

(2)      in addition to the payment requirement by paragraph 9(b)(1), the Settlement Fund shall receive the greater of (a) 6.5% of the net sales proceeds and (b) $700,000; and

(3)      CDTFA shall receive the balance of the $1.9 million required to be paid pursuant to paragraph 10(c)(2) of this Agreement, with credit given for (a) any installment payments made prior to closing of the sale, and (b) the amount to be paid to CDTFA by the Plan Disbursing Agent from the funds received under paragraph 9(b)(2) of this Agreement.

c.      If the ownership of the Reorganized Debtor, or substantially all of Reorganized Debtor's assets, is sold within eight (8) years after the Effective Date of the Plan, the Reorganized Debtor shall pay $700,000 to the Settlement Fund within ten (10) business days after the end of the eighth (8th) year.

10.      **CDTFA-Specific Provisions.**

a.      The CDTFA Undisputed Priority Tax Claim shall be allowed in the amount of $495,301.11 and shall be paid by the Plan Disbursing Agent in accordance with the Plan.

b.      The CDTFA Disputed Priority Tax Claim shall be allowed as an Unsecured Priority Tax Claim in the amount of $4,789,477.03.  On behalf of themselves and the estate, the Debtors waive any and all rights to object to the allowance, priority or amount of the CDTFA Disputed Priority Tax Claim, including (i) the right to commence an action or other proceeding under section 505 of the Bankruptcy Code with respect thereto, and (ii) the right to seek a refund of any alleged overpayment of taxes incurred during the tax periods covered by the CDTFA Disputed Priority Tax Claim.

c.      Notwithstanding section 1129(a)(9) of the Bankruptcy Code, the CDTFA Disputed Priority Tax Claim shall be paid as follows:

(1)      From the Settlement Fund, the Plan Disbursing Agent shall make distributions on account of the CDTFA Disputed Priority Tax Claim as if such claim were allowed as a general unsecured claim instead of a Priority Tax Claim.  Accordingly, CDTFA shall receive a pro rata share of all distributions made by the Plan Disbursing Agent to holders of Allowed Class 15 Claims, as if the CDTFA Disputed Priority Tax Claim is an Allowed Class 15 Claim.

(2)      From January 2027 through December 2032, the Reorganized Debtor shall pay CDTFA an additional $1.9 million in equal quarterly installments.  The $1.9 million shall be reduced by the amount paid to CDTFA by the Plan Disbursing Agent from the sale or payout amount set forth in paragraph 9 of this Agreement.  After such reduction, the amount of the remaining quarterly payments shall be recalculated so the balance due shall be paid in equal installments.

d.      If the Reorganized Debtor defaults on any of its obligations to make required payments to CDTFA under paragraph 10(c)(2) of this Agreement, and without need for any order of the Court, CDTFA shall have the right to proceed to collect directly from the Reorganized Debtor the entire balance of the amount due and owing under paragraph 10(c)(2) of this Agreement through the administrative or judicial collection procedures available under

1689514.4  26988                        5
4679382.1

applicable nonbankruptcy law.  Nothing in this paragraph is intended to or shall be deemed to constitute a waiver of CDTFA's rights under bankruptcy law.

e.      Within 5 business days after the Effective Date of the Plan, CDTFA shall dismiss the CDTFA Appeal with prejudice.  In the interim, the Debtors and CDTFA shall request that the relevant appellate court(s) hold the appellate proceedings in abeyance.

f.      Notwithstanding anything to the contrary in Section XI.B. of the Plan, the CDTFA Claim shall be discharged only upon completion of all payments to be made to CDTFA by the Plan Disbursing Agent and the Reorganized Debtor pursuant to this Agreement and the Plan.  Until the CDTFA Claim is discharged, CDTFA reserves any and all non-bankruptcy rights with respect to the unpaid portion of the CDTFA Claim, including any and all rights to assess "responsible person" liability against appropriate persons (including Parties to this Agreement) if the Reorganized Debtor defaults on its obligations to make required payments to the Settlement Fund or to CDTFA in accordance with this Agreement and the Plan.  Upon completion of all payments to be made to CDTFA by the Plan Disbursing Agent and the Reorganized Debtor, the balance of the CDTFA Claim (including all accrued interest and penalties) shall be discharged.

g.      As to claims that CDTFA has or may have for taxes (and related interest and penalties) incurred by the Debtors after December 11, 2020 (the "Petition Date"), any and all waivers and releases in this Agreement and the Plan apply only to claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses, damages, injuries, actions, causes of action and defenses that existed as of the Petition Date.  Nothing in this Agreement or the Plan is intended to constitute a waiver or release by the Debtors, CDTFA or any other Party with respect to taxes incurred after the Petition Date.

11.    **Other Allowed Claims**.  Except for claims addressed herein, all other claims shall be paid and treated as set forth in the Plan.

12.    **Insider Claims**.  Yazdan Irani, Kimberly Irani, Aria Irani and Cesar Leyva waive and release any and all proofs of claim held by them (individually or collectively) and/or any and all entitlement to any claims in the estate held by them (individually or collectively).  For the avoidance of doubt, no distribution shall be made from the Settlement Fund to pay any claim previously held by Yazdan Irani, Kimberly Irani, Aria Irani or Cesar Leyva (whether individually or collectively).

13.    **The Tierney Claims.**  Notwithstanding any releases or exculpations in this Agreement or in the Plan, the Tierney Claims are expressly preserved for the benefit of the Debtors' estates and shall not be released, waived or otherwise forfeited.  In accordance with this provision, the Plan has been modified to exclude Kevin Tierney from any and all releases, exculpations, and/or waivers of any kind whatsoever.  The Debtors hereby represent that Mr. Tierney's employment for the Debtors ceased effective July 21, 2022.  The Committee intends to pursue claims for disgorgement against Mr. Tierney, and may pursue additional claims against him.  The Committee shall seek no more than $35,000 in professional fees from the Debtors or the Reorganized Debtors as compensation for services related to the Tierney Claims.  Any funds recovered by the Committee from Mr. Tierney or as a result of the Tierney Claims shall be payable directly to the Settlement Fund and be distributed by the Plan Disbursing Agent to the Beneficiaries

1689514.4  26988
4679382.1

6

in addition to the payment(s) set forth above.  The Debtors shall not be involved in such matters, except as requested or required by the Court or applicable law, such as responding to discovery or subpoenas.  For the avoidance of doubt, neither the Debtors nor the Reorganized Debtor shall take any action to oppose the Tierney Claims.

14.      **Cure Periods and Notice.**  Except for the payments required by paragraph 7(b) and (c) of this Agreement, any default hereunder shall be entitled to a 30-day cure period, running from the date of notice.  Notice of default to the Debtors shall be given in writing via email to zs@danninggill.com, jtedford@danninggill.com, and aria@airportvanrental.com.  If to the Plan Disbursing Agent, notice of default shall be to hgrobstein@gtllp.com or, if Howard Grobstein is not the Plan Disbursing Agent, to the Plan Disbursing Agent selected through the procedure proscribed in paragraph 6(b) of this Agreement.  If to the CDTFA, notice of default shall be to Donny.Le@doj.ca.gov.

## Miscellaneous Terms

15.      **Interpretation.**  If there is a dispute over the meaning of any provision, this Agreement shall not be interpreted against any Party, regardless of which Party prepared the initial draft hereof.

16.      **Jurisdiction; Applicable Law.**  The Bankruptcy Court presiding over the Bankruptcy Case shall have and retain sole and exclusive jurisdiction to interpret and enforce the terms of this Agreement, without a jury, and the Parties hereby consent and submit to such exclusive jurisdiction and to entry of a final Order or final Judgment by the Bankruptcy Court. This Agreement shall be interpreted and enforced pursuant to the laws of the United States of America, and where state law is required to be applied, California law shall apply.  For the avoidance of doubt, the confession of judgment referenced in paragraph 7(c) of this Agreement, and attached hereto as Exhibit A, shall be interpreted and enforced pursuant to the law of California.

17.      **Entire Agreement.**  The Plan and this Agreement together constitute the entire agreement between and among the Parties concerning the subject matter hereof.  In the event of any inconsistency between the Plan and this Agreement, the terms of this Agreement shall control in all respects.

18.      **Amendments; Modifications; Waiver.**  This Agreement may not be modified, superseded, terminated, or amended and no provision hereto may be waived except by: (A) a writing, making specific reference hereto, signed by the Parties and approved by the Bankruptcy Court; or (B) an Order of the Bankruptcy Court which has become final.

19.      **Further Necessary Actions.**  To the extent that any document is reasonably required to be executed or other action is reasonably required by either or both of the Parties to effectuate the purposes of this Agreement, each Party shall execute and deliver such document or take such other action as reasonably requested by another one of the Parties.

1689514.4  26988                                              7
4679382.1

## SIGNATURE PAGE 1 OF 2

20.  **Counterparts.** This Agreement (and any amendments, modifications or waivers in respect hereof) may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument. Signatures reproduced by electronic means on a counterpart shall have the same force and effect as original signatures on a counterpart. (Repeated and restated on Signature Page 2).

DATED: July 29, 2022

AIRPORT VAN RENTAL, INC., a California corporation

By:     Yazdan Irani, its Chief Executive Officer

By:     Aria Irani, its Chief of Staff, and Chief Executive Officer of the Reorganized Debtor

DATED: July 29, 2022

AVR VANPOOL, INC., a California corporation

By:     Yazdan Irani, its Chief Executive Officer

By:     Aria Irani, its Chief of Staff, and Chief Executive Officer of the Reorganized Debtor

DATED: July __, 2022

OFFICIAL COMMITTEE OF UNSECURED CREDITORS appointed in *In re Airport Van Rental, Inc.,* and *In re AVR Vanpool, Inc.*

By:     Susan Gardner, Director of A/R and Credit - Service Fleet for The Pep Boys - Manny, Mo & Jack, its Chair

## SIGNATURE PAGE 1 OF 2

20.    **Counterparts.** This Agreement (and any amendments, modifications or waivers in respect hereof) may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.  Signatures reproduced by electronic means on a counterpart shall have the same force and effect as original signatures on a counterpart.  (Repeated and restated on Signature Page 2).

DATED:  July __, 2022                    AIRPORT VAN RENTAL, INC., a California corporation


_____
By:    Yazdan Irani, its Chief Executive Officer


_____
By:    Aria Irani, its Chief of Staff, and Chief Executive Officer of the Reorganized Debtor


DATED:  July __, 2022                    AVR VANPOOL, INC., a California corporation


_____
By:    Yazdan Irani, its Chief Executive Officer


_____
By:    Aria Irani, its Chief of Staff, and Chief Executive Officer of the Reorganized Debtor


DATED:  July __, 2022                    OFFICIAL    COMMITTEE    OF    UNSECURED CREDITORS appointed in *In re Airport Van Rental, Inc.*, and *In re AVR Vanpool, Inc.*


*Susan Gardner*
_____
By:    Susan Gardner, Director of A/R and Credit - Service Fleet for The Pep Boys - Manny, Mo & Jack, its Chair

1689514.4  26988
4679382.1

## SIGNATURE PAGE 2 of 2

20.   **Counterparts.** This Agreement (and any amendments, modifications or waivers in respect hereof) may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument. Signatures reproduced by electronic means on a counterpart shall have the same force and effect as original signatures on a counterpart. (Repeated and restated from Signature Page 1).

DATED: July __, 2022          CALIFORNIA DEPARTMENT OF TAX AND FEE
                              ADMINISTRATION

                              By:   ROB BONTA
                                    Attorney General of California
                                    TAMAR PACHTER
                                    Senior Assistant Attorney General
                                    BRIAN D. WESLEY
                                    Supervising Deputy Attorney General
                                    DONNY P. LE
                                    Deputy Attorney General

DATED: July 29 2022

                              Yazdan Irani

DATED: July 29, 2022

                              Kimberly Irani

DATED: July __, 2022

                              Aria Irani

DATED: July __, 2022

                              Cesar Leyva

# EXHIBIT A
# (CONFESSION OF JUDGMENT)

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:20-bk-20876-BB |
| AIRPORT VAN RENTAL, INC., et al.,[1] | Chapter 11 (Jointly Administered) |
| Debtors and Debtors in Possession. | **STATEMENT AUTHORIZING CONFESSION OF JUDGMENT; VERIFICATION OF ARIA IRANI** |
| ☒ Affects all Debtors | Hon. Sheri Bluebond |
| ☐ Affects the following Debtor(s): | |

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

We, Yazdan Irani, the owner of both the Debtors and the Reorganized Debtors, and Aria Irani, Chief of Staff of the Debtors and Chief Executive Officer ("CEO") of the Reorganized Debtors, are authorized to execute this Confession of Judgment and act on behalf of the Reorganized Debtors.

The Reorganized Debtors, as defined in the Debtors' Plan of Reorganization ("Plan"),[2] hereby confesses judgment in the above-captioned action in favor of Howard Grobstein (or his

---

[1] Pursuant to an order of the Court, this case is being jointly administered with a case filed by AVR Vanpool, Inc., a California corporation, case no. 2:20-bk-20883-BB. The case also was jointly administered with the following three cases that have been dismissed: Airport Van Rental, Inc., a Georgia corporation, case no. 2:20-bk-20877-BB; Airport Van Rental, Inc., a Nevada corporation, case no. 2:20-bk-20878-BB; and Airport Van Rental, LLP, a Texas limited liability partnership, case no. 2:20-bk-20882-BB.

[2] Pursuant to the Plan: "Reorganized Debtor means AVR California, or any successor thereto by merger, Consolidation, or otherwise, on and after the Effective Date. Reorganized Debtors means, collectively, AVR California and AVR Vanpool, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date; provided, however, that after AVR Vanpool is dissolved this term shall refer only to the Reorganized Debtor (i.e.,AVR California)."

4680162.1

STATEMENT AUTHORIZING CONFESSION OF JUDGMENT

successor) as Plan Disbursing Agent under the Binding Term Sheet Agreement ("Agreement") attached hereto as Exhibit 1 ("Plan Disbursing Agent"), for the benefit of (1) Holders of Allowed Unsecured Priority Tax Claims and (2) Holders of Allowed General Unsecured Claims (collectively the "Beneficiaries"), as follows:

1.      Reorganized Debtors hereby confess judgment herein and authorize the entry of judgment against them and in favor of the Plan Disbursing Agent for the benefit of the Beneficiaries, in the principal sum of $500,000.00.

2.      Reorganized Debtors submit to the personal jurisdiction of the Bankruptcy Court, authorize entry of judgment in this action in the Central District of California, Los Angeles Division, or in any other court of competent jurisdiction, and authorize enforcement of said judgment in all applicable jurisdictions.

3.      This Confession of Judgment shall be governed by the laws of the state of California, without giving effect to conflict of laws principles.

4.      This Confession of Judgment is for a debt justly due to the Beneficiaries arising from the following facts:

a.      On December 11, 2020 (the "Petition Date"), Airport Van Rental ("AVR") and various affiliates, Airport Van Rental, Inc., a Georgia corporation, Airport Van Rental, Inc., a Nevada corporation, Airport Van Rental, LLP, a Texas limited liability partnership, and AVR Vanpool, Inc., a California corporation, filed voluntary Chapter 11 petitions.  Subsequent to the Petition Date, the cases of all of the foregoing entities except AVR and AVR Vanpool, Inc., (collectively "Debtors") were voluntarily dismissed.

b.      On February 2, 2021, the Office of the United States Trustee (the "UST") appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to 11 U.S.C. § 1102.

c.      On July 20, 2022, a mediation was held before the Honorable Randall Newsome, amongst the Debtors, Yazdan Irani, the Committee, and the California Department of

Elkins Kalt Weintraub Reuben Gartside LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

Tax and Fee Administration ("CDFTA") (collectively, the "Parties").

d.      On July ▆, 2022, the Parties entered into the Agreement, by which Debtors agreed that following Plan confirmation, the Reorganized Debtor would pay $500,000.00 to the Plan Disbursing Agent for deposit into a post-confirmation settlement fund (the "Settlement Fund") for the benefit of the Beneficiaries by February 1, 2023.

e.      Pursuant to that Agreement, Debtors agreed that, if the payment of the $500,000.00 was not made by February 1, 2023, this Confession of Judgment may be entered against Reorganized Debtors, without notice, for the sum of five-hundred thousand dollars ($500,000.00).

5.      This Confession of Judgment is not for the purpose of securing the Debtors or Reorganized Debtors against a contingent liability.

6.      At all relevant times, Yazdan Irani owned one-hundred percent (100%) of the equity in the Debtors and Reorganized Debtors, and participated in the July 20, 2022 mediation on behalf of the Debtors and Reorganized Debtors.

7.      Prior to Plan confirmation, Aria Irani was the Chief of Staff of the Debtors and following Plan confirmation, Aria Irani became the Chief Executive Officer for the Reorganized Debtors.  Aria Irani participated in the July 20, 2022 mediation on behalf of the Debtors and Reorganized Debtors.

8.      Debtors and Reorganized Debtors were at all material times, including at the July 20, 2022 mediation, and are now, represented in this matter by Zev Shechtman, of Danning, Gill, Israel & Krasnoff, LLP, a licensed attorney.

9.      On behalf of the Reorganized Debtors, we hereby certify and declare that we have fully read and examined this Confession of Judgment, that we have had the opportunity to discuss this Confession of Judgment with our attorney, and that we have determined, with the benefit of advice from that attorney, to utilize the confession of judgment procedure, and that we voluntarily, knowingly, and intelligently choose and decide to sign this Confession of Judgment on behalf of Reorganized Debtors.

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

4680162.1

3

STATEMENT AUTHORIZING CONFESSION OF JUDGMENT

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____, 2022, at _____, _____.

Yazdan Irani
Print Name of Signatory

Signature
Reorganized Debtors
By:  Yazdan Irani, their owner

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____, 2022, at _____, _____.

Aria Irani
Print Name of Signatory

Signature
Reorganized Debtors
By:  Aria Irani, their CEO

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

4680162.1

4

STATEMENT AUTHORIZING CONFESSION OF JUDGMENT

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **STATEMENT AUTHORIZING CONFESSION OF JUDGMENT; VERIFICATION OF YAZDAN IRANI** and know its contents.

I am the owner of the Debtors and Reorganized Debtors, parties to this action.  The matters stated in the foregoing document are true of my own knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____, 2022, at _____, _____.


Yazdan Irani_____          _____
Print Name of Signatory                                          Signature

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

4680162.1

1

STATEMENT AUTHORIZING CONFESSION OF JUDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                              )
County of Orange                                )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



   Signature    _____



ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

4680162.1                                    2
STATEMENT AUTHORIZING CONFESSION OF JUDGMENT

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I have read the foregoing **STATEMENT AUTHORIZING CONFESSION OF JUDGMENT; VERIFICATION OF ARIA IRANI** and know its contents.

I am the Chief Executive Officer of the Reorganized Debtor, and, before Plan confirmation, was the Chief of Staff of the Debtors, parties to this action. The matters stated in the foregoing document are true of my own knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____, 2022, at _____, _____.


Aria Irani _____          _____
Print Name of Signatory                                                          Signature

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400  •  Facsimile: 310.746.4499

4680162.1

3

STATEMENT AUTHORIZING CONFESSION OF JUDGMENT

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                        )
County of Orange                                          )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Signature    _____

4680162.1                                    1
STATEMENT AUTHORIZING CONFESSION OF JUDGMENT

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
MICHAEL I. GOTTFRIED, State Bar No. 146689
  *mgottfried@elkinskalt.com*
ROYE ZUR, State Bar No. 273875
  *rzur@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California  90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Attorneys for the Official Committee of
Unsecured Creditors

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:20-bk-20876-BB |
| AIRPORT VAN RENTAL, INC., et al.,[1] | Chapter 11 (Jointly Administered) |
| Debtors and Debtors in Possession. | **DECLARATION OF ZEV SHECHTMAN IN SUPPORT OF CONFESSION OF JUDGMENT** |
| ☒ Affects all Debtors | Hon. Sheri Bluebond |
| ☐ Affects the following Debtor(s): | |

[1]  Pursuant to an order of the Court, this case is being jointly administered with a case filed by AVR Vanpool, Inc., a California corporation, case no. 2:20-bk-20883-BB. The case also was jointly administered with the following three cases that have been dismissed: Airport Van Rental, Inc., a Georgia corporation, case no. 2:20-bk-20877-BB; Airport Van Rental, Inc., a Nevada corporation, case no. 2:20-bk-20878-BB; and Airport Van Rental, LLP, a Texas limited liability partnership, case no. 2:20-bk-20882-BB.

DECLARATION OF ZEV SHECHTMAN IN SUPPORT OF CONFESSION OF JUDGMENT

I, Zev Shechtman, declare as follows:

1.      I am an attorney at law duly admitted to practice in this Court.  I have provided advice and counsel to Debtors Airport Van Rental, Inc., and AVR Vanpool, Inc. (collectively, "Debtors" or "AVR") and the Reorganized Debtors in connection with this confession of judgment.  I have personal knowledge of the following facts and if called upon to testify, could testify competently thereto.

2.      I have examined the proposed judgment by confession.  I have advised Debtors and Reorganized Debtors with respect to the waiver of rights and defenses under the confession of judgment procedure, and have advised them to utilize the confession of judgment procedure.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed September _____, 2022, at _____, _____.

___Zev Shechtman_____         _____
Print Name of Signatory                                          Signature

2
DECLARATION OF ZEV SHECHTMAN IN SUPPORT OF CONFESSION OF JUDGMENT

# EXHIBIT B
# (SCHEDULE FOR REVENUE-SHARING PAYMENTS
# TO SETTLEMENT FUND)

(Assumes a Plan Effective Date of September 30, 2022)

| Year | Revenue Period(s) | Percentage | Pmt. Date |
|---|---|---|---|
| 1 | 4Q-22 & 1Q-23 | 1.25% | 4/28/23 |
| 1 | 2Q-23 & 3Q-23 | 1.25% | 10/31/23 |
| 2 | 4Q-23 & 1Q-24 | 1.25% | 4/30/24 |
| 2 | 2Q-24 & 3Q-24 | 1.25% | 10/31/24 |
| 3 | 4Q-24 | 1.25% | 1/31/25 |
| 3 | 1Q-25 | 1.25% | 4/30/25 |
| 3 | 2Q-25 | 1.25% | 7/31/25 |
| 3 | 3Q-25 | 1.25% | 10/31/25 |
| 4 | 4Q-25 | 1.55% | 1/30/26 |
| 4 | 1Q-26 | 1.55% | 4/30/26 |
| 4 | 2Q-26 | 1.55% | 7/31/26 |
| 4 | 3Q-26 | 1.55% | 10/30/26 |
| 5 | 4Q-26 | 1.65% | 1/29/27 |
| 5 | 1Q-27 | 1.65% | 4/30/27 |
| 5 | 2Q-27 | 1.65% | 7/30/27 |
| 5 | 3Q-27 | 1.65% | 10/29/27 |

If less than $1.8 million of Revenue-Sharing Payments are paid into the Settlement Fund for revenues received through the fifth anniversary of the Effective Date, the Reorganized Debtor will continue paying 1.65% of revenues into the Settlement Fund thereafter until the aggregate amount of Revenue-Sharing Payments paid into the Settlement Fund is equal to $1.8 million.

The foregoing payment schedule assumes that the Reorganized Debtor is not sold (or substantially all of the Reorganized Debtor's assets are not sold) before all Revenue-Sharing Payments are made.  If a sale occurs before all Revenue-Sharing Payments are made and if an aggregate of $1.8 million has not been paid to the Settlement Fund, the Reorganized Debtor will make a lump sum payment to the Settlement Fund so that the aggregate amount of Revenue-Sharing Payments made to the Settlement Fund is equal to $1.8 million.